**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

JACK A. HANES                          CAUSE NO:  2:04-cv-0140-RLY-WGH
        Plaintiff

        vs.

JOHN R. GREGG, Interim President of
Vincennes University, in his individual
capacity and in his official capacity;
DALE DOWDEN, University Provost and
Vice President for Academic Affairs, in
his individual capacity;
PHILLIP RATH, Vice President for
Finance and Government Relations, in his
individual capacity;
JIM MESSMER, Vice President for
Statewide Services, in his individual capacity; and
THE BOARD OF TRUSTEES OF VINCENNES
UNIVERSITY in their official capacity
        Defendants


**APPENDIX OF DESIGNATED MATERIALS**
**VOLUME I**
**PAGES 1-100**

                    Respectfully submitted,

                    KELLEY, BELCHER & BROWN


        By:     s/ Thomas J. Belcher
                Thomas J. Belcher, #3773-53
                Attorneys for Defendants
                301 West Seventh Street
                Post Office Box 3250
                Bloomington, Indiana  47402-3250
                Telephone:   812-336-9963
                Fax:              812-336-4588
                E-mail: tbelcher@kelleybelcherbrown.com

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Appendix of Designated Materials -- Volume I was filed electronically on the 16th day of June, 2005.  Notice of this filing was sent to the following by operation of the Court's electronic filing system:

Ida Coleman Lamberti
MAURER RIFKIN & HILL, P.C.
E-mail:  iclamberti@mrhlaw.com

s/ Thomas J. Belcher
Thomas J. Belcher

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JACK A. HANES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 2:04-cv-0140-RLY-WGH |
| | ) |
| JOHN R. GREGG, Interim President | ) |
| of Vincennes University in his Individual | ) |
| capacity, and in his Official capacity; | ) |
| DALE DOWDEN, University Provost and | ) |
| Vice-President for Academic Affairs, in his | ) |
| Individual capacity; PHILLIP RATH, | ) |
| Vice-President For Finance and Government | ) |
| Relations, in his Individual capacity; | ) |
| JIM MESSMER, Vice-President for | ) |
| Statewide Services, in his individual capacity; and | ) |
| THE BOARD OF TRUSTEES OF VINCENNES | ) |
| UNIVERSITY in their Official capacity; | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Jack A. Hanes, by and through his attorney, Ida Coleman Lamberti, of MAURER RIFKIN & HILL, complaining of Defendants Dale Dowden, Phillip Rath, and Jim Messmer, all in their individual capacities, and Interim President John R. Gregg, in his individual and official capacities, and the Trustees of Vincennes University in their official capacity alleges

1.   This action is brought to remedy violations of his civil rights as protected by the First and Fourteenth Amendments to the United States Constitution.

2.   This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(3) and (4). It is

1

being a suit authorized by 42 U.S.C. §1983.  The jurisdiction of this court is invoked to secure protection and redress of deprivation of rights secured by these Acts. This court also has pendant jurisdiction of related state claims as authorized by 28 U.S.C. §1367.

3.     Plaintiff timely filed a Tort Claim Notice to preserve potential state law claims.  A true and accurate copy of said Notice is attached and marked as Exhibit "A".

4.     Venue is proper in the Southern District of Indiana under 28 U.S.C. §1391 which allows for an action to be brought in the district where the defendants reside or in which the cause of action arose. The cause of action arose in the City of Vincennes, Knox County, Indiana, which is in the Southern District of Indiana.

## PARTIES

5.     Plaintiff Jack A. Haines is now, and was at all times relevant, a tenured professor in the Department of Broadcasting at Vincennes University. He is a resident of the State of Indiana and a citizen of the United States

6.     Defendant John R. Gregg is now, and was at all times relevant, the Interim, President of Vincennes University.  He is sued in his individual capacity and his official capacity.

7.     Defendant Dale Dowden is now, and was at all times relevant, Provost and Vice-President for Academic Affairs at Vincennes University.  He is sued in his individual capacity

8     Defendant Phillip Rath is now, and was at all times relevant, Vice-President for Finance and Government Relations at Vincennes University.  He is sued in his individual capacity.

9     Defendant Jim Messmer is now, and was at all times relevant, Vice-President of Statewide Services at Vincennes University. He is sued in his individual capacity.

2

2

10. The Board of Trustees of Vincennes University has the legislative responsibility and the authority for the governance and operation of Vincennes University, a state institution. The Trustees are sued in their official capacities.

## STATEMENT OF FACTS

11. Plaintiff's claims arise out of the request, by Plaintiff Jack A. Hanes to return to his tenured position as full professor in the Department of Broadcasting after agreeing to assist the Vincennes University administration ("Administration") for three years in the position of Assistant Provost for Enrollment Management.

12. Jack A. Hanes began employment at Vincennes University in 1982 as Station Manager of WVUT-Television and Instructor in Broadcasting.

13. In 1984, Hanes became Chairman of the Department of Broadcasting.

14. In 1987 Hanes received faculty tenure in the Department of Broadcasting.

15. In 1996, Hanes reached the rank of full professor.

16. In 2000, Hanes was "begged" by the Administration to accept the interim position of Assistant Provost for Enrollment Management.

17. Shortly after, Hanes was recruited by the Administration to accept the position of Assistant Provost for Enrollment Management on a full-time basis, and Hanes served in that position full-time until his termination on January 28, 2004.

18. In the summer of 2000, when Plaintiff agreed to assist the administration by assuming the interim position of Assistant Provost for Enrollment Management, he signed a contract similar to the one he had signed in earlier years when he was a tenured professor in the Department of Broadcasting.

19. The initial paragraph of the earlier contract that Plaintiff had signed as a professor of Broadcasting described his duties as a professor and his professional obligation to attend

3

faculty meetings and other professional duties.   A true and accurate copy of said contract is attached and marked as Exhibit "B".

20.    The initial paragraph of the contract that Plaintiff signed when he was requested to become Assistant Provost for Enrollment Management described his duties as an administrator and his professional obligation to attend administration meetings and other administrative duties. A true and accurate copy of said contract is attached and marked as Exhibit "C".

21.    Other than the description of the specific duties for each year, the contracts are substantially similar in all material respects.

22.    Neither contract included any terms regarding or referencing Plaintiff's academic tenure.

23    During the time when he was Assistant Provost for Enrollment Management, Hanes frequently spoke out on matters of public concern.

24    Hanes spoke out because of his concern for academic freedom, the exercise of free speech, and the free exchange of ideas which is at the core of a university, and on matters that affect the public's perception of the quality of education.

25.    Hanes spoke out specifically on the need to maintain admissions standards, the need for admissions procedures to be in compliance with federal law, the need for accurate student records, and the need to present accurate university records when seeking state monies based on student enrollment.

26.    Hanes spoke out on these matters in a proper forum during meetings of the Administration in a manner that did not interfere with the educational process.

27.    On or about November 13, 2003, Dr. Dale Dowden told Jack A. Hanes that "we're moving Enrollment Management in a new direction and the move does not include [you]."

4

**4**

28. Dowden also told Hanes that "out of respect for his tenure," Hanes was being offered a position as Coordinator for Southern Indiana Business and Industry ("Coordinator position"), a position in which he would travel through Southern Indiana and be responsible for managing all business and industry training activities in the Southern Indiana region, including marketing on-campus and off-campus services to a wide range of companies.

29. Messmer admitted agreeing with the President and other two Vice Presidents that Hanes would be offered the position of Coordinator, but would not be offered a return to his tenured teaching position in Broadcasting.

30. Hanes considered the offer overnight, and the following day, November 14, 2003, declined the position and requested that he be allowed to return to his teaching position in the Department of Broadcasting.

31. Dr. Dowden responded that it would take a few days to have an answer.

32. On November 20, 2003, Dr. Dowden asked Hanes to come to his office for a meeting during which Dowden told Hanes that the Administration would not be offering him a full-time teaching assignment even though there was an overload in the Department of Broadcasting.

33. During the course of the meeting, Dowden handed Hanes a letter "directing" Hanes to either accept the Coordinator position or submit his resignation to Human Resources.

34. Hanes again declined to accept the Coordinator position or to resign.

35. At that time there were other Vincennes University employees who were qualified to fill the Coordinator position; Hanes was not the only employee who could do the job.

36. On December 5, 2004, Hanes received a letter from Interim President John R. Gregg recommending to the Board of Trustees that Jack A. Hanes be terminated for insubordination.

5

37.    As Interim President of Vincennes University, Defendant John R. Gregg was a policy maker and final decision-maker.

38.    Although his policies were reviewed by the Board of Trustees, Gregg, as the Interim President of the university, was responsible for developing and implementing the policies by which the university operated.

39.    Gregg was also responsible for the practices governing the day-to-day operation of the university, including knowing whether the university was in compliance with the law and whether the university was acting in compliance with the law or matters affecting the operation of the university such as remissions standards, procedures, and practices and compensation for employees involved in recruiting and admitting students.

40.    On January 8, 2004, pursuant to Hanes' timely request, a three-person panel from the Board of Trustees conducted a hearing ("Hearing") on the termination of Hanes' employment.

41.    During the Hearing there was uncontradicted testimony that Hanes had always performed at a satisfactory level or above both as a tenured professor in the Department of Broadcasting and as Assistant Provost for Enrollment Management, moreover, his excellent performance and contribution to the university was acknowledged by the Administration

42.    Although the University alleged that Hanes was terminated for "insubordination" for refusing to accept the position of Coordinator for Southern Business and Industry, there was no testimony or evidence during the Hearing of what the University meant by "insubordination."

43.    The University attempted to show that Hanes no longer possessed academic status in the Department of Broadcasting, but that he was a professional staff employee.

44.    Dowden testified that when Hanes accepted the administrative position of Assistant Provost for Enrollment Management in 2000, "his academic tenure was transferred to

6

professional staff tenure", however, it is undisputed that Vincennes University ended professional staff tenure in 1990.

45.     Provost Dowden testified that the "transfer" of Hanes' tenure was done as an "exception."

46.     Hanes was never informed of any "exception" allowing the transfer of his faculty tenure to professional staff tenure.

47.     The Administration did not explain, in any way, how this "transfer" or "exception" took place.

48.     The Administration provided no documentation to show that this "transfer" or "exception" ever took place, and Dowden admitted that he was not present when the arrangements were negotiated for Hanes to accept the position of Assistant Provost for Enrollment Management.

49.     The Administration provided no documentation to support its contention that when Hanes accepted the administrative position, he waived his academic tenure.

50.     The Administration provided no documentation showing that when Hanes accepted the administrative position, he was advised he was waiving his academic tenure.

51.     The university provided no testimony or documentation to explain why the administration in 2000 would "beg" Hanes to accept the position and at the same time take away from him what is the most valued right as a tenured faculty member — his academic tenure.

52.     During the Hearing, Dowden explained that tenure is received through a process initiated in the academic department and is based initially on a review by the tenure candidate's academic peers (his colleagues in the department).

53.     Following the initial tenure application review by one's academic colleagues, the candidate's review is then approved up through: the department head, the Dean of the Division,

7

the Academic Vice-President or Provost for Academic Affairs, the President of the University, and ultimately by the Board of Trustees.

54.     Dowden confirmed that this is the process by which tenure is granted and that it was the process by which he himself received tenure in his academic department of chemistry.

55.     Hanes also confirmed that this is the process by which he received academic tenure in the Department of Broadcasting.

56.     On April 21, 1987, Hanes was granted tenure by then President Summers.

57.     The receipt of tenure is a property right distinct from the contract signed by Hanes setting forth his duties and salary, such as the continuing contract that Hanes had at the time of this controversy.

58.     According to the standards set forth by the American Association of University Professors ("AAUP") tenure protects the exercise of academic freedom because it provides assurances of continued "economic security and the continuing ability to work in one's area of professional competence."

59.     The position of Coordinator of Southern Indiana Business and Industry, which Vincennes University insisted that Hanes accept, provides neither economic security nor the continuing ability for Hanes to work in his area of professional competence.

60.     According to Hearing testimony, Jim Messmer wrote a portion of the job description for the Coordinator position that dealt with compensation; the job description provided, in relevant part, that the compensation would be dependent on the number of credit hours that the position holder was able to generate from Southern Indiana Business and Industry.

61.     A commission arrangement does not provide "economic security" for a tenured professor, and Hanes believed that such a compensation scheme was not in compliance with the Higher Education Act.

8

**8**

62.     The job description for the Coordinator position stated that the compensation provided a "base salary" of $65,000.00 with additional commission available depending on the number of credit hours that Hanes was able to generate from business and industry in Southern Indiana.

63.     The $65,000 figure is approximately a 23.2% reduction from Hanes' salary the previous year and over $7,000 less than Hanes' salary his last year of teaching in the Department of Broadcasting approximately three (3) years earlier.

64.     The "base salary" of $65,000.00 was not actually a base salary; it was merely a starting point, in fact, in order to earn the $65,000 compensation, Hanes would have to generate a 400% increase in business in 18 months.

65.     The 400% increase is based on documentation provided to Hanes by Measmer in November of 2003.

66.     The commission like structure of Hanes' proposed compensation was set without the benefit of any market analysis or assessment of needs for Southern Indiana.

67.     The "base salary" of $65,000.00 was to continue only until July 1, 2005, at which time the compensation would become totally dependent on a commission only arrangement based on the number of credit hours generated by students Hanes recruited from business and industry.

68.     The position of Coordinator does not provide a "continuing ability to work in one's area of professional competence."

69.     The job description for the position of Coordinator specifically requires someone with business and technology education and experience, neither of which Hanes possesses.

70.     Hanes declined the position of Coordinator because it did not provide concrete security or the continuing ability to work in his area of professional competence and because he

9

**9**

had serious concerns about whether the compensation, which was based on bonus and/or commission, was in compliance with the Higher Education Act.

71.     At the Hearing, none of the university administrators provided testimony showing that they had investigated whether the commission compensation arrangement for the position of Coordinator was in compliance with the Higher Education Act, nor did any of them testify that the compensation for the position of Coordinator was, in fact, in compliance with the Higher Education Act.

72.     According to testimony from the Dean of Hanes' Division, there were approximately 41.3 hours available in the Department of Broadcasting during the school year of 2003-2004 that needed to be taught.

73.     The Dean of the Division testified that the 41.3 hours were currently being covered by adjunct faculty, that is, instructors who are brought in on a short time, nontenure track basis, to cover the necessary teaching hours, and by nontenured teachers who were on the faculty on either a full-time or part-time basis.

74.     The Dean of the Division further testified that a full time teaching load averaged 21 to 22 hours per semester.

75.     Despite the availability of the teaching hours, Hanes, who is a tenured faculty member, was denied the opportunity to return to his teaching position in the Department of Broadcasting.

76.     Hanes did not request a specific teaching schedule or particular courses, he requested only to be returned to a teaching position in Broadcasting, the department, in which he had been granted tenure.

77.     Dowden testified in the due process hearing that the enrollment of enrollment was in flux, and there were several positions open.  Enrollment Management (Hanes' former

17

position), Director of Admissions; and **Director** of University Relations and Marketing (a new position which was unfilled).

77. Dowden testified that the organization of the enrollment area was still fluid at the time of the due process hearing on January 8, 2004.

79. Dowden testified that the position of Enrollment Management still existed on January 8, 2004.

80. During the three years that Hanes served as Assistant Provost for Enrollment Management, his position made him aware of the qualifications of prospective students who were seeking admission to Vincennes University.

81. On more than one occasion during the time when Hanes served as Assistant Provost for Enrollment Management, there was discussion at top administration meetings regarding enrollment numbers.

82. On one occasion in June of 2003, Hanes and the Director of Admissions refused to admit a student who did not have a high school diploma.

83. Hanes refused to admit the student not only because he had no high school diploma but also because Hanes discovered during the preliminary admissions process that the student's record had been falsified.

84. Admitting the student could have placed the university's accreditation in jeopardy.

85. Hanes spoke out against admitting students who were not qualified because admissions standards are a matter of public concern because they affect the public's view of the quality of education at state institutions.

86. Hanes reported to Dr. Dowden the falsification of the student's record and its potential negative impact on the university's seeking of state funds based on student enrollment.

11

87.     Although the decision by Hanes and the Director of Admissions not to admit the student actually prevailed at the time, both Hanes and the Director of Admissions had their employment terminated within a few months.

88.     The employee who falsified the record is still employed at Vincennes University.

89.     During the years when Hanes was Assistant Provost for Enrollment Management, from approximately 2000 to the fall of 2003, there was an initiative in the state to develop the Community College of Indiana ("CCI")

90.     Dale Dowden, Phillip Rath, Jan Messmer, and Joan R. Gregg (then Speaker of the House) were key officials involved in the negotiation regarding the structure and operation of the CCI.

91.     When enrollment was beginning to dip slightly at the beginning of the Fall 2003 semester, Hanes researched the impact of the Community College of Indiana (CCI) on Vincennes' enrollment decline.

92.     The research showed that 79.6% of the enrollment loss occurred in counties served by the CCI sites.

93.     Hanes informed the administration of this fact, but the administration never publicly acknowledged it because it revealed the possibility that state funds that may have previously gone to Vincennes University now were going to CCI. Hanes spoke out because allocation of state monies for state institutions is a matter of public concern.

94.     At a meeting in September of 2003, when Hanes brought up the topic again of the CCI data, Vice-President Rath angrily responded that, "I'm tired of hearing about that CCI [____] [____] that's enough of h____ ____"

12

95.    During a meeting in October of 2003 in which enrollment was being discussed, Hanes and the Director of Admissions explained recruitment guidelines outlined as "acceptable practices" by the National Association of College Admissions Counselors (NACAC).

96.    Some of the recruitment practices were established to prevent college fairs from becoming "carnival-like" with admissions staff acting like "carnival barkers."

97.    Vice-President Ruth scorned the recruiting standards, and said that it was "totally ludicrous" to show such respect for the standards of the admission's profession.

98.    Many times during the period Hanes served as Assistant Provost for Enrollment Management, Vice-President Ruth raised the possibility of putting the admissions counselors on commission.

99.    Hanes was opposed to this possibility and spoke out against it several times as a matter of public concern because he believed putting the admissions counselors on commission would have a negative effect on admissions standards and because he believed it was in violation of the provisions of the Higher Education Act.

100.    At a meeting in the Fall of 2003, Vice-President Ruth stated that the university should be able, at least, to recruit unqualified students who, although they were without the ability to benefit, could be admitted to increase enrollments.

101.    Hanes and his staff did not agree with Ruth's policy; the Director of Admissions responded: "No, the University should not admit those who are not qualified."

102.    A short time after this Fall meeting, on November 13, 2003, the Director of Admissions, who was not a tenured employee, was terminated; on that same date, Hanes, a tenured faculty member, was given notice of Interim President Gragg's recommendation of termination of his employment.

13

103.    By forcing Hanes to accept the position of Coordinator of Southern Indiana Business and Industry, Hanes would no longer make admissions decisions, and he would be removed from the information loop regarding applicants' qualifications and their ultimate success in obtaining admission.

104.    On January 28, 2004 (approximately three weeks after the January 8, 2004 Hearing), the entire Board of Trustees of Vincennes University met and voted to terminate Hanes' employment.

105.    Hanes received a letter on February 7, 2004, which contained official written notice of the termination of his employment at Vincennes University.

106.    Hanes received this letter only after he called the Director of Human Resources on February 5, 2004 to inform her that he had received no official notification of his termination nor had he received any information regarding the discontinuation of his health insurance.

107.    Hanes was informed by the Director of Human Resources for the first time during the telephone call on February 5, 2004, that his health insurance had been cancelled on January 31, 2004.

## CAUSE OF ACTION
### (Violation of 42 U.S.C. §1983)
### Count I.  Retaliation for Exercise of Free Speech

108.    Plaintiff, Hanes, realleges paragraphs 1 through 103 as if fully set forth, and complains against Defendants Gregg, Dowden, Roth, and Messmer in their individual capacities.

109.    Hanes was subjected to retaliation for the exercise of his right to free speech in that he was denied a return to his tenured position in the Department of Broadcasting, his property right, and his employment was terminated.

110.    Defendants retaliated against Hanes for speaking out on various matters of public concern including admissions standards, accurate student records, accurate application for state

14

monies based on student enrollments, and compliance with the Higher Education Act, all matters of public concern at a state university.

111.   The administration's decision to refuse to allow Hanes to return to his tenured position in the Department of Broadcasting and his subsequent termination had a chilling effect on speech at Vincennes University and was part of the administration's effort to have broad discretion to decide what speech to permit and what speech to suppress.

112.   Defendants Gregg, Dowden, Rath, and Messmer, each in his individual capacity, retaliated against Hanes in violation of the exercise of his right to free speech as provided by the First Amendment to the Constitution.

113.   Defendants' conduct was done intentionally, willfully, and wantonly in violation of Hanes' rights under the First Amendment to the Constitution as enforced by 42 U.S.C. §1983.

114.   At all times relevant Defendants were acting under color of state law.

115.   As a direct result of Defendants' unconstitutional conduct, Hanes suffered and continues to suffer embarrassment and humiliation, loss of employment, economic harm including loss of salary, past and future earnings, loss of benefits, damage to his professional reputation, and loss of future opportunity.

WHEREFORE, the Plaintiff, Jack Hanes, respectfully requests the court to grant the following relief:

a.   To award actual damages and compensatory damages for his injuries.

b.   To award punitive damages so as to deter the Defendants and others in similar situations from like conduct;

c.   To grant Plaintiff the cost of this action and reasonable attorney's fees; and

d.   To grant Plaintiff all other relief which is just and proper in the premises.

15

## Count 3.  Practice and Policy in Violation of Free Speech

116.   Plaintiff, Jack Hanes, realleges paragraphs 1 though 111 as if fully set forth and complains against Defendant Gregg in his official capacity and the Board of Trustees of Vincennes University in their official capacity.

117.   Defendant Gregg as Interim President of a state university implemented a practice and policy which violated Hanes' right to exercise free speech.

118.   Gregg violated Hanes' exercise of his right to free speech and academic freedom by recommending termination of Hanes' employment with Vincennes University because Hanes refused to accept the position of Coordinator of Southern Indiana Business and Industry and because Hanes spoke out on matters of public concern.

119.   Subsequent to discussion with Dowden, Rath, and Messmer, Gregg implemented the recommendation to terminate Hanes rather than allowing Hanes to return to his teaching position in the Department of Broadcasting.

120.   At all times relevant Gregg was acting under color of state law as Interim President of a state university.

121.   The Board of Trustees of Vincennes University violated Hanes' First Amendment exercise of his right to free speech and academic freedom by acquiescing in, condoning, and ratifying Gregg's recommendation to terminate Hanes' employment with Vincennes University.

122.   The Board of Trustees of Vincennes University, by voting to terminate Hanes' employment, ratified Gregg's recommendation of termination of Hanes' employment despite his status as a tenured professor.

123.   The actions take by Gregg and the Board of Trustees of Vincennes University were intentional, willful, and wanton and in violation of the Hanes' rights under the First Amendment to the Constitution.

16

**16**

124. As a direct and proximate result of the illegal and unconstitutional conduct in contravention of the First Amendment, Gregg in his official capacity as Interim President, and the Board of Trustees of Vincennes University in their official capacity, violated Hanes' exercise of his right to free speech and academic freedom.

125. As a direct result of the conduct of said defendants, Hanes suffered and continues to suffer embarrassment and humiliation, loss of employment, economic harm including loss of salary, past and future earnings, loss of benefits, damage to his professional reputation, and loss of future opportunity.

WHEREFORE, the Plaintiff, Jack Hanes, respectfully requests the court to grant the following relief:

    a. To award actual and compensatory damages to Plaintiff to adequately compensate him for his injuries;

    b. To grant Plaintiff the cost of this action and reasonable attorneys' fees; and

    c. To grant Plaintiff all other relief which is just and proper in the premises.

## Count 3. Violations of the Due Process Clause

126. Plaintiff, Jack Hanes, realleges paragraphs 1 through 121 and complains against Defendants Gregg, Dowden, Rath, and Messmer in their individual capacities:

127. Job tenure is property within the meaning of the due process clause of the Constitution, and Hanes has a property interest protected by due process in his tenured position as a full professor in the Department of Broadcasting.

128. Notwithstanding the commission compensation arrangement or whether the compensation was in compliance with the Higher Education Act, Hanes still had the right to return to his teaching position in the Department of Broadcasting because he had a property right in his tenured position within that department.

17

17

129.   Hanes was illegally and wrongfully forced to accept a position in business and industry that was outside of his area of professional competence.

130.   As a tenured professor in the Department of Broadcasting, Hanes was entitled to a due process hearing.

131.   Hanes' right to procedural due process was violated because the Vincennes University officials acted in a random, arbitrary, and unauthorized fashion in depriving Hanes of his protected property interest.

132.   The decision to terminate Hanes was already determined prior to the Hearing and prior to an opportunity for Hanes to tell his side of the story.

133.   A tenured public university professor is entitled to constitutionally sufficient procedures before he may be deprived of his protected property interest, and if the procedures used to investigate charges, such as "insubordination," are a sham, then there has not been a constitutionally sufficient opportunity for the plaintiff to respond.

134.   Procedural due process requires notice of forfeiture of a property right prior to the property right being taken away.

135.   Public university administrators are not entitled to dismiss a tenured professor using arbitrary disciplinary procedures and actions; Hanes was never given notice that his academic tenure was being taken away when he responded to the administration's request to accept the position of assistant Provost for Enrollment Management.

136.   Furthermore, Gregg, Dowden, Rath, and Messmer, each in his individual capacity, violated Hanes' right to substantive due process by depriving him of his continued employment as a tenured professor in the Department of Broadcasting.

137.   Gregg, Dowden, Rath, and Messmer deprived Hanes of his property interest in continued employment by arbitrary and irrational means that constitute a substantive due process

18

violation by "transferring" his academic tenure to "professional staff tenure" and by alleging that the loss of his academic tenure was done by an "exception".

138    Defendants' decision to terminate Hanes' employment for "insubordination" was arbitrary and capricious; Hanes was not given notice that he was waiving his academic tenure when he accepted the position of assistant Provost for Enrollment Management.

139.    The Defendants' arbitrary and irrational decision to violate Hanes' substantive due process rights by taking way his property interest in his tenured position was in addition to their retaliation for Hanes' exercise of his right to free speech.

140.    Defendants' conduct was done intentionally, willfully, and wantonly in violation of the Plaintiff's right under the Fourteen Amendment to the Constitution.

141.    At all times relevant Defendants were acting under color of state law.

142.    As a direct and proximate result of this illegal and unconstitutional conduct in contravention of the Fourteenth Amendment, Defendants violated the Hanes' right to procedural and substantive due process.

143.    As a direct result of Defendants' unconstitutional conduct, the Hanes suffered and continues to suffer embarrassment and humiliation, loss of employment, economic harm including loss of salary, past and future earnings, loss of benefits, damage to his professional reputation, and loss of future opportunity.

WHEREFORE, the Plaintiff, Jack Hanes, respectfully requests the court to grant the following relief:

a    To award actual damages and compensatory damages for his injuries.

b.    To award punitive damages so as to deter the Defendants and others in similar situations from like conduct;

c.    To grant Plaintiff the cost of this action and reasonable attorney's fees; and

19

d.      To grant Plaintiff all other relief which is just and proper in the premises.

### Count 4.  Practice and Policy in Violation of Due Process

144.    Plaintiff, Jack Hanes, realleges paragraphs 1 though 139 as if fully set forth and complains against Defendant Gregg in his official capacity and the Board of Trustees of Vincennes University in their official capacity.

145.    Gregg as Interim President of a state university implemented a practice and policy which violated Hanes' rights to due process.

146.    According to Hearing testimony, it was the policy of Vincennes University that a tenured faculty member assuming a position in administration need be given no notice of forfeiture of academic tenure.

147.    By recommending termination of Hanes' employment rather than allowing Hanes to return to his tenured teaching position in Broadcasting, Gregg implemented the University policy requiring forfeiture of Hanes' academic tenure without notice when Hanes accepted the position in administration.

148.    Defendant Gregg violated Hanes' right to procedural and substantive due process provided by the Fourteenth Amendment.

149.    At all times relevant Defendant Gregg was acting under color of state law as Interim President of a state university.

150.    The Board of Trustees of Vincennes University violated Hanes' Fourteenth Amendment right to due process by acquiescing in, condoning, and ratifying Gregg's recommendation of termination of Hanes' employment with Vincennes University.

151.    Defendants' conduct was done intentionally, willfully, and wantonly in violation of the Hanes' rights under the Fourteenth Amendment to the Constitution.

20

**20**

152.   As a direct result of Defendants' unconstitutional conduct, Hanes' suffered and continues to suffer embarrassment and humiliation, loss of employment, economic harm including loss of salary, past and future earnings, loss of benefits, damage to his professional reputation, and loss of future opportunity.

WHEREFORE, the Plaintiff, Jack Hanes, respectfully requests the court to grant the following relief:

a.   To award actual and compensatory damages to Plaintiff to adequately compensate him for his injuries;

b.   To grant Plaintiff the cost of this action and reasonable attorneys' fees; and

c.   To grant Plaintiff all other relief which is just and proper in the premises.

## PENDANT STATE CLAIMS

### Count 5.   Breach of Contract

153.   Comes now the Plaintiff and realleges paragraphs 1-152 and complains against the Defendants as follows:

154.   The continuing teaching contract that Plaintiff signed during his years of teaching in the Department of Broadcasting contained no terms regarding academic tenure or any references to academic tenure because Plaintiff was granted academic tenure in 1987, and his tenure status was carried forward as part of his continuing employment contracts with Vincennes University.

155.   The contract that Plaintiff signed in 2000 when he became Assistant Provost for Enrollment Management does not contain any terms regarding Plaintiff's academic tenure or any references to academic tenure because Plaintiff was granted academic tenure in 1987, and his tenure status was carried forward as part of his continuing employment contracts with Vincennes University.

21

156.   The contract that Plaintiff signed in 2000 when he became Assistant Provost for Enrollment Management does not contain any terms stating that Plaintiff's academic tenure is being taken away, nor is there any reference in the contract stating that he is waiving his academic tenure by signing the contract.

157.   Defendants breached the contract with Plaintiff when they terminated him rather than allow him to return to his tenured teaching position in Broadcasting.

158.   Defendants acted with malice when they breached their contract with Plaintiff by failing to meet the terms and conditions of employment set forth when he received academic tenure in 1987 and which were understood and carried forward as part of his continuing employment contracts with Vincennes University until he was unlawfully terminated on January 28, 2004.

159.   As a direct result of Defendants' conduct in breaching Plaintiff's employment contract, Plaintiff suffered economic loss of his salary and other economic benefits of his employment, including health insurance, pension, retirement monies, and other such benefits.

WHEREFORE, the Plaintiff respectfully requests the Court to grant the following relief:

a.   To award actual damages to Plaintiff to adequately compensate him for his economic loss;

b.   To award punitive damages to Plaintiff to deter Defendants and others from similar conduct in the future.

c.   To grant Plaintiff all other relief which is just and proper in the premises.

## Count 6.  Promissory Estoppel

160.   Comes now the Plaintiff and realleges paragraphs 1 through 159 and complains against the Defendants as follows:

22

**22**

161.   Because the continuing teaching contract that Plaintiff signed in prior years was substantially similar in all material respects to the contract that he signed in 2000 when he assumed the position of Assistant Provost for Enrollment Management except for a description of his specific duties, Plaintiff had no way of knowing when he signed the contract of continuing employment in 2000 that he was being stripped of his academic tenure.

162.   Defendants knew or should have known that their representation to Plaintiff that he had a "continuing contract" with Vincennes University would induce Plaintiff to reasonably believe, in the absence of notice to the contrary, that his tenure continued as it had with his previous "continuing" teaching contracts.

163.   As a result of this representation, Plaintiff suffered and continues to suffer economic loss of his salary and other economic benefits of his employment, damage to his professional reputation, and future opportunities.

WHEREFORE, the Plaintiff respectfully requests the Court to grant the following relief:

a.   To award actual damages to Plaintiff to adequately compensate him for his economic loss;

b.   To grant Plaintiff all other relief which is just and proper in the premises.

## OTHER RELIEF

164.   Plaintiff respectfully requests the Court to grant Declaratory, Injunctive, and Equitable Relief and all other relief which is just and proper in the premises.

## RESERVATION OF RIGHTS

165   Plaintiff reserves the right to assert additional violations of federal and state law.

23

## JURY TRIAL

166.   Plaintiff respectfully requests that this matter be tried by a jury of his peers.

Respectfully submitted,

IDA COLEMAN LAMBERTI

s/ Ida Coleman Lamberti
Ida Coleman Lamberti,
Attorney No. 16776-49
MAURER RIFKIN & HILL, P.C.
11550 N. Meridian Street, Suite 115
Carmel, Indiana 46032
Telephone: (317) 844-8372
Fax:  (317) 573 5564
e-mail:  iclamberti@mrhlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Amended Complaint and Jury Demand was filed electronically on the ___ day of January, 2005.  Notice of this filing was sent to the following by operation of the Court's electronic filing system:

Thomas J. Belcher
Attorneys for Defendants
301 West Seventh Street
Post Office Box 3250
Bloomington, Indiana 47402-3250

s/ Ida Coleman Lamberti
Ida Coleman Lamberti

24

MAURER RIFKIN & HILL, P.C.

ATTORNEYS AT LAW

SUITE 115

11550 NORTH MERIDIAN STREET

CARMEL, INDIANA 46032
E-mail: mrhlawfirm@mrhlaw.com

ROBERT S. RIFKIN
SHERWOOD P. HILL

—

CLINTON E. BLANCK
STEPHANIE J. FAIRFIELD
THOMAS M. JOHNSTON

February 20, 2004

*Certified Mail*
*Return Receipt Requested*

TEL (317) 844-8372
FAX (317) 573-5564

—

IDA COLEMAN CAMPBELL
OF COUNSEL

## TORT CLAIM NOTICE

Board of Trustees
Vincennes University
Vincennes, IN 47591

Mr. John R. Gregg
Interim President
Vincennes University
Vincennes, IN 47591

Dr. Dale Dowden
Provost/Vice-President for Academic Affair
Vincennes University
Vincennes, IN 47591

Mr. Jim Messner
Vice-President for Statewide Services
Vincennes University
Vincennes, IN 47591

Mr. Phillip Rath
Vice-President for Financial Services
Vincennes University
Vincennes, IN 47591

Indiana Political Subdivision
Risk Management Commission
333 West Washington Street, Suite 368
Indianapolis, Indiana 46204

> Re:     Tort Claim Notice on Behalf of Mr. Dick Hanus
>         1148 North Dogwood Drive, Vincennes, IN 47591

Attn:   Ms. Anne Caffey
        Secretary, Indiana Political Subdivision, Risk Management Commission

EXHIBIT "V"

**25**

This is to advise you that Ida Coleman Lamberti of Maurer Rifkin & Hill, P.C. has been retained by Professor Jack A. Hanes to represent his interests in any claims he may have against Interim President John R. Gregg, Provost/Vice-President for Academic Affairs Dale Dowden, Vice-President for Statewide Services Jim Messmer, Vice-President for Financial Affairs Phillip Rath, the Board of Trustees of Vincennes University, and its various officers and agents. The purpose of this correspondence is to officially serve you with a Tort Claim Notice required by Indiana Code 34-13-3-1 et seq. This letter is a good faith effort to comply with the statutory notice requirements for claims against government entities. If further notice to another governmental entity is required or further information is needed, please notify me; I will be happy to comply with your instruction. If I do not receive a reply from you, I will consider the notice requirement satisfied.

Professor Jack A. Hanes was at all times relevant, an employee of Vincennes University in Vincennes, Indiana. Specifically, Hanes complains that he was terminated in violation of his due process rights in contravention of the Constitution of the United States and various other federal statutes. His rights were also violated under the Indiana Constitution and laws of the State of Indiana, including, but not limited to, unlawful termination.

Jack A. Hanes began employment at Vincennes University in 1982 as Station Manager of WVUT-Television and Instructor in Broadcasting. In 1984, he became Chairman of the Department of Broadcasting. In 1987, he received faculty tenure in the Department of Broadcasting. Subsequently, he reached the rank of full professor in 1996. In 2003, he was "begged" by the administration to accept the interim position of Assistant Provost for Enrollment Management, a position he later was recruited to accept

2

full-time, which he did until the fall of 2003. It is undisputed that Mr. Hanes' evaluations in both teaching and administrative positions were always satisfactory and above.

On or about November 13, 2003, Provost Dale Dowden called Jack A. Hanes to a meeting in the Provost's office at which Jim Messmer, Vice-President of State-Wide Services was also present. During the meeting Provost Dowden told Jack A. Hanes that "we're moving Enrollment Management in a new direction and the move does not include [you]." Dowden also told Hanes that "out of respect for his tenure," he was being offered the position as Coordinator Southern Indiana Business and Industry, a position in which he would travel through Southern Indiana to try to recruit enrollees from among workers in business and industry.

Although there were several positions open, Hanes was offered only the position of Coordinator Southern Indiana Business and Industry. Hanes was then directed to meet further with Messmer regarding the details of the job. Messmer and Assistant Vice President for Statewide Services John Ludlow had written the job description and method of compensation. Ludlow was also present at this latter meeting. During the meeting with Messmer and Ludlow, Hanes was told that his salary would be approximately $65,000.00. However, although the job description states that this is a base salary, the $65,000.00 is in actuality only a starting point because the salary would fluctuate upward or downward starting in June of 2005 based upon enrollment growth. In other words, after a short time in the position, Hanes' salary would be based on a bonus or commission that was completely dependent on the number of enrollees that Hanes recruited. That is, his compensation would be substantially, if not entirely, "at risk."

Hanes considered the offer overnight, and the following day, November 14, 2003, declined the position, and requested that he be allowed to return to his teaching position in

5

**27**

Broadcasting, the academic department in which he had received faculty tenure. Provost Dowden responded that it would take a few days to have an answer. On November 20, 2003, Provost Dowden met with Jack Hanes and told him that he had looked into Hanes's request to return to teaching, and that even though there was an overload in the Broadcasting Department, they could not justify a full-time teaching assignment for him. At that point, Dowden handed Hanes a letter "directing" Hanes to either accept the Business and Industry position or submit his resignation to Human Resources. At that point, Hanes again declined the position and also declined to resign. On December 5, 2004, Hanes received a letter from Interim President Gregg recommending to the Board of Trustees that Jack A. Hanes be terminated for "insubordination." Hanes timely requested a Hearing which was held on January 8, 2004.

The Hearing on January 8, 2004, was held before a panel of three members of the Board of Trustees of Vincennes University and was recorded by a court reporter. During the Hearing Provost Dowden asserted that Jack A. Hanes waived his faculty tenure when he accepted the position of Assistant Provost for Enrollment Management in 2000, but no documents were provided that supported this assertion. Further, Dowden asserted that when Hanes accepted the position in 2000 that his faculty tenure was "transferred" to professional staff tenure, but no documents were provided that supported this assertion. Furthermore, there was undisputed testimony that professional staff tenure was discontinued at Vincennes University in 1990. Dowden alleged that Hanes' faculty tenure was "transferred" to professional staff tenure by way of an "exception." No documents were provided that supported this assertion of an "exception." Dowden claimed that a "transfer" took place because the earlier contract that Hanes had signed when he was teaching in the Department of Broadcasting was different than the contract

4

**28**

he signed in 2000 when he accepted the position of Assistant Provost for Enrollment Management. However, there are no terms in either contract regarding tenure. Moreover, Hanes testified that he was never informed or advised that he was waiving his faculty tenure when he accepted the position of Assistant Provost for Enrollment Management which the administration "begged" him to accept in 2000.

The record of the Hearing reveals that Hanes requested to be returned to his teaching position and the nine-month teaching salary which would be significantly less than the salary for the position of Assistant Provost for Enrollment Management. Hanes testified, when questioned, that one of the reasons he declined the position of Coordinator Southern Indiana Business and Industry, in addition to his primary desire to return to teaching, was his concern that the compensation for the position, starting in July of 2005, would be a bonus or commission that was completely dependent on the number of enrollees which Hanes could obtain. His concern was whether this manner of compensation was in compliance with the provisions of the Higher Education Act. A question was also raised about whether Hanes' termination was connected with the discovery by Hanes and members of his staff a few months earlier of falsification of records at the university.

Furthermore, regarding compensation, the teaching salary Hanes would have received had he been allowed to return to teaching would also have been less than the salary that Hanes would allegedly have received if he accepted the position of Coordinator Southern Indiana Business and Industry. Nonetheless, Dowden testified that there was not a full-time teaching position available in Broadcasting, contradicting testimony in the Dean of the Division of Business and Public Service that there were "41 hours of overload" for the academic year of 2003-2004. The Dean of the Division of

5

29

Business and Public Service also testified that the overload was being taught by adjunct faculty and untenured faculty members.   Moreover, the Dean testified that he had advertised for the position of Department Head for the Department of Broadcasting and that the number of teaching hours for that position was only 17 teaching hours per semester, that is, 34 annualized teacher hours.

Despite this, documents show that Hanes was turned down when he applied for the advertised position of Head of the Department of Broadcasting, and he was denied his request to return to the Department of Broadcasting to teach simply as a faculty member. Testimony revealed that Hanes' teaching position in the Department of Broadcasting was not filled when he left his teaching position and agreed to assist the administration in 2000 and that there is a "vacant position" in the Broadcasting Department.

Dowden testified that the entire area of enrollment is in flux, and there are several positions open:   Enrollment Management (Jack Hanes' former position), Director of Admissions; and Director of University Relations and Marketing (a new position that is unfilled).

On January 28, 2004, the panel of three trustees who attended the Hearing made their recommendation to the entire Board.   The entire Board of Trustees of Vincennes University voted to support Interim President Gregg's recommendation to terminate Jack A. Hanes for "insubordination." Jack A. Hanes was officially terminated on January 28, 2004.

Professor Hanes is claiming that he was subjected to unlawful termination under Indiana law and the Indiana State Constitution. He also claims that his constitutional rights were violated under the United States Constitution and various other federal statutes.   Although the complainant is seeking a total of $300,000.00 in damages under

6

the Tort Claims Act, please note that he is not limited to this amount in any action which he may bring under 42 U.S.C. §1983 to redress the violations of any Constitutional rights which will also be asserted.

At this time it is believed that the following individual is a witness to the above incidents. More witnesses may be discovered during the litigation process.

1. Anne Skace

Sincerely,

*Ida Coleman Lamberti*

Ida Coleman Lamberti
Attorney at Law
Maurer Rifkin & Hill, P.C.
11550 N. Meridian Street
Suite 115
Carmel, Indiana 46032
Tel: 317-844-8372

31



## Vincennes University
A Public Comprehensive Two Year College
VINCENNES, INDIANA 47591-9987

CONTINUING TEACHING CONTRACT BETWEEN VINCENNES UNIVERSITY, hereinafter called "University" and _____ Jack A. Banes _____, hereinafter called "Employee". The University hereby employs said Employee as _____ Professor of Broadcasting _____ for the period commencing on ____ June 12 ____, 19 86, and ending on ____ June 14 ____, 19 87, for the stipulated compensation of $ 64,115 ____, payable in installments in accordance with the University's salary payment schedule. The employee will also receive such fringe benefits as are provided to all of the employees at the University. These fringe benefits may be changed from time to time by the University. Fringe benefits shall terminate on the date the employee's employment with the University terminates.

The Employee agrees to share in regular faculty meetings and committee work, in the academic advising of students, and in pre-registration and registration duty and such other reasonable functions as may be assigned by the University from time to time during the period covered by this agreement in furtherance of the program of the University. The Employee also agrees to submit to his or her respective Division Chair or Dean all course syllabi by August 16th in the first semester and at the beginning of classes for the second semester.

In accepting this contract, the Employee understands that he or she may be assigned to day or evening classes at Vincennes University and Vincennes University Jasper Center as part of the normal teaching load. Where travel to Jasper Center is required, a stipend of $100 per semester will be paid in addition to mileage. Acceptance of this contract also includes agreement to work in harmony with the philosophy and objectives of Vincennes University and acceptance of the standards of professional behavior normally expected in an academic community.

The employee's employment may be terminated by the University before the expiration date of this contract for reasons of incompetence, serious personal or professional misconduct, or insubordination by the employee.

In addition to the above, the following additional stipulations are made in this contract: _____

_____

_____

Executed in duplicate this __7th__ day of _____ July _____, 19 86.

VINCENNES UNIVERSITY

BY: _____
                                    President

EXHIBIT "a"                          Employee

**32**



VINCENNES
UNIVERSITY
The Two-Year College

Vincen... ...sity
Vincennes, IN 47591
(812) 569-8888
Fax (812) 888-5888

www.vinu.edu

MEMORANDUM OF CONTINUING AGREEMENT between Vincennes University, hereinafter called "University" and _____ Jack Hanes _____, hereinafter called "Employee". The University hereby employs said Employee as ____ Assistant Provost of Enrollment Management ____ for the period commencing on ____ August 16 ____, 20 00, and ending on ____ June 19 ____, 20 01, for the stipulated compensation of $ __78,928__, payable in installments in accordance with the University's salary payment schedule. The Employee will also receive such fringe benefits as are provided to all of the employees at the University. These fringe benefits may be changed from time to time by the University. Fringe benefits shall terminate on the date the Employee's employment with the University terminates.

The Employee agrees to share in regular professional staff meetings and committee work, and in pre-registration, registration duty, and such other reasonable functions as may be assigned by the University from time to time during the period covered by this contract in furtherance of the program of the University.

Acceptance of this contract also includes agreement to work in harmony with the philosophy and objectives of Vincennes University and acceptance of the standards of professional behavior normally expected in an academic community.

The Employee's employment may be terminated by the University before the expiration date of this contract for reasons of incompetence, serious personal or professional misconduct, or insubordination by the Employee.

In addition to the above, the following additional stipulations are made in this contract: _____

_____

_____

Executed in duplicate this 16th day of ____ August ____, 20 00

VINCENNES UNIVERSITY

BY: _____
    Phillip M. Summers, President

    _____
                        Employee

EXHIBIT "C"

33

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

JACK A. HANES                          CAUSE NO: 2:04-cv-0140-RLY-WGH
    Plaintiff

    vs.

JOHN R. GREGG, Interim President of
Vincennes University, in his individual
capacity and in his official capacity;
DALE DOWDEN, University Provost and
Vice President for Academic Affairs, in
his individual capacity;
PHILLIP RATH, Vice President for
Finance and Government Relations, in his
individual capacity;
JIM MESSMER, Vice President for
Statewide Services, in his individual capacity; and
THE BOARD OF TRUSTEES OF VINCENNES
UNIVERSITY in their official capacity
    Defendants

## ANSWER TO AMENDED COMPLAINT

Come now the Defendants, John R. Gregg, Interim President of Vincennes University,

in his individual capacity and in his official capacity; Dale Dowden, University Provost and

Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President

for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice

President for Statewide Services, in his individual capacity; and The Board of Trustees of

Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their

Answer to the Plaintiff's Amended Complaint respond as follows:

    1.    The Defendants, in response to the allegations contained in rhetorical

paragraphs numbered 1 and 2 of the Plaintiff's Amended Complaint, state that those

allegations are legal conclusions to which a response is not required.

2

2.    The Defendants admit the allegations contained in rhetorical paragraphs numbered 3 and 4 of the Plaintiff's Amended Complaint.

3.    The Defendants deny the allegations contained in rhetorical paragraph numbered 5 under the heading entitled *Parties* of the Plaintiff's Amended Complaint.

4.    The Defendants, in response to the allegations contained in rhetorical paragraphs numbered 6, 7, 8, 9 and 10 under the heading entitled *Parties* of the Plaintiff's Amended Complaint, admit that those individuals were at all relevant times employed in the capacity as designated, but deny the allegations that the Plaintiff's Amended Complaint sets forth a cause of action against them in their individual capacities.

5.    The Defendants deny the allegations contained in rhetorical paragraph numbered 11 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

6.    The Defendants admit the allegations contained in rhetorical paragraphs numbered 12, 13, 14 and 15 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

7.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

8.    The Defendants, in response to the allegations contained in rhetorical paragraph numbered 27 of the Plaintiff's Amended Complaint under the heading entitled *Statement of Facts*, admit that Dr. Dale Dowden did on or about November 13, 2003, advise Jack Hanes of a change in leadership in Enrollment Management. However, the Defendants, at this time, are without sufficient information within which to admit or deny whether the

3

quotation contained therein is a verbatim quote by Mr. Dowden on November 13, 2003, and, therefore, deny the allegation.

9.      The Defendants, in response to the allegations contained in rhetorical paragraph numbered 28 of the Plaintiff's Amended Complaint under the heading entitled *Statement of Facts*, admit that Jack Hanes was offered the position of Coordinator of Southern Indiana Business and Industry. However, the Defendants, at this time, are without sufficient information within which to admit or deny whether the quotation contained therein is a verbatim quote by Mr. Dale Dowden and, therefore, deny the allegation.

10.     The Defendants admit the allegations contained in rhetorical paragraphs numbered 29, 30, 31, 32, 33, 34, 35 and 36 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

11.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 37 and 38 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

12.     The Defendants admit the allegations contained in rhetorical paragraphs numbered 39 and 40 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

13.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 41 and 42 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

14.     The Defendants admit the allegations contained in rhetorical paragraph numbered 43 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

**36**

4

15.   The Defendants deny the allegations contained in rhetorical paragraphs numbered 44, 45, 46, 47, 48, 49, 50 and 51 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

16.   The Defendants admit the allegations contained in rhetorical paragraphs numbered 52, 53, 54, 55, 56 and 58 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

17.   The Defendants, in response to the allegations contained in rhetorical paragraph numbered 57 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint, admit that receipt of tenure is a property right distinct and separate from contractual rights. The Defendants deny the remaining allegations contained in paragraph number 57 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

18.   The Defendants deny the allegations contained in rhetorical paragraphs numbered 59, 60 and 61 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

19.   The Defendants admit the allegations contained in rhetorical paragraph numbered 62 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint to the extent that the job description for the Coordinator position did state a compensation of "base salary" of $65,000.00 and it did provide for additional performance bonus. The Defendants deny the remaining allegations contained in rhetorical paragraph numbered 62 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint

5

20.     The Defendants admit the allegations contained in rhetorical paragraph numbered 63 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

21.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 64, 65, 66, 67, 68 and 69 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

22.     The Defendants are without sufficient knowledge to either admit or deny Hanes' reasoning for declining the position of Coordinator and, therefore, deny the allegations contained in rhetorical paragraph numbered 70 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

23.     The Defendants deny the allegations contained in rhetorical paragraph numbered 71 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

24.     The Defendants admit the allegations contained in rhetorical paragraphs numbered 72, 73 and 74 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

25.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 75 and 76 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

26.     The Defendants admit the allegations contained in rhetorical paragraphs numbered 77, 78 and 79 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

27.     The Defendants, in response to the allegations contained in rhetorical paragraph numbered 80 under the heading entitled *Statement of Facts* of the Plaintiff's

Amended Complaint, admit that the position of Assistant Provost for Enrollment provided Plaintiff with access to information regarding the qualifications of prospective students, but are without sufficient knowledge to either admit or deny whether Plaintiff was "aware" of that information and, therefore, deny it.

28.     The Defendants admit the allegations contained in rhetorical paragraphs numbered 81 and 82 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

29.     The Defendants, in response to the allegations contained in rhetorical paragraph numbered 83 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint, are without sufficient knowledge to either admit or deny the Plaintiff's reasons or reasoning for refusal to admit a student and, therefore, deny the allegations.

30.     The Defendants admit the allegations contained in rhetorical paragraph numbered 84 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

31.     The Defendants deny the allegations contained in rhetorical paragraph numbered 85 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

32.     The Defendants admit the allegations contained in rhetorical paragraph numbered 86 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

33.     The Defendants deny the allegations contained in rhetorical paragraph numbered 87 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

34.　The Defendants admit the allegations contained in rhetorical paragraphs numbered 88, 89, 90, 91 and 92 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

35.　The Defendants deny the allegations contained in rhetorical paragraphs numbered 93 and 94 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

36.　The Defendants admit the allegations contained in rhetorical paragraph numbered 95 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

37.　The Defendants admit that there are a number of reasons for the establishment of recruitment guidelines, including those characterized in rhetorical paragraph numbered 96 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

38.　The Defendants deny the allegations contained in rhetorical paragraphs numbered 97, 98, 99, 100, 101, 102 and 103 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

39.　The Defendants admit the allegations contained in rhetorical paragraphs numbered 104 and 105 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

40.　The Defendants deny the allegations contained in rhetorical paragraphs numbered 106 and 107 under the heading entitled *Statement of Facts* of the Plaintiff's Amended Complaint.

41.　As to the allegations contained in rhetorical paragraph numbered 108 under the heading entitled *Cause of Action, Count 1. Retaliation for Exercise of Free Speech*, the

8

Defendants restate and reallege their responses to paragraphs numbered 1 through 107, inclusive, of the Plaintiff's Amended Complaint.

42.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 109, 110, 111, 112, 113 and 115 under the heading entitled *Cause of Action, Count 1. Retaliation for Exercise of Free Speech* of the Plaintiff's Amended Complaint.

43.    The Defendants admit the allegations contained in rhetorical paragraph numbered 114 under the heading entitled *Cause of Action, Count 1. Retaliation for Exercise of Free Speech* of the Plaintiff's Amended Complaint.

44.    As to the allegations contained in rhetorical paragraph numbered 116 under Count 2 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Free Speech*, the Defendants restate and reallege their responses to paragraphs numbered 1 through 115, inclusive, of the Plaintiff's Amended Complaint.

45.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 117 and 118  under Count 2 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Free Speech*.

46.    The Defendants admit the allegations contained in rhetorical paragraph numbered 119  under Count 2 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Free Speech*.

47.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 120, 121, 122, 123, 124 and 125 under Count 2 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Free Speech*.

48.    As to the allegations contained in rhetorical paragraph numbered 126 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the*

*Due Process Clause*, the Defendants restate and reallege their responses to paragraph numbered 1 through 125, inclusive, of the Plaintiff's Amended Complaint.

49.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 127, 128, 129, 130, 131, 132 and 133 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the Due Process Clause*.

50.    The Defendants admit the allegations contained in rhetorical paragraph numbered 134 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the Due Process Clause*.

51.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 135, 136, 137, 138, 139 and 140 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the Due Process Clause*.

52.    The Defendants admit the allegations contained in rhetorical paragraph numbered 141 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the Due Process Clause*.

53.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 142 and 143 under Count 3 of the Plaintiff's Amended Complaint under the heading entitled *Violations of the Due Process Clause*.

54.    As to the allegations contained in rhetorical paragraph numbered 144 under Count 4 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Due Process*, the Defendants restate and reallege their responses to paragraphs numbered 1 through 143, inclusive, of the Plaintiff's Amended Complaint.

55.    The Defendants deny the allegations contained in rhetorical paragraphs numbered 145, 146, 147 and 148 under Count 4 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Due Process*.

**42**

10

56.     The Defendants admit the allegations contained in rhetorical paragraph numbered 149 under Count 4 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Due Process.*

57.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 150, 151 and 152 under Count 4 of the Plaintiff's Amended Complaint under the heading entitled *Practice and Policy in Violation of Due Process.*

58.     As to the allegations contained in rhetorical paragraph numbered 153 under Count 5 of the Plaintiff's Amended Complaint under the heading entitled *Breach of Contract,* the Defendants restate and reallege their responses to paragraphs numbered 1 through 152, inclusive, of the Plaintiff's Amended Complaint.

59.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 154, 155, 156, 157, 158 and 159 under Count 5 of the Plaintiff's Amended Complaint under the heading entitled *Breach of Contract.*

60.     As to the allegations contained in rhetorical paragraph numbered 160 under Count 6 of the Plaintiff's Amended Complaint under the heading entitled *Promissory Estoppel*, the Defendants restate and reallege their responses to paragraphs numbered 1 through 159, inclusive, of the Plaintiff's Amended Complaint.

61.     The Defendants deny the allegations contained in rhetorical paragraphs numbered 161, 162 and 163 under Count 6 of the Plaintiff's Amended Complaint under the heading entitled *Promissory Estoppel.*

## AFFIRMATIVE DEFENSES

### I.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and

11

Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their first affirmative defense to the Plaintiff's Amended Complaint would show that the Plaintiff's Amended Complaint fails to state a cause of action against the Defendants herein in their individual capacities and fails to state a claim upon which relief can be granted.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

**II.**

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their second affirmative defense to the Plaintiff's Amended Complaint would show that the Defendant, Vincennes University, is an instrumentality of the state for purposes of the Eleventh Amendment, and thus, the University itself, and its board of trustees, and the individual Defendants in their official capacities are immune from suits for money damages under 42 U.S.C.A. §1983.  U.S.C.A Const. Amend. 11

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

**44**

12

### III.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their third affirmative defense to the Plaintiff's Amended Complaint would show the Court that the individual Defendants herein are entitled to qualified immunity pursuant to the Eleventh Amendment of the United States Constitution. U.S.C.A. Cont. Amend. 11.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

### IV.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their fourth affirmative defense to the Plaintiff's Amended Complaint would show that the Plaintiff's speech, as characterized herein, is not a matter of public concern or public speech based upon its content, context and forum and, therefore, is not subject to protection by the First Amendment of the United States Constitution.

45

13

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## V.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity, Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their fifth affirmative defense to the Plaintiff's Amended Complaint would show that the Defendants and the University's academic independence is protected by the United States Constitution, as well as any faculty member's speech, and, in fact, the Defendants have a right to determine for themselves on academic grounds, who may teach; what may be taught; how it shall be taught; and who will be admitted to study. These are referred to as the academic freedoms of the University and such rights of the University outweigh and dominate any First Amendment rights that the Plaintiff may have herein. *Feldman v. Ho*, 171 F.3d 494 (7th Cir. 1999). U.S.C.A. Const. Amend. 1.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## VI.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity, Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice

46

14

President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their sixth affirmative defense to the Plaintiff's Amended Complaint would show that any speech by the Plaintiff or any alleged exercise by the Plaintiff of his First Amendment Rights was not a substantial or motivating factor in the Defendants' decision to proceed with the termination of his employment and dismissal.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

### VII.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their seventh affirmative defense to the Plaintiff's Amended Complaint would show that the First Amendment confers to each individual certain fundamental rights, and the Plaintiff's allegation of substantive due process violation is a repeat claim of his alleged First Amendment violation and is, therefore, barred and subject to dismissal.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

### VIII.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and

**47**

15

Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their eighth affirmative defense to the Plaintiff's Amended Complaint would show that the acts of the Defendants were not the proximate cause of the Plaintiff's damages.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## IX.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their ninth affirmative defense to the Plaintiff's Amended Complaint would show that the Plaintiff's claim is barred for failure to comply with the notice provisions set forth in the Indiana Tort Claims Act, I.C. 34-13-3-1, *et seq.*

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## X.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President

16

for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their tenth affirmative defense to the Plaintiff's Amended Complaint state that the Plaintiff's damages are limited by I.C. 34-13-3-4.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## XI.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their eleventh affirmative defense to the Plaintiff's Amended Complaint would say that the Plaintiff's claims are barred by the Indiana Tort Claims Act, I.C. 34-13-3-3, and that the Defendants are not liable for damages resulting from the performance of a discretionary function.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## XII.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President

**49**

17

for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their twelfth affirmative defense to the Plaintiff's Amended Complaint would say that the Defendants deny violating the Plaintiff's constitutional rights herein.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## XIII.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their thirteenth affirmative defense to the Plaintiff's Amended Complaint would say that the Plaintiff's claim for punitive damages is not available to the Plaintiff and, in fact, is barred by the provisions of I.C. 34-13-3-4 and by federal law prohibiting recovery of punitive damages from the states, municipalities or political subdivisions thereof.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## XIV.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President

18

for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their fourteenth affirmative defense to the Plaintiff's Amended Complaint would say that the Plaintiff's claims are barred by the applicable statute of limitations.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

### XV.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their fifteenth affirmative defense to the Plaintiff's Amended Complaint would say that the Plaintiff's claims should be dismissed for lack of subject matter jurisdiction.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

### XVI.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of

19

Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their sixteenth affirmative defense to the Plaintiff's Amended Complaint would assert the affirmative defense of waiver.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

## XVII.

Come now the Defendants, John R. Gregg, Interim President of Vincennes University, in his individual capacity and in his official capacity; Dale Dowden, University Provost and Vice President for Academic Affairs, in his individual capacity; Phillip Rath, Vice President for Finance and Government Relations, in his individual capacity; Jim Messmer, Vice President for Statewide Services, in his individual capacity; and The Board of Trustees of Vincennes University in their official capacity, by counsel, Thomas J. Belcher, and for their seventeenth affirmative defense to the Plaintiff's Amended Complaint would assert the affirmative defense of estoppel.

WHEREFORE, the Defendants pray that the Plaintiff take nothing by way of his Amended Complaint and that costs be assessed against the Plaintiff.

Respectfully submitted,

KELLEY, BELCHER & BROWN

By:   s/ Thomas J. Belcher
Thomas J. Belcher, #3773-53
Attorneys for Defendants
301 West Seventh Street
Post Office Box 3250
Bloomington, Indiana  47402-3250
Telephone:   812-336-9963
Fax:          812-336-4588
E-mail: thelcher@kelleybelcherbrown.com

**52**

20

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Answer to Amended Complaint was filed electronically on the 11th day of February, 2004. Notice of this filing was sent to the following by operation of the Court's electronic filing system:

Ida Coleman Lamberti
MAURER RIFKIN & HILL, P.C.
E-mail: iclamberti@mrhlaw.com

> s/ Thomas J. Belcher
> Thomas J. Belcher

**53**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION


JACK HANES,                          CAUSE NO: 2:04-CV-0140-RLY-WGH

     Plaintiff,

vs

JOHN R. GREGG, Interim President of
Vincennes University, in his individual
capacity and in his official capacity;
DALE DOWDEN, University Provost and
Vice President for Academic Affairs, in
his individual capacity;
PHILLIP RATH, Vice President for
Finance and Government Relations, in his
individual capacity;
JIM MESSMER, Vice President for
Statewide Services, in his individual capacity; and
THE BOARD OF TRUSTEES OF VINCENNES
UNIVERSITY in their official capacity.

     Defendants.



     The deposition of JACK HANES taken on behalf of the
defendants in the above cause in the offices of MAURER
RIFKIN & HILL, P.C., 11550 North Meridian Street, Suite
115, Carmel, Hamilton County, State of Indiana,
beginning at 1:00 o'clock p. m. on the 25th day of April,
2005 under the Indiana Rules of Trial.

          Christie A. Fisher, Notary

IN ATTENDANCE

FOR THE PLAINTIFF:

Ms. Ida Coleman Lamberti
MAURER RIFKIN & HILL, P.C.
11550 N. Meridian Street
Suite 115
Carmel, Indiana 46032


FOR THE DEFENDANTS:

Mr. Thomas Belcher
KELLEY, BELCHER & BROWN
301 West Seventh Street
Post Office Box 3250
Bloomington, Indiana 47402-3250



**************************************************************

### INDEX

DIRECT EXAMINATION:
     QUESTIONS BY: MR. BELCHER......................3

     Defendant's Exhibit #1........................26
     Defendant's Exhibit #2........................39
     Defendant's Exhibit #3.......................110

CROSS EXAMINATION:
     QUESTIONS BY: MS. COLEMAN LAMBERTI...........122


SIGNATURE REQUESTED................................130

55

11

| | | |
|---|---|---|
| 1 | A. | Probably at age 65. |
| 2 | Q. | And you're how old now? |
| 3 | A. | 51. |
| 4 | Q. | Okay. Let's go back to when you worked at |
| 5 | | Vincennes. As I understand it, you began working |
| 6 | | for Vincennes in 1982 as a station manager. Is |
| 7 | | that right? |
| 8 | A. | Yes. |
| 9 | Q. | Okay. And then in 1984, you became the chairman |
| 10 | | of the Department of Broadcasting? |
| 11 | A. | Yes. |
| 12 | Q. | In 1987, you received faculty tenure in the |
| 13 | | Department of Broadcasting? |
| 14 | A. | Yes. |
| 15 | Q. | Then when the complaint that you filed in this |
| 16 | | action, says in 2000 you were begged by the |
| 17 | | administration to accept an interim position as |
| 18 | | Assistant Provost for Enrollment Management. Can |
| 19 | | you tell me how that came about? |
| 20 | A. | President Summers, then President Summers, |
| 21 | | called me to his office to inform me that the |
| 22 | | current Enrollment Manager was leaving and asked |
| 23 | | if I would be interested in stepping up to |
| 24 | | assist the university in the enrollment |

**56**

12

| | | |
|---|---|---|
| 1 | | management efforts. |
| 2 | Q. | In the interim capacity? |
| 3 | A. | Yes, in an interim capacity. |
| 4 | Q. | Did he tell you why it was interim? |
| 5 | A. | Because they would be advertising for a |
| 6 | | position. |
| 7 | Q. | Did, at this meeting, did Mr. Summers give you |
| 8 | | any indication as to whether or not he was |
| 9 | | looking towards you to fill that position on a |
| 10 | | permanent basis? |
| 11 | A. | At the initial meeting, we didn't get that far. |
| 12 | Q. | How far did you get on the initial meeting? |
| 13 | A. | He simply asked me to give some thought to |
| 14 | | helping on an interim basis. |
| 15 | Q. | Okay. What else do you recall about that |
| 16 | | discussion, the initial meeting between you and |
| 17 | | Mr. Summers? |
| 18 | A. | I really don't recall much other than his desire |
| 19 | | for me to help him. |
| 20 | Q. | Called you up and came over to your office? |
| 21 | A. | I went to his office. |
| 22 | Q. | You went to his office, I'm sorry. Called you up |
| 23 | | and invited you to his office? |
| 24 | A. | Yes. |

**57**

| 1 | Q. | Did he tell you what the subject matter was |
| 2 | | going to be? |
| 3 | A. | I don't believe so. |
| 4 | Q. | So you went? |
| 5 | A. | Yes. |
| 6 | Q. | And what do you remember happening after you got |
| 7 | | there? |
| 8 | A. | Sitting at his octagonal table and him entering |
| 9 | | into this discussion. |
| 10 | Q. | So he basically says, sit down Jack, I want to |
| 11 | | talk to you about this thought or this position? |
| 12 | A. | Yes. |
| 13 | Q. | Okay. Told you that the guy that had that |
| 14 | | position was leaving? |
| 15 | A. | Yes. |
| 16 | Q. | And just inquired generally if you were |
| 17 | | interested in it or what? |
| 18 | A. | He, he asked me if I would undertake that |
| 19 | | position on an interim basis. |
| 20 | Q. | Okay. And you told him? |
| 21 | A. | That I would have to think about it and would |
| 22 | | get back with him. |
| 23 | Q. | At that time, did he tell you what that interim |
| 24 | | position would involve? |

58

FISHER REPORTING, .     ...U. BOX 214**ELLETTSV  ..E, IN 47429**812-876-7312

14

1    A.   I don't believe so.

2    Q.   No discussion that you can recall about what it

3         precisely was he was asking you to do?

4    A.   No.

5    Q.   Did you know already what that position would

6         involve?

7    A.   I had a pretty good idea through being an

8         employee at the university what an enrollment

9         manager did.

10   Q.   The enrollment manager that was leaving, what

11        was his name?

12   A.   Mike Davis.

13   Q.   Okay. So were you acquainted with Mr. Davis?

14   A.   Yes, I was.

15   Q.   You think he had a fairly good handle at that

16        time about what Mr. Davis' job involved?

17   A.   Yes.

18   Q.   So it's not something Mr. Summers would have had

19        to explain to you. He, kind of, could assume

20        that you had a general idea at least of what it

21        was about?

22   A.   Yes.

23   Q.   How long do you think that meeting lasted, that

24        initial meeting?

**59**

| 1 | A. | Thirty minutes. |
| 2 | Q. | You discuss anything else besides him wanting |
| 3 | | you to consider taking the job? |
| 4 | A. | Not that I recall. |
| 5 | Q. | He give you any idea about the time frame, how |
| 6 | | long the interim tag was going to be there, for |
| 7 | | example? |
| 8 | A. | At some point the time frame was discussed but I |
| 9 | | don't recall if it was in the first or the |
| 10 | | second meeting. |
| 11 | Q. | Anything else you can recall about the first |
| 12 | | meeting that we haven't talked about? |
| 13 | A. | Not at this point. |
| 14 | Q. | You remember about when that happened? |
| 15 | A. | It would have been late winter or early spring |
| 16 | | of the year 2000, probably in the February time |
| 17 | | frame. |
| 18 | Q. | So what was the next thing in this chain of |
| 19 | | events that happened leading you to take the |
| 20 | | interim position? |
| 21 | A. | I went back to see Dr. Summers one or two days |
| 22 | | following the initial meeting and told him that |
| 23 | | I was not interested in the position. |
| 24 | Q. | So did you call him and schedule a time to go to |

60

16

1       see him?

2    A.   Yes.

3    Q.   And you actually went to his office the second

4        time?

5    A.   Yes.

6    Q.   And said I'm not interested?

7    A.   Yes.

8    Q.   What was his response?

9    A.   He was disappointed.

10   Q.   Do you recall what he said? Or the gist of what

11       he said?

12   A.   I believe he asked if there was anything he

13       could do to persuade me to accept the position.

14       What, what circumstances might have to change.

15   Q.   And what did you tell him?

16   A.   I told him that I would have difficulty

17       reporting to the current supervisor in that

18       position.

19   Q.   And who would ...

20   A.   Because of a lack of respect.

21   Q.   Who would that have been?

22   A.   Dr. Wesley Teo.

23   Q.   How do you spell his last name?

24   A.   T-E-O.

**61**

17

1    Q.    Wesley?

2    A.    Yes.

3    Q.    Do you know if he's still there?

4    A.    No, he is not still there.

5    Q.    So ... and what was his response?

6    A.    Again, I believe he asked me what circumstances

7          might have to change for me to accept the

8          position.

9    Q.    And you said, basically you didn't want to work

10         with Wesley?

11   A.    Yes.

12   Q.    Anything Dr. Summers said in response to that?

13   A.    Not that I recall.

14   Q.    Did you just end the conversation there or?

15   A.    Yes, I believe we did.

16   Q.    You didn't say you'd think about it more, he

17         didn't offer to talk to Wesley or try to

18         rearrange the chain of command or any of that?

19   A.    Not that I'm aware of.

20   Q.    Okay. How long did this meeting last, the

21         second?

22   A.    Less than 30 minutes.

23   Q.    Anything else you recall about that conversation

24         other than what we've talked about?

**62**

FISHER REPORTING, INC.**E... ... ... ...ETTSVILLE, IN 47423**812-876-7312

```
 1    A.    No.

 2    Q.    What happened next in this sequence?

 3    A.    Within a short time, and by short, a couple of

 4          weeks, three weeks, Wesley Teo announced his

 5          intent to depart the university.

 6    Q.    How did you learn of that announcement?

 7    A.    Probably through the grapevine.

 8    Q.    Okay. So then what did you do?

 9    A.    I didn't do anything.

10    Q.    Did they contact, did Dr. Summers contact you at

11          this point?

12    A.    Yes.

13    Q.    How did that come about?

14    A.    Dr. Summers, either he himself or his secretary

15          asked if I could come to his office.

16    Q.    And you did?

17    A.    And I did.

18    Q.    And now we, are we in March .. ish?

19    A.    Still sometime in the last winter or early

20          spring.

21    Q.    You think three weeks after the first meeting,

22          somewhere in there?

23    A.    Probably within three weeks.

24    Q.    Okay. So you go see Dr. Summers, and what did he
```

**63**

19

| | | |
|---|---|---|
| 1 | | say to you and what did you say to him? |
| 2 | A. | I went to Dr. Summers and he said Wesley Teo is |
| 3 | | leaving now what? |
| 4 | Q. | Okay. And what was your reply? |
| 5 | A. | That certainly that obstacle had been overcome |
| 6 | | and that I would be willing to talk further |
| 7 | | about that position on an interim basis. |
| 8 | Q. | Okay. Did you talk further at that time? |
| 9 | A. | I believe we did. |
| 10 | Q. | Okay. What do you remember that was said? |
| 11 | A. | I think we talked about the timetable for Mr. |
| 12 | | Davis departure, my need to spend some time with |
| 13 | | Mr. Davis getting up to speed before his |
| 14 | | departure, the position ultimately being |
| 15 | | advertised as a permanent post. I believe that |
| 16 | | he indicated to me that he would like me to |
| 17 | | serve on an interim basis but that that could |
| 18 | | give me an opportunity to learn about the |
| 19 | | position to make a decision whether or not I |
| 20 | | wanted to consider it more on a permanent level. |
| 21 | Q. | Anything else you recall about that |
| 22 | | conversation? Did you get the impression from |
| 23 | | Dr. Summers that he wanted you to take that as a |
| 24 | | permanent position at this meeting? |

**64**

27.

1   A.   Again, not knowing what was in Dr. Summers mind
2        but knowing my experience and qualifications
3        with the university, I would assume I would have
4        a pretty good shot at it.

5   Q.   Was Dr. Summers going to be the one who would
6        decide who would fill that position or how did
7        that procedure work?

8   A.   All of those positions on that campus are
9        handled through search committees. The search
10       committee makes a recommendation of a set of
11       finalists to someone who is in a hiring making
12       decision.

13  Q.   Do you know who that person would be, whether
14       that would be Dr. Summers or someone else?

15  A.   I believe it was Provost Dowden.

16  Q.   Anything else you can recall about this
17       conversation with Dr. Summers?

18  A.   No.

19  Q.   What was the next thing that happened in the
20       chain of events?

21  A.   I believe I started shadowing Mike Davis.

22  Q.   Do you know how long that was after this first
23       meeting?

24  A.   A few weeks. He departed in mid-April.

**65**

22

1   Q.   Okay. Do you know how long you shadowed him

2        before he departed?

3   A.   A few weeks.

4   Q.   Okay. And so at the time you started shadowing

5        Mr. Davis, were you operating under any written

6        agreements with the university to take this

7        interim position?

8   A.   I believe i had proposed to the university some

9        suggestions of what might happen to my duties

10       within the broadcasting department during that

11       interim position.

12               MR. BELCHER: Okay.

13   A.   I believe there was a stipend dollar amount that

14       was agreed upon. I can't recall anything much

15       more specific than that.

16   Q.   Nothing in writing that you signed other that

17       this proposal you talked about?

18   A.   None that I recall.

19   Q.   So they paid you a stipend to shadow Mr. Davis

20       while you continued your responsibilities in the

21       department of broadcasting. Is that fair?

22   A.   I can't remember the exact specifics. At some

23       point, I handed off a significant amount of the

24       responsibilities in broadcasting to other

**66**

23

| | | |
|---|---|---|
| 1 | | faculty and staff people so that I could devote |
| 2 | | more exclusive time to the enrollment position. |
| 3 | | And I can't remember whether that was a clean |
| 4 | | cut or a transition up to the point where Mr. |
| 5 | | Davis departed. |
| 6 | Q. | It would have been before Mr. Davis departed |
| 7 | | that this handing off occurred? |
| 8 | A. | Again I can't, I can't remember specifically. |
| 9 | Q. | So once Mr. Davis departed were you the interim? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. And at that time, once he left and you |
| 12 | | became the interim assistant, did you devote |
| 13 | | full-time at that time to the administration |
| 14 | | side or were you still involved in the |
| 15 | | Department of Broadcasting? |
| 16 | A. | I devoted full effort to the enrollment position |
| 17 | | but was certainly available to those in |
| 18 | | broadcasting on a counsel basis or to answer |
| 19 | | questions. |
| 20 | Q. | Would that have happened when Mr. Davis left or |
| 21 | | was there still a period of continuing |
| 22 | | transition after Mr. Davis left? |
| 23 | A. | No. I believe that happened when Mr. Davis left. |
| 24 | Q. | So when he left you went in as the Interim |

**67**

24

1          Assistant Provost.

2     A.   Yes.

3     Q.   And would it be fair to say that at that time,

4          your involvement with the Department of

5          Broadcasting was basically like on call if

6          somebody needed something, or needed your

7          direction, or needed your input, they would call

8          you and say, hey what do we do with this?

9     A.   Yes.

10    Q.   Alright. How long did that last?

11    A.   Well, the interim title lasted until, I believe,

12         mid August when I was selected as the permanent

13         replacement. The on call status with

14         broadcasting never ceased.

15    Q.   Never, still there?

16    A.   Well, up until the point when I was removed from

17         the university's employment.

18    Q.   So that would have been in December of 200- ...

19    A.   2003.

20    Q.   2003. What types of things were you asked to do

21         from the folks in the broadcasting department

22         say, during the calendar year 2003. Give us some

23         examples.

24    A.   I was asked for advice regarding things such as

**68**

1   A.   To my knowledge, he is.

2   Q.   And Mr., how do you pronounce his last name?

3   A.   Rerko.

4   Q.   Rerko?

5   A.   Yes, he's still there.

6   Q.   Are they still in the broadcasting department?

7   A.   To my best knowledge.

8   Q.   I'm going to hand you what was marked as

9        Defendant's Deposition Exhibit 1 and ask you if

10       that is a true and accurate copy of a letter

11       that you wrote to Dr. Summers dated, it looks

12       like February 21, 2000?

13  A.   I don't have specific memory of writing this but

14       it certainly looks like what I probably did.

15  Q.   Is that your signature on the second page?

16  A.   Yes, it is.

17  Q.   Okay. Would you have any reason to believe that

18       it's not accurate?

19  A.   No.

20  Q.   Is this the letter that you talked to us about

21       already today? Where you said you'd given a

22       letter to Dr. Summers outlining some of your

23       thoughts about the transitional period?

24  A.   Yes.

**69**

27

| | | |
|---|---|---|
| 1 | Q. | So this is what, this is the one we're talking |
| 2 | | about. Right? |
| 3 | A. | Yes. |
| 4 | Q. | Do you recall when you signed a written contract |
| 5 | | to take on the Enrollment Manager position on a |
| 6 | | permanent basis? |
| 7 | A. | Sometime in mid-August. |
| 8 | Q. | Of? |
| 9 | A. | 2000. |
| 10 | Q. | So six months more or less after the date of |
| 11 | | this letter reflected in Defendant's Deposition |
| 12 | | Exhibit 1. Correct? |
| 13 | A. | Yes. |
| 14 | Q. | On paragraph #1 on the first page of that |
| 15 | | exhibit it talks about, it says term from April |
| 16 | | 20th through August 15th. Is that the interim |
| 17 | | period that we're talking about? |
| 18 | A. | Yes. |
| 19 | Q. | So between February 21st, then it says I will |
| 20 | | spend time with Mike Davis between now and April |
| 21 | | 20th so your thought was that between February |
| 22 | | 21st, more or less, until April 20, more or less, |
| 23 | | you'd shadow Mr. Davis? |
| 24 | A. | Yes. |

**70**

29

1        that we're talking about between April to August

2        there were no written contracts signed during

3        that period of time by you, between you and the

4        university?

5    A.  None that I recall.

6    Q.  On page 2, it says "compensation for myself,

7        $5,000." Is that the stipend that you were

8        talking about?

9    A.  Yes.

10   Q.  Okay. So, do, would I, would I be correct in

11       stating that during this interim period you were

12       continuing to be paid by the university under

13       your contract with them as the Department Chair

14       for the Department of Broadcasting and also

15       received this $5,000 stipend for this

16       transitional period into the Assistant Provost

17       position?

18   A.  Well, with one minor qualification. Your

19       assertion that being paid my existing salary for

20       being Broadcast Department Chair, that was also

21       a stipend.

22            MR. BELCHER: Okay.

23   A.  I was a 12 month faculty member for which I

24       received the lion's share of my salary, a small

**71**

30

| | | |
|---|---|---|
| 1 | | stipend for being Broadcast Chair. And then |
| 2 | | requested this additional stipend. |
| 3 | Q. | So they maintained their current financial |
| 4 | | arrangement with you in the Department of |
| 5 | | Broadcasting and in addition paid you this |
| 6 | | 55,000 |
| 7 | A. | Correct. |
| 8 | Q. | Okay. Why did Mr. Rorko and Mr. Hitchcock |
| 9 | | receive additional compensation? Were they |
| 10 | | taking on additional duties? |
| 11 | A. | Yes |
| 12 | Q. | Did they receive that? Do you know? |
| 13 | A. | I believe they did. |
| 14 | Q. | Okay. Now the last paragraph says, "If these |
| 15 | | details are agreeable to you please confirm in |
| 16 | | writing." Do you know if Dr. Summons gave you |
| 17 | | anything back in writing to confirm this |
| 18 | | arrangement? |
| 19 | A. | I can't recall. |
| 20 | Q. | Okay. The next sentence says "Upon your |
| 21 | | confirmation, I will provide a written note of |
| 22 | | my agreement to the interim position." Did that |
| 23 | | happen? |
| 24 | A. | I can't recall. |

**72**

31

```
 1   Q.   During this interim period, were there any

 2        ongoing discussions between you and Dr. Summers

 3        about your intentions toward taking this

 4        position on a permanent basis or not?

 5   A.   Yes.

 6   Q.   Can you tell me about those?

 7   A.   I believe there's only one and I announced to

 8        him that I had submitted my application for the

 9        position on a full-time basis.

10   Q.   Do you remember when that was?

11   A.   Probably sometime in the end of June of that

12        year.

13   Q.   What's the process there? Who do you submit that

14        application to?

15   A.   I can't remember specifically. It either would

16        have been to the search committee or to the

17        Department of Human Resources.

18   Q.   Is, would I be correct in saying that this was

19        just a, this was a letter that you prepared?

20        This application was a letter that you prepared

21        expressing an interest in this position or do

22        they have a form, an application that you

23        actually fill out and submit to them?

24             MS. COLEMAN LAMBERT: I'd like to
```

73

32

| 1 | | just clarify if you're talking about |
|---|---|---|
| 2 | | a letter or a form for the full-time |
| 3 | | position? |
| 4 | | MR. BELCHER: Yes. |
| 5 | | MS. COLEMAN LAMBERTI: That's what |
| 6 | | you're talking about? |
| 7 | | MR. BELCHER: Yeah, the application |
| 8 | | we just talked about. |
| 9 | | MS. COLEMAN LAMBERTI: Okay. |
| 10 | A. | I believe I simply submitted a letter of |
| 11 | | interest and a resume. |
| 12 | Q. | Okay. Do you know if anyone else applied for the |
| 13 | | position? |
| 14 | A. | Not definitively. |
| 15 | Q. | So to the best of your recollection, you had one |
| 16 | | conversation with Dr. Summers about this. You |
| 17 | | just said I submitted my application, basically. |
| 18 | A. | Yeah. he said good or I believe so. |
| 19 | Q. | What was the next step in the process of your |
| 20 | | getting the position on a permanent basis? |
| 21 | A. | I was scheduled for an interview. |
| 22 | Q. | Who contacted you to arrange that, do you |
| 23 | | remember? |
| 24 | A. | No. |

**74**

33

| | | |
|---|---|---|
| 1 | Q. | What department were they with, you remember |
| 2 | | that? I mean, was it from the president's |
| 3 | | office, the search committee? |
| 4 | A. | Probably the search committee. |
| 5 | Q. | Okay. Then what happened? |
| 6 | A. | Then I went to the interview. |
| 7 | Q. | And do you recall who interviewed you? |
| 8 | A. | Many people  the search committee, a group of |
| 9 | | staff from the Enrollment Management area. I |
| 10 | | believe there was a meeting of the deans and |
| 11 | | administrators. It was a very typical interview |
| 12 | | process for an administrative position with |
| 13 | | multiple constituencies throughout the course of |
| 14 | | the majority of a day. |
| 15 | Q. | Okay. So did you, did all these meetings happen |
| 16 | | in one room? |
| 17 | A. | I don't believe so. |
| 18 | Q. | Okay. Describe the process to me as best as you |
| 19 | | can recall. |
| 20 | A. | I simply recall being interviewed by several |
| 21 | | groups of people throughout the course of the |
| 22 | | day. I believe in multiple rooms. |
| 23 | Q. | Okay. Do you know who constituted the search |
| 24 | | committee? |

**75**

34

1    A.    I don't recall.

2    Q.    You remember any of them?

3    A.    No.

4    Q.      Then was, do I understand it correctly that
5          there was an assembly of staff representatives
6          from the Enrollment Management Department that
7          spoke with you or interviewed you?

8    A.    I believe so.

9    Q.    Do you remember who any of those folks were?

10   A.    Marketing Director, Director of Admissions,
11         Director of Retention, Admissions staff.

12   Q.    Remember any names?

13   A.    Sure.

14   Q.    Can you tell me who you remember?

15   A.    Marketing Director is Phyllis Alder; Director of
16         Admissions, Ann Skuce; Director of Retention,
17         Penny Quinn; several other admission staff
18         people.

19   Q.    Do you recall any names of the other folks that
20         were involved?

21   A.    Gwen Snyder, Chris Crews, C-R-E-W-S. The rest of
22         the names escape me.

23   Q.    And then some representatives from some various
24         deans and administrators, I think you said.

**76**

35

1   A.   Uh huh.

2   Q.   Were they in one group or?

3   A.   I believe so.

4   Q.   You remember any of those folks?

5   A.   Well, I can't remember specifically who

6        participated but I believe there was an assembly

7        called and I met with a group of people. But I

8        can't remember specifically.

9   Q.   You don't remember any of those names? Anybody

10       who was there in that group, other than you?

11  A.   No.

12  Q.   Is that the extent of the interview process that

13       took place that day?

14  A.   To my best recollection.

15  Q.   Were you told anything at the end of the day or

16       by any of these groups as you went through this

17       process about the likelihood that you were going

18       to get the job or be working in the new

19       position?

20  A.   No.

21  Q.   What's the next thing of significance that

22       happened?

23  A.   I was contacted by Provost Dowden, went to his

24       office and he told me he would like to offer me

**77**

36

```
1              that position.
2    Q.        Do you recall how much time passed between this
3              day of interviews and the time that ...
4    A.        No.
5    Q.        Mr. Dowden contacted you?
6    A.        I do not.
7    Q.        Soon? We talking about like a week or less or
8              more or have any estimate of time?
9    A.        I honestly don't remember.
10   Q.        So did you have a, did Mr. Dowden call and ask
11             you to come in and visit with you about this or
12             did he just tell you this over the phone?
13   A.        I believe that's the way it worked, he called me
14             and asked me to come in.
15   Q.        Okay. And offered you the position?
16   A.        Yes.
17   Q.        And you said?
18   A.        I'll sleep on it and let you know.
19   Q.        Any details of the position, salary wise, that
20             sort of thing discussed during this initial
21             meeting with Mr. Dowden?
22   A.        Yes, I believe we discussed a salary.
23   Q.        You remember anything else you talked about?
24   A.        No.
```

**78**

37

```
 1   Q.   You remember what the salary was that he offered
 2        you?
 3   A.   Simply by reviewing the information in
 4        hindsight, I believe it was in the $79,000
 5        range. $78,000 or $79,000.
 6   Q.   And is it accurate that that's all you recall
 7        about that conversation, he called you and asked
 8        you to come in. Offered you the job, talked
 9        about salary and you said you wanted to sleep on
10        it?
11   A.   Yes.
12   Q.   What happened next?
13   A.   I slept on it.
14   Q.   Okay. And then what did you do?
15   A.   I accepted the position.
16   Q.   Was it the next day or?
17   A.   I believe it was the next day.
18   Q.   How did that come about?
19   A.   I asked to see Dean, Provost Dowden, and told
20        him that I accepted the position.
21   Q.   Went to his office?
22   A.   Yes.
23   Q.   You recall anything about that conversation
24        other than you accepted and he, I assume,
```

**79**

38

```
 1              congratulated you?
 2   A.         Yes.
 3   Q.         Was that the extent of the conversation that you
 4              recall?
 5   A.         Yes.
 6   Q.         Any written contracts proposed or signed at that
 7              meeting?
 8   A.         I don't believe so.
 9   Q.         Any discussion about any written contracts at
10              that meeting?
11   A.         No.
12   Q.         Was anybody else present besides you and Mr.
13              Dowden at that meeting?
14   A.         Not that I'm aware of.
15   Q.         So how'd you leave it when you left his office
16              that day?
17   A.         That I had accepted the position. Typically the
18              custom on that campus is that subsequently a
19              contract usually arrives in the mail.
20   Q.         Is that what happened in your case?
21   A.         Yes.
22   Q.         Was it already signed by Dr. Summers when you
23              got it in the mail?
24   A.         I can't remember that.
```

**80**

FISHER REPORT                OX 214**ELLETTSVILLE, IN 47429**812-876-7312

39

```
 1    Q.    Did it come with any correspondence?

 2    A.    I can't remember that either.

 3    Q.    Did it come to your office at the university as

 4          opposed to your home?

 5    A.    I can't remember that either.

 6    Q.    It's usually cheaper to mail them on campus

 7          isn't it? What do you remember about receiving

 8          that contract?

 9    A.    I remember receiving it, signing it, returning

10          it.

11    Q.    You stick it back in the mail or did you deliver

12          it to someone?

13    A.    I don't remember.

14    Q.    I'm going to hand you what's been marked as

15          Defendant's De position Exhibit 2 and ask you if

16          that's a copy of the contract that we just

17          talked about  that you signed in August of 2000?

18    A.    It appears to be.

19    Q.    It says Exhibit C down at the bottom of it, that

20          wasn't on the original contract that you signed,

21          was it?

22    A.    No, I believe that was added for the fairness

23          hearing.

24    Q.    Actually, I'll tell you, that was a copy that
```

40

1               came off of the complaint, your amended

2               complaint that was filed in this district court

3               action. And that's apparently where the Exhibit

4               C came from. Is that the only contract you

5               signed with the university concerning your

6               position as Assistant Provost?

7   A.      I believe so.

8   Q.      How is a contract like that continued? If I

9               recall correctly the contract you have in front

10              of you has a term from August of 2000 through

11              June of 2001. Is that correct?

12   A.      Yes.

13   Q.      Did you receive any sort of written

14              documentation from the university after June of

15              2001 indicating in any way that this contract

16              was continuing or terminated or anything like

17              that?

18   A.      I don't believe so.

19   Q.      Alright. Did you have any discussions with

20              either Mr. Dowden or Mr. Summers after you

21              signed that contract and sent it back or

22              delivered it back about any of the contents of

23              that contract or?

24   A.      No.

**82**

41

| | | |
|---|---|---|
| 1 | Q. | Did you talk to an attorney at all before you |
| 2 | | signed the contract about what you were signing? |
| 3 | A. | No. |
| 4 | Q. | Did you talk to anybody at the university about |
| 5 | | the contract before you signed it about, as far |
| 6 | | as what you were signing? |
| 7 | A. | Not that I recall. |
| 8 | Q. | Did you feel like you understood it well enough |
| 9 | | before you signed it that you didn't need to |
| 10 | | consult with the other folks? |
| 11 | A. | Yes. |
| 12 | Q. | How would you describe your duties as the |
| 13 | | Assistant Provost for Enrollment Management? |
| 14 | A. | To have oversight over the entire enrollment |
| 15 | | management operation at the university. |
| 16 | Q. | What does that include? |
| 17 | A. | Supervision of the Office of Admissions, the |
| 18 | | marketing efforts of the university, the Office |
| 19 | | of Retention Management, also a Parent Services |
| 20 | | Initiative. |
| 21 | Q. | What would that involve, Parent Services |
| 22 | | Initiative? |
| 23 | A. | Interacting with parents as they had questions |
| 24 | | or concerns about their children's experience at |

**83**

44

1   A.   Oh, when I was probably first employed at the

2        university in the early 80's.

3   Q.   And do you recall in what context you heard it

4        used?

5   A.   From people discussing the fact that there were

6        professional staff employees on that campus who

7        had tenure.

8   Q.   This was in the early 80's?

9   A.   Yes.

10  Q.   And so during the early 80's when you first

11       heard about this, what was your understanding of

12       what it meant?

13  A.   That it afforded professional staff people some

14       of the same property rights and securities just

15       as faculty members would attain tenure.

16  Q.   Do you recall in particular, who the folks were

17       who you knew had professional staff tenure?

18  A.   Sure, some of my professional staff people in

19       the Broadcast Department did.

20  Q.   Okay. And did they ever, any of these folks tell

21       you how they acquired professional staff tenure?

22  A.   I don't know that they told me, but I was aware.

23  Q.   How were you aware?

24  A.   Through reading processes. I believe at least

**84**

```
 1              one of those people received professional staff

 2              tenure under my supervision so I had to be a

 3              part of the process.

 4    Q.        Okay. And what part in that process did you

 5              take?

 6    A.        To review tenure application and sign off with a

 7              recommendation.

 8    Q.        Who was this person?

 9    A.        I believe that would have been Jill Ballinger,

10              B-A-L-L-I-N-G-E-R.

11    Q.        And what job title did she obtain when obtained

12              professional staff tenure?

13    A.        Her job title does not change.

14    Q.        What was her job title?

15    A.        Production Manager.

16    Q.        And she worked?

17    A.        In the television station.

18    Q.        Okay. Do you recall what year we're talking

19              about that this process took place?

20    A.        No.

21    Q.        In the 90's?

22    A.        Couldn't have, professional staff tenure was

23              eliminated in 1990.

24    Q.        So it happened in the 80's?
```

**85**

46

| 1 | A. | Yes. |
|---|----|------|

2    Q.    Okay. So were you the Broadcasting Department

3         Head at that time?

4    A.    Yes.

5    Q.    That's why you had to sign off on her

6         professional staff tenure?

7    A.    Yes.

8    Q.    You have knowledge of any other individuals who

9         had professional staff tenure as far as your

10        being involved in the process of obtaining it?

11    A.    That's the only one I can remember. That doesn't

12        mean there weren't others.

13    Q.    Are you familiar with anyone who was granted

14        professional staff tenure after 1990 for any

15        reason?

16    A.    No.

17    Q.    You know of any individuals who transferred from

18        faculty to administration who retained faculty

19        tenure?

20    A.    I would assume all of them.

21    Q.    Do you know of any of them who did?

22    A.    No.

23    Q.    Do you know of anyone who transferred from

24        faculty to professional staff during the 1990's?

**86**

| | | |
|---|---|---|
| 1 | | MS. COLEMAN LAMBERTI: Would you |
| 2 | | repeat the question? |
| 3 | | MR. BELCHER: Sure, do you know of |
| 4 | | anyone who transferred from faculty |
| 5 | | to professional staff during the |
| 6 | | 1990s? |
| 7 | A. | I know faculty members who assumed |
| 8 | | administrative roles during the 1990's. |
| 9 | Q. | Okay. And tell me who those folks are. |
| 10 | A. | Jim Messmer. |
| 11 | Q. | Okay. Anybody else? |
| 12 | A. | I believe Dr. Phillip Pierpont. |
| 13 | Q. | How would we spell his last name? |
| 14 | A. | P-I-E-R-P-O N T. |
| 15 | Q. | Just like it sounds. Anybody else? |
| 16 | A. | Those are the only ones I can recall. |
| 17 | Q. | Now you used a different term that I used. My |
| 18 | | question was do you know anybody who transferred |
| 19 | | from faculty to profession staff. And you said |
| 20 | | you know of some people who assumed, faculty |
| 21 | | members who assumed administrative roles. Is |
| 22 | | that what you told me? |
| 23 | A. | Uh huh. |
| 24 | Q. | What's the difference? |

**87**

48

1    A.    Your statement asserts that somehow they stopped
2          becoming faculty.
3    Q.    And your's asserts that they did not?
4    A.    Correct.
5    Q.    So is Mr. Messmer part of the faculty now? Do
6          you know, Jim Messmer?
7    A.    I would assume he has faculty tenure.
8    Q.    Do you know?
9    A.    No.
10   Q.    How about Dr. Pierpont?
11   A.    Don't know.
12   Q.    What does Dr. Pierpont do now? Do you know?
13   A.    He is an Assistant Provost for Academic Affairs.
14   Q.    Do you know when he took that position?
15   A.    No.
16   Q.    Was it in the 90's?
17   A.    I believe so.
18   Q.    Are those the only two folks that you know of
19         who transferred, moved over from faculty to
20         professional staff whether it was an assumption
21         or whatever you want to call it?
22   A.    Those are the only ones I can recall.
23   Q.    Is it your position that that's what he did?
24   A.    Yes.

**88**

50

1    Q.    Who was the last one who did that before you?

2    A.    I do not recall.

3    Q.    You don't remember whether it was Mr. Messmer or

4          Mr. Pierpont?

5    A.    I do not recall.

6    Q.    Alright. Have you ever had a conversation with

7          either Mr., well let's take them one at a time,

8          with Mr. Messmer about his moving from faculty

9          to administrative staff and what all that

10         involved?

11   A.    Not that I recall.

12   Q.    Do you know whether or not Mr. Messmer believes

13         he retained his faculty tenure when he moved?

14   A.    I do not know.

15   Q.    Have you had a conversation with Mr. Pierpont

16         about his move from faculty to administrative

17         staff?

18   A.    Not that I recall.

19   Q.    Do you know whether or not Mr. Pierpont believes

20         that he retained his faculty tenure when he

21         moved to administrative staff?

22   A.    I do not know.

23   Q.    Are you aware of whether or not you ever

24         obtained professional staff tenure after you

**89**

51

| | | |
|---|---|---|
| 1 | | became the Assistant Provost? |
| 2 | A. | To my best knowledge I did not. |
| 3 | Q. | No one ever told you that you did? |
| 4 | A. | No. |
| 5 | Q. | You never asked anyone if you did? |
| 6 | A. | I don't know how I could, it ceased to exist ten |
| 7 | | years prior. |
| 8 | | MR. BELCHER: Well, that's not the |
| 9 | | answer to my question, it calls for |
| 10 | | a yes or no answer. |
| 11 | Q. | Did anyone tell you that you obtained it? |
| 12 | A. | No. |
| 13 | Q. | Did you ever have a conversation with Dr. |
| 14 | | Summers about it? |
| 15 | A. | No. |
| 16 | Q. | Never? |
| 17 | A. | Not that I recall. |
| 18 | Q. | Did anyone ever, from the university ever tell |
| 19 | | you ... I'm paraphrasing, Mr. Hanes in |
| 20 | | recognition of your service to the university, |
| 21 | | you have obtained profession staff tenure now |
| 22 | | that you're an Assistant Provost? |
| 23 | A. | The only statement I recall from someone in the |
| 24 | | university would have occurred at the time I was |

**90**

1      assumption that that was a permanent position or

2      not? As Assistant Provost for Enrollment

3      Management.

4                    WITNESS: From the university's

5                    perspective or from my perspective?

6                    MR. BELCHER: Take them one at a

7                    time.

8   Q.   From yours.

9                    MS. COLEMAN LAMBERTI: To clarify

10                   whether the position as Assistant

11                   Provost was a permanent position. Is

12                   that what you're asking?

13                   MR. BELCHER: Right.

14  A.   Okay. From my perspective I intended to

15       undertake the position for a period of years and

16       then return to teaching in the Broadcasting

17       Department.

18  Q.   Did you ever tell anybody that?

19  A.   No.

20  Q.   That's not what Defendant's Exhibit 1 says, is

21       it? The letter, 2001, or I'm sorry, February 21,

22       2000 Defendant's Exhibit 1. You talk in

23       paragraph 2 about if I'm interested in the

24       position permanently. Correct?

**91**

54

1   A.   Yes.

2   Q.   Paragraph 7, if I do not apply for or do not get

3        the Enrollment Management position as a

4        permanent position. It didn't indicate anything

5        here that you planned to do something beyond

6        that. Did you?

7   A.   No, I did not.

8   Q.   Okay. Did you have a conversation with Ms., Dr.

9        Summers that you planned to do anything beyond

10       being the Assistant Provost for Enrollment

11       Management?

12  A.   No, I did not.

13  Q.   Did you have a conversation with anybody at the

14       university that you planned to do something

15       beyond that?

16  A.   I don't recall that.

17  Q.   You said you were dumbfounded when Mr. Dowden

18       had this conversation with you on November 13th

19       of 2003.

20  A.   Uh huh.

21  Q.   Which part dumbfounded you?

22  A.   I guess the, the entire scenario, the entire

23       meeting.

24  Q.   Why?

**92**

55

| | | |
|---|---|---|
| 1 | A. | Because I'd been given no indication to believe |
| 2 | | that my performance in that job was anything |
| 3 | | less than satisfactory. |
| 4 | Q. | So is it fair to say that it was a surprise to |
| 5 | | you that they were removing you from that |
| 6 | | position? |
| 7 | A. | Yes. |
| 8 | Q. | Was that, this conversation with Mr. Dowden on |
| 9 | | November the 13th of 2003, is that the first |
| 10 | | indication you had from anyone at the university |
| 11 | | that this was being considered or being done? |
| 12 | | Removing you from that position? |
| 13 | A. | I believe so. |
| 14 | Q. | How did it come about? Did Mr. Dowden contact |
| 15 | | you, call you into his office? |
| 16 | A. | Yes. |
| 17 | Q. | And tell you this? |
| 18 | A. | Yes. |
| 19 | Q. | Did he call you? |
| 20 | A. | Yes, I believe so. |
| 21 | Q. | Do you remember what he said when he called you? |
| 22 | A. | Could you come to my office. |
| 23 | Q. | Did he tell you why? |
| 24 | A. | I don't believe so. |

**93**

56

1    Q.    So you went straight away?

2    A.    Yes, uh huh.

3    Q.    Who all was there?

4    A.    Mr. Dowden, Mr. Messmer and myself.

5    Q.    And what do you recall about, what, what

6          conversations do you recall took place at that

7          meeting?

8    A.    I recall Mr. Dowden saying that they intended to

9          move the Enrollment Management area in a

10         different direction and that those plans did not

11         include me. And that out of respect for my

12         tenure with the university, they would like to

13         offer me a Business and Industry position.

14   Q.    You recall anything further that either Mr.

15         Messmer or Mr. Dowden said to you at that?

16   A.    At that point, Mr. Messmer gave me some basic

17         overview information of the position that I was

18         being offered. Mr. Dowden, at that point,

19         excused himself and said that Mr. Messmer will

20         take you to his office to talk with you about

21         more details about that position. And that was

22         the end of that meeting.

23   Q.    So then you went with Mr. Messmer?

24   A.    Yes.

**94**

57

1    Q.    And Mr. Dowden didn't say anything else?

2    A.    No.

3    Q.    Okay. What happened in Mr. Messmer's office?

4    A.    He handed me the job description and salary

5         schedule. And John Ludlow, his assistant was

6         also in the meeting who would be the supervisor

7         of the position which I was offered. And they

8         explained more to me about this specific job and

9         what the duties would be.

10    Q.    And what did you say to them?

11    A.    I just listened.

12    Q.    You recall anything else about that meeting?

13         Anything that anyone else said, did?

14    A.    I believe, I believe as we ended the meeting,

15         Mr. Messmer told me he needed to hear back from

16         me as soon as possible whether this position was

17         acceptable.

18    Q.    Was there anyone in that position when they were

19         offering it to you?

20    A.    Not that I'm aware of.

21    Q.    Is that a position that existed in the

22         university or were they creating this position?

23    A.    I don't know.

24    Q.    So what? You left the meeting?

**95**

58

1   A.   Yes.

2   Q.   To think about it?

3   A.   Yes.

4   Q.   And what happened next in this sequence?

5   A.   The next morning I returned to Mr. Dowden's

6        office to tell him that I had considered the

7        offer and respectfully declined it and requested

8        that I be reassigned to teach within the

9        Broadcasting Department.

10  Q.   Did you say anything else at that meeting?

11  A.   Yes.

12  Q.   What else did you say?

13  A.   Told him that I thought teaching in the

14       Broadcasting Department was where I was at the

15       best service to the university. That was what I

16       had always thought I had done best and also told

17       him of my great sadness and heartbreak over the

18       way I had been treated.

19  Q.   When was the last time you taught at the

20       university?

21  A.   In the spring of 2000.

22  Q.   What else took place during this conversation,

23       this meeting, that you can recall?

24  A.   I told Mr. Dowden that I was declining the

**96**

59

| | | |
|---|---|---|
| 1 | | position, requested that I return to |
| 2 | | Broadcasting to teach, explained that I thought |
| 3 | | it was the best service to the university, told |
| 4 | | him of my dissatisfaction with what had just |
| 5 | | happened. He indicated he could not give me an |
| 6 | | immediate response, but would look into my |
| 7 | | request and would get back with me. |
| 8 | Q. | Was anyone else present besides the two of you? |
| 9 | A. | No. |
| 10 | Q. | Anything else said during that meeting? |
| 11 | A. | Not that I recall. |
| 12 | Q. | Did he question you about why you turned down |
| 13 | | his offer or why you? |
| 14 | A. | No, not that I recall. |
| 15 | Q. | No conversations about that other than your |
| 16 | | statement you don't want it. Yes? |
| 17 | A. | Yes. |
| 18 | Q. | So what happened next? |
| 19 | A. | I waited for his call. |
| 20 | Q. | And you know how long it was? |
| 21 | A. | And I waited for his call. |
| 22 | | MR. BELCHER: Okay. |
| 23 | A. | I actually made two phone calls the, this was, I |
| 24 | | believe, a Thursday. I made two phone calls to |

**97**

61

```
 1              the department, they deemed that it was, I can't

 2              remember the specific information. But anyhow

 3              deemed it wouldn't be possible for me to do

 4              that. But they would like me to reconsider the

 5              Business and Industry position.

 6    Q.        Did they say anything else to you at that

 7              meeting that you can recall?

 8    A.        Up to that point, I don't recall.

 9    Q.        So then you responded?

10    A.        And then I responded, I told you a week ago I

11              was not interested in that position and that's

12              still my stance.

13    Q.        And they responded I take it?

14    A.        By handing me a letter.

15    Q.        Okay. What did it say?

16                        WITNESS: I'd have to see the letter

17                        specifically but if I could

18                        paraphrase?

19                        MR. BELCHER: Sure.

20    A.        The request for me to accept the position became

21              a directive. And at that point they said they

22              directed me to accept the position or turn in my

23              resignation to the university.

24    Q.        Was this letter signed by somebody that they
```

**98**

1           gave you?

2     A.    It was signed by Dowden and Messmer.

3                 MS. COLEMAN LAMBERTI: It will ...

4     Q.    Both of them, it's your recollection?

5                 MS. COLEMAN LAMBERTI: Excuse me. I

6                 think if you're going to ask him

7                 questions about that letter, if you

8                 could put it in front of him.

9                 MR. BELCHER: No, I'm just asking his

10                knowledge. What he recalls about it.

11    A.    To my knowledge, it was signed by both Dowden

12          and Messmer.

13    Q.    And it's your understanding that it was a

14          directive? Your term was take it or resign?

15    A.    Well, if, if, if you understand the verb direct

16          as meaning a directive, yes.

17    Q.    What was your response?

18    A.    I told, I read the letter and told them that I

19          didn't intend to do either option that they'd

20          indicated. I didn't intend to accept the

21          position and I did not intend to resign.

22    Q.    Okay. And did they say anything in response to

23          that?

24    A.    At that point Mr. Dowden said, well then,

**99**

```
1              someone will be in touch.

2      Q.      Then what?

3      A.      I walked out.

4      Q.      Okay. What happened next?

5      A.      I guess I cleaned out my office.

6      Q.      So you left, was this in Mr. Dowden's office?

7      A.      Yes.

8      Q.      You left Mr. Dowden's office and went back to

9              your office and started packing up?

10     A.      Yes.

11     Q.      Did you move out that day, clean out your office

12             and leave that day?

13     A.      Either that day or that evening.

14                     MR. BELCHER: Okay.

15     A.      I can't remember. I think my wife came back and

16             helped me move things out that evening.

17     Q.      You have like a key that you had to turn into

18             somebody or did you do anything with that?

19     A.      Not at that point.

20     Q.      What happened next after you left your, cleaned

21             out your office and left? What was the next

22             contact with the university?

23     A.      My next contact with the university was through

24             a local attorney in Vincennes.
```

**100**