# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

JACK A. HANES                                           CAUSE NO:  2:04-cv-0140-RLY-WGH
     Plaintiff

    vs.

JOHN R. GREGG, Interim President of
Vincennes University, in his individual
capacity and in his official capacity;
DALE DOWDEN, University Provost and
Vice President for Academic Affairs, in
his individual capacity;
PHILLIP RATH, Vice President for
Finance and Government Relations, in his
individual capacity;
JIM MESSMER, Vice President for
Statewide Services, in his individual capacity; and
THE BOARD OF TRUSTEES OF VINCENNES
UNIVERSITY in their official capacity
     Defendants


### APPENDIX OF DESIGNATED MATERIALS
### VOLUME II
### PAGES 101-150

Respectfully submitted,

KELLEY, BELCHER & BROWN


By:    s/ Thomas J. Belcher
       Thomas J. Belcher, #3773-53
       Attorneys for Defendants
       301 West Seventh Street
       Post Office Box 3250
       Bloomington, Indiana  47402-3250
       Telephone:   812-336-9963
       Fax:             812-336-4588
       E-mail: tbelcher@kelleybelcherbrown.com

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Appendix of Designated Materials -- Volume I was filed electronically on the 16th day of June, 2005.  Notice of this filing was sent to the following by operation of the Court's electronic filing system:

Ida Coleman Lamberti
MAURER RIFKIN & HILL, P.C.
E-mail:  iclamberti@mrhlaw.com

s/ Thomas J. Belcher
Thomas J. Belcher

64

1    Q.    Was that Paul Ledford?

2    A.    Yes.

3                  MR. BELCHER: Okay.

4    A.    I asked for his assistance. I asked him to write

5          a letter to the university asking them to

6          reconsider my request to teach.

7    Q.    So when you cleaned out your office and left

8          that day ...

9    A.    Uh huh.

10   Q.    You left the university and you had left your

11         job?

12   A.    I was still an employee of the university.

13   Q.    But just didn't have an office. Or what?

14   A.    Well, remember I was told I was being removed

15         from the Enrollment Management position so I

16         guess at that point I was an employee in limbo,

17         no office.

18   Q.    No office?

19   A.    I choose to leave that office.

20                 MR. BELCHER: Okay.

21                 MS. COLEMAN LAMBERTI: Mr. Belcher,

22                 it's about 2:15. We've been going

23                 for about an hour and fifteen

24                 minutes.

**101**

FISHER REPORTING, INC.            **ELLETTSVILLE, IN 47429**812-876-7312

1          Number one that it was structured on a, the

2          document we refer to is a base salary plus bonus

3          scheme, which I was not comfortable with. In

4          order to come back to the salary level that

5          would, was what I left, I would have to

6          demonstrate an increase of 400 percent in the

7          business over an 18 month period. That seemed a

8          little out of line. And I was also concerned

9          about whether or not the pay structure was in

10         compliance with the Higher Education Act.

11    Q.   What was it that you were concerned about as far

12         as the pay structure being in compliance with

13         the Higher Education Act?

14    A.   I know that the Higher Education Act restricts

15         compensation of university employees recruiting

16         students and generating enrollments based on a

17         commissional bonus scheme. And that certainly

18         appeared to fly in the face of the Higher

19         Education Act guidelines.

20    Q.   Did you tell Mr. Dowden that?

21    A.   No, I did not.

22    Q.   Did you tell Mr. Messmer that?

23    A.   No, I did not.

24    Q.   Did you tell anybody at the university that?

**102**

1   A.   Not at that point.

2   Q.   Did you tell them that you had concerns about

3        the pay, the pay structure in general?

4   A.   No.

5   Q.   Did you tell them that you didn't think that you

6        had the training to do this job?

7   A.   What I told them was that I thought I could

8        serve the university best in my teaching

9        position.

10  Q.   Is that the only thing that you told them in

11       response to their offer that you take this new

12       position as the Coordinator of Southern Indiana

13       Business and Industry?

14  A.   To my best recollection.

15  Q.   In response to one of my other questions, you

16       said not at that time. When I asked you, I

17       think, if you told Mr. Dowden and Mr. Messmer

18       about your concern with the pay scale ... did

19       you tell them that at some point?

20  A.   I don't believe I told them that until the due

21       process hearing.

22  Q.   When you were working as the Assistant Provost

23       for Enrollment Management during the term of

24       your contract with the university in that

**103**

```
 1              position, is it your position that you had the
 2              right to terminate that contract and go back to
 3              a faculty position at any time?
 4       A.     Yes, it's my position that I have the right to
 5              return to faculty and teach.
 6       Q.     At any time?
 7       A.     Yes.
 8       Q.     You could tell them, I don't want to do this
 9              anymore, I want to go back?
10       A.     Yes.
11       Q.     Did anybody tell you that you had that right?
12       A.     No.
13       Q.     Do you know of anyone at Vincennes University
14              that has ever gone from professional staff to
15              faculty?
16                      MS. COLEMAN LAMBERTI: I'm going to
17                      ... are you asking him not that he
18                      went from professional staff back to
19                      teaching, you're asking him if he
20                      knew anyone that ever went from
21                      professional staff?
22                      MR. BELCHER: I think my question
23                      was, do you know of anyone at
24                      Vincennes University who ever went
```

**104**

```
 1   Q.    So if you would go back to being a Department

 2         Chair the Dean would have had to remove the

 3         person who was there in that position and

 4         inserted you in that position?

 5   A.    If I were to have undertaken the

 6         responsibilities of Department Chair, yes.

 7   Q.    Right. Is it your position that the university

 8         offered you this job as the Coordinator of

 9         Southern Indiana Business and Industry because

10         they knew you wouldn't take it?

11                   MS. COLEMAN LAMBERTI: I'm going to

12                   object on the basis that he, he has

13                   no way of knowing what was in their

14                   mind or what their motivation was to

15                   the extent that he can respond to

16                   it. You may respond to it.

17   A.    I don't know.

18   Q.    You don't have an opinion on that one way or the

19         other?

20   A.    Opinion ... I guess would tell me that they

21         thought it was a position that would put me on

22         the sidelines.

23   Q.    Is that your opinion?

24   A.    Yes.
```

**105**

1       enrollment of students. I pointed out examples

2       of poor quality service to students, to

3       situations where we were really driving students

4       away rather than recruiting students. I also

5       pointed out situations where I thought the

6       university was moving toward a direction of

7       wanting to admit less qualified students.

8       Students who would have a slim ability to

9       succeed purely for financial reasons.

10  Q.    Any others?

11  A.    That's all I can recall right now.

12  Q.    Okay. The first one I wrote down anyway is you

13       spoke out on issues that you felt were

14       detrimental to student recruitment. Did I get

15       that right?

16  A.    Yes.

17  Q.    Tell me about that. What are the issues that you

18       thought were detrimental to student recruitment?

19  A.    Faculty abuse of students, faculty demeaning

20       students, providing very poor service which

21       would lead the students to believe they weren't

22       wanted there.

23  Q.    Who did you express these concerns to?

24  A.    Provost Dowden.

**106**

76

```
 1    Q.    Did you express them you anybody else?

 2    A.    And the entire group that he met with on a

 3          weekly basis which was called the Deans meeting.

 4    Q.    Who would all be present in these Deans

 5          meetings?

 6    A.    The Deans.

 7    Q.    Anyone else?

 8    A.    The other two Assistant Provosts, Assistant

 9          Provost for Academic Affairs, and Assistant

10          Provost for Student Affairs.

11    Q.    Anybody else be present at these Deans meetings?

12    A.    On a regular basis those are the people who met,

13          occasionally there were invited guests. I can't

14          recall the timing and attendance at those

15          meetings.

16    Q.    Is that the only forum where you spoke out on

17          the issues that you thought were detrimental to

18          student recruitment?

19    A.    I also referred those comments to Interim

20          President Gregg.

21    Q.    To him personally or?

22    A.    To him personally.

23    Q.    Okay. Any other folks or forums where you

24          expressed your concerns about the issues
```

**107**

77

1          detrimental to student recruitment?

2   A.   Not that I can recall.

3   Q.   When you expressed them personally to Interim

4          President Gregg, how did you do that?

5   A.   It was in my office. I explained to him that I

6          thought the current concerns about the

7          enrollment issue were going in the wrong

8          direction. That we were not trying to resolve

9          the root problems of enrollment but simply

10         trying to solve them through PR and marketing.

11   Q.   Okay. Did you have suggested changes that you

12         made to President Gregg?

13   A.   Yes, told him we needed to fix those problems.

14   Q.   Did this conversation with President Gregg

15         happen on one occasion or more than one

16         occasion? I'm just talking about now. What we've

17         identified as issues detrimental to student

18         recruitment?

19   A.   I can recall it happening on one occasion.

20   Q.   And do you remember when that was?

21   A.   It would have been in the fall of 2003.

22   Q.   In your office?

23   A.   Yes.

24   Q.   What was his response?

**108**

78

| 1 | A. | I don't recall specifically. I think he agreed |
| 2 | | that they were issues. But I don't recall it |
| 3 | | going beyond that. |
| 4 | Q. | No discussion as to plans to correct anything? |
| 5 | A. | No. |
| 6 | Q. | Changes to be made? |
| 7 | A. | Not that I recall. |
| 8 | Q. | How about at the Deans meetings, when you made |
| 9 | | these statements?  Did that result in any |
| 10 | | proposed changes or agreement that we got these |
| 11 | | problems or? |
| 12 | A. | There was general discussion that there were |
| 13 | | problems. I saw no specific tasks undertaken to |
| 14 | | resolve them. |
| 15 | Q. | Are you the only person who spoke out on these |
| 16 | | issues at the Deans meeting? |
| 17 | A. | To my best recollection, yes. |
| 18 | Q. | What kind of reception did you get from the |
| 19 | | Deans and from Provost Dowden? |
| 20 | A. | And again the response that we need to do better |
| 21 | | than that, but I saw no action steps. |
| 22 | Q. | Do you know when these meetings took place, what |
| 23 | | dates we're talking about where you made these |
| 24 | | statements about student recruitment? |

**109**

79

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Would it have been before your meeting with |
| 3 | | Interim President Gregg? |
| 4 | A. | Yes. |
| 5 | Q. | The same year, meaning it was 2003? |
| 6 | A. | Yes. |
| 7 | Q. | Okay. Then the second issues of public concern |
| 8 | | that I wrote down that you said was poor quality |
| 9 | | service to the kids. Is that fair? Or was it |
| 10 | | more than that? |
| 11 | A. | Yes, and really that pretty well ties into the |
| 12 | | first issue that we just talked about. |
| 13 | Q. | Okay. Did you discuss those issues about the |
| 14 | | poor quality service to the students at any |
| 15 | | place other than the Deans meeting and with |
| 16 | | Interim President Gregg in your office? |
| 17 | A. | I discussed them with my staff in the Enrollment |
| 18 | | Management area. |
| 19 | Q. | And who would those people have been? Do you |
| 20 | | remember any names? |
| 21 | A. | Yes, Ann Skuce, the Director of Admissions. |
| 22 | Q. | How do you spell her last name? |
| 23 | A. | S-K-U-C-E. |
| 24 | | MR. BELCHER: Okay. |

**110**

80

| 1 | A. | Phyllis Alder, Director of Marketing. |
|---|----|---------------------------------------|
| 2 |    | MR. BELCHER: Okay. |
| 3 | A. | Penny Quin, Director of Retention Management. |
| 4 | Q. | Okay. Anybody else? |
| 5 | A. | Probably Cindy Beaman, B-E-A-M-A-N, Parent |
| 6 |    | Services Coordinator. |
| 7 | Q. | Okay. Anybody else? |
| 8 | A. | That's all I can recall. |
| 9 | Q. | So as far as the poor quality service to |
| 10 |   | students issues, you spoke about that to the |
| 11 |   | Deans meeting, to President, Interim President |
| 12 |   | Gregg and to your staff in the Enrollment |
| 13 |   | Management Area? |
| 14 | A. | Yes. |
| 15 | Q. | These people that we just talked about? |
| 16 | A. | Yes. |
| 17 | Q. | Anyplace else or to any other persons? |
| 18 | A. | Probably in casual conversation to other faculty |
| 19 |   | and staff on campus. What, I guess, I would |
| 20 |   | refer to as, you know, coffee pot discussions. |
| 21 | Q. | Sure. Anyplace else? |
| 22 | A. | Not that I can recall. |
| 23 | Q. | And then the last one that I have written down |
| 24 |   | was you pointed out ... I can't read my writing |

**111**

```
 1                 ... situations when university is moving towards

 2                 admitting less qualified students for financial

 3                 reasons.

 4      A.         Uh huh.

 5      Q.         Is that fairly accurate as to what you told me?

 6      A.         Yes.

 7      Q.         Alright. Where did you speak out about that?

 8      A.         I spoke out during meetings with VP's and

 9                 Assistant Provosts when we were discussing ways

10                 to enhance enrollment at the university.

11      Q.         Okay. Any other place?

12      A.         Again other than coffee pot discussions,

13                 probably no other formal venues.

14      Q.         Are those the three issues of public concern

15                 that you told me that you spoke out about while

16                 you were the Assistant Provost for Enrollment

17                 Management?

18      A.         Those are the ones I can think of at this point,

19                 yes.

20      Q.         Can't think of any others now?

21      A.         Not at this point.

22      Q.         Your amended complaint says that you spoke out

23                 specifically on the need to maintain admission

24                 standards. Have we talked about that?
```

**112**

82

```
1    A.    Well, that pretty well ties in with point #3
2          that we just discussed, the lowering of
3          standards.
4    Q.    The need for admissions procedures to be in
5          compliance with federal law?
6    A.    Yes.
7    Q.    That the same area that, the lowering of
8          standards?
9    A.    Uh huh.
10   Q.    Yes?
11   A.    The lowering of standards and also the need to
12         not switch admissions people over to commission
13         type compensations. Again going back to the
14         Higher Education Act.
15   Q.    Who did you talk to about that?
16   A.    Vice President for Finance, Phil Rath.
17   Q.    Anybody else?
18   A.    I don't believe so.
19   Q.    You remember when that was?
20   A.    No, actually I think it was on multiple
21         occasions probably over a three year period.
22   Q.    Okay. Were you asking him to do something or?
23   A.    No, I was telling him we could not do something.
24         He was suggesting that we should put our
```

**113**

83

```
 1              admissions staff on commission as an incentive
 2              for them to do better work. To which I explained
 3              we cannot do that, it violates the Higher
 4              Education Act.
 5    Q.        Did that ever, did he ever do that, put those
 6              people on commission?
 7    A.        No, not to my knowledge. At least not under my
 8              watch.
 9    Q.        Okay. And then it says the need for accurate
10              student records.
11    A.        Uh huh.
12    Q.        Have we talked about that?
13    A.        There was a situation in which a student's
14              admissions application had been falsified and I
15              reported that to Provost Dowden.
16    Q.        Okay. Is that what you're talking about here,
17              the need for accurate student records or was
18              there more than one ... are you referring to
19              more than that incident?
20    A.        No, I'm referring to that incident.
21    Q.        When, what, when did this, when did this occur,
22              this falsification of a record?
23    A.        The early summer of 2003.
24    Q.        And you reported it to Mr. Dowden?
```

**114**

FISHER REPORTING, INC. ...........    **ELLETTSVILLE, IN 47429**812-876-7312

84

1   A.   Yes.

2   Q.   What... Did you call him up and tell him, go see

3        him, what happened?

4   A.   Went to see him.

5   Q.   Anybody else there?

6   A.   I believe my Director of Admissions, Ann Skuce

7        was there.

8   Q.   Okay. And what was said?

9   A.   We simply explained to him that we, we'd

10      discovered what we felt was an impropriety in an

11      application for admission being falsified in

12      order to admit a student who was not eligible

13      for admission. And handed the case over to Mr.

14      Dowden.

15   Q.   What did he do with it? Do you know what became

16      of it?

17   A.   He followed up on the issue. There were

18      subsequent meetings, parties on campus who had

19      falsified the documents, confirmed that they had

20      falsified the documents. There was some, some

21      disciplinary action taken against those

22      employees.

23   Q.   Are these admissions people?

24   A.   No, they're not.

**115**

85

| 1 | Q. | What relationship do these employees have to the |
| 2 | | university? |
| 3 | A. | They were in the athletic program. |
| 4 | Q. | Like teachers? |
| 5 | A. | Yes, teachers and coaches. |
| 6 | Q. | And coaches. So this was falsifying records of a |
| 7 | | student who was a student. The falsification |
| 8 | | took place while this guy was a student at |
| 9 | | Vincennes? |
| 10 | A. | No, he was attempting to become a student. He |
| 11 | | was in the process of applying for admissions. |
| 12 | Q. | Okay. So they falsified his high school records? |
| 13 | A. | Yes. |
| 14 | | MR. BELCHER: Okay. |
| 15 | A. | And falsified his residence so he could get |
| 16 | | instate tuition. |
| 17 | Q. | Did he get admitted? Do you know? |
| 18 | A. | No, he did not. |
| 19 | Q. | And the people that admitted doing this were all |
| 20 | | disciplined? |
| 21 | A. | I believe so. |
| 22 | Q. | Do they still work for the university? Do you |
| 23 | | know? |
| 24 | A. | Yes, they do. |

**116**

86

```
 1    Q.    All of them?

 2    A.    I believe so.

 3    Q.    Can you tell me, well you could probably name

 4          names if I asked you. As the coaches, what sport

 5          are we talking about?

 6    A.    Basketball.

 7    Q.    Was it ...

 8    A.    Men's.

 9    Q.    Head basketball coach?

10    A.    He was one of the parties involved.

11    Q.    Any assistant basketball coaches?

12    A.    Yes.

13    Q.    Coaches?

14    A.    Yes.

15    Q.    And who else, what other connections with the

16          university? Teachers?

17    A.    Both, the people who are the basketball coaches

18          also have teaching contracts.

19    Q.    Same people just ...

20    A.    Yes.

21    Q.    Dual, dual roles?

22    A.    Yes.

23    Q.    And then it says the need to present accurate

24          university records when seeking state fundings
```

**117**

88

| | | |
|---|---|---|
| 1 | A. | I expressed it to Mr. Dowden. |
| 2 | Q. | Anybody else? |
| 3 | A. | I think we carried it to him. Then he, he from |
| 4 | | that point convened other meetings to discuss |
| 5 | | the issue. |
| 6 | Q. | Okay. But you didn't discuss it with anybody |
| 7 | | else? |
| 8 | A. | I attended some other meetings. But pretty well |
| 9 | | as an observer. |
| 10 | Q. | This says Mr. Hanes spoke out on these matters |
| 11 | | in a proper forum during meetings of the |
| 12 | | administration in a manner that did not |
| 13 | | interfere with the educational process. So, are |
| 14 | | you referring in that sentence to meetings you |
| 15 | | just told us about. The meetings of the Deans, |
| 16 | | and meeting with Interim President Gregg and |
| 17 | | with your staff and Mr. Dowden? |
| 18 | A. | Yes. |
| 19 | Q. | You stated earlier, I think, that you felt that |
| 20 | | you weren't trained or didn't have the |
| 21 | | experience or training, I think, to take the |
| 22 | | position of Coordinator of Southern Indiana |
| 23 | | Business and Industry. Is that what you told me? |
| 24 | A. | Yes. |

**118**

1           from the Assistant Provost for Enrollment

2           Management because you turned in the head

3           basketball coach and two assistant coaches?

4    A.     I think that's one of the factors.

5    Q.     What makes you think that? I want to know what

6           all in your mind leads you to that conclusion?

7    A.     Well, the timing of the issue certainly leads me

8           to that. We uncovered the impropriety, reported

9           it. Within a few months we were the ones on the

10          street. The people who are the guilty parties

11          were still there. Knowing that up to a point,

12          the university stance appeared to be that those

13          people were going to be dismissed but somehow

14          after I was removed from the loop, that decision

15          changed.

16   Q.     Anything else?

17   A.     At this point, that's it.

18   Q.     Who told you that they were going to be

19          dismissed? Or how did you get the information

20          that they were going to be dismissed?

21   A.     I was an observer in a personnel committee of

22          the Board of Trustees when I heard the consensus

23          of the personnel committee to dismiss them.

24   Q.     And who was on that committee? Anybody that you

**119**

1          impact of the Community Colleges in Indiana on

2          Vincennes enrollment." Then it says, "The

3          research showed that 79.6 percent of the

4          enrollment loss occurred in counties served by

5          CCI sites. Hanes informed the administration of

6          this fact, but the administration never

7          publically acknowledged it because it revealed

8          the possibility that state funds that may have

9          gone, previously gone to Vincennes University

10         now were going to CCI.? Is that right?

11   A.    Yes.

12   Q.    Okay. It says, "Hanes spoke out because

13         allocation of state monies for state

14         institutions is a matter of public concern." Who

15         did you speak to about these issues?

16   A.    I spoke to the university administration, the

17         President, Vice-president and Provosts and I

18         spoke to the Deans.

19   Q.    Was it at the Deans meeting when you spoke to

20         the deans?

21   A.    At the Deans meeting and also at a meeting of

22         the President and Vice-presidents and Assistant

23         Provosts, two separate meetings.

24   Q.    Two separate meetings. Were the Deans at the, at

**120**

1          the President meeting?

2    A.    No.

3    Q.    So at Deans meeting and then the administration

4          type meeting?

5    A.    Yes.

6    Q.    When did those meetings, it says beginning in

7          fall of 2003. So is it after the fall of 2003

8          or?

9    A.    The, it was, it was following the beginning of

10         the semester. I compiled the report probably

11         within 10 or 15 days after the beginning of

12         classes. It takes that long to crunch the data.

13   Q.    Okay. So did you call this meeting with

14         President, Interim President Gregg?

15   A.    No, I simply made it as part of my report in

16         those meetings.

17   Q.    I see. Was it a written report?

18   A.    Yes.

19   Q.    That you furnished to President Gregg?

20   A.    Yes.

21   Q.    And did you furnish any in writing to the Deans?

22   A.    I believe so.

23   Q.    The same report?

24   A.    Yes, I believe so.

**121**

101

```
 1    A.    No.

 2    Q.    Did you tell this to anybody else other than the

 3          Presidents, and the administration talked about

 4          in the Dean's meeting?

 5    A.    I probably, well, I'm sure I shared it with my

 6          enrollment staff. And probably shared it

 7          anecdotally with casual friends on campus.

 8    Q.    Coffee break ...

 9    A.    Yes.

10    Q.    Stuff. Then we're talking, then your complaint

11          also talks about recruiting practices at college

12          fairs.

13    A.    Uh huh.

14    Q.    And it says "Hanes was opposed to this

15          possibility and spoke out against it several

16          times as a matter of public concern because he

17          believed putting the admissions counselors on

18          commission would have a negative effect on the

19          administration, or the admission standards

20          because he believed it was a violation of the

21          provisions of the Higher Education Act." Right?

22    A.    There may be two thoughts mixed together there.

23    Q.    Okay. What are they?

24                     WITNESS: Read it to me again,
```

**122**

104

```
 1              Admissions explained recruitment guidelines

 2              outlined as acceptable practices by the National

 3              Association of College Admissions Counselors.

 4              And then that some of the recruitment practices

 5              were established to prevent college fairs from

 6              becoming carnival like.

 7      A.      Uh huh.

 8      Q.      Who did you speak out about that to?

 9      A.      To the Vice Presidents, probably the President

10              also in a meeting to discuss recruiting

11              initiatives and recruiting practices.

12      Q.      Were these different meetings from the time

13              where you talked about the violations of the

14              Higher Education Act ...

15      A.      Yes.

16      Q.      And also commissions. So we're talking about

17              different meetings?

18      A.      Yes.

19      Q.      Who, any other meetings, other than, when you

20              talked about this recruitment guidelines other

21              than the meetings with the Vice Presidents?

22      A.      Not to my knowledge.

23      Q.      Do you think somehow that's involved in the

24              decision to remove you from the position of
```

**123**

FISHER REPORTING, I. . . . . . . . . ... **ELLETTSVILLE, TN 47429**812 876-7312

105

```
 1              Assistant ...

 2      A.      Yes.

 3      Q.      Provost? And why is that?

 4      A.      I think they saw my insistence that we follow

 5              guidelines as an obstacle to their goals.

 6      Q.      Who is they and their?

 7      A.      The administration.

 8      Q.      Generally or anybody in particular?

 9      A.      Generally.

10      Q .     Is that President, Vice President or is that

11              Trustees that you're talking about?

12      A.      President, Vice President.

13      Q.      And then we're talking about a meeting, your

14              complaint, it talks about a meeting in the fall

15              of 2003 where Vice President Mark Rath or Roth,

16              is it Roth?

17      A.      Rath.

18      Q.      Stated that the university should be able to

19              recruit unqualified students who although they

20              are without the ability to benefit could be

21              admitted to increase enrollments. What are we

22              talking about there?

23      A.      A common term used in admission circles is the

24              term, ability to benefit. It simply means only
```

**124**

106

```
 1            admitting students who have the potential to
 2            benefit from higher education. There are
 3            generally accepted practices and standards by
 4            which, for example, you would not admit a
 5            student who is mentally retarded because they
 6            don't have the ability to learn at a higher
 7            education level.
 8    Q.      Okay. So this statement means that at this
 9            meeting in the fall of 2003, Vice President Rath
10            said the university should be able to do that?
11    A.      Vice President Rath indicated at that meeting
12            that that would be a way for us to increase
13            enrollments.
14    Q.      To admit students who did not have the ability
15            to benefit?
16    A.      Yes.
17    Q.      Who all was present at that meeting?
18    A.      Well, I know Ann Skuce and myself, obviously
19            Phil Rath, I believe Phyllis Alder, the
20            Marketing Director, I can't recall beyond that.
21    Q.      Where did it take place?
22    A.      It would have either been the board room in the
23            administration building or our meeting room in
24            Enrollment Management. There were a lot of
```

**125**

109

1   A.   Well, at the point at which I became a tenured

2        employee, then the contract was just perpetuated

3        on an ongoing basis. The only time a new paper

4        was issued was if there was some change in my

5        level of status or the change in the way I was

6        to be paid or stipended.

7   Q.   Did you receive a letter from the President

8        annually or on any regular basis saying your

9        contract's been renewed or continued or?

10  A.   We received a letter annually from the President

11       that outlined our pay. There was a description

12       of the university's budgetary situation, what

13       the average pay on campus, the pay raise would

14       and what our specific pay raise would be.

15  Q.   So you received that every year regardless of

16       whether you had an change in your pay?

17  A.   Yes, every year I had a change in my pay but,

18       yes that was the custom.

19  Q.   Did you receive that letter in 2001?

20  A.   I think I did, yes.

21  Q.   Did you receive it in 2002?

22  A.   Yes.

23  Q.   Was there any mention in those letters about the

24       fact that you were now a professional staff?

**126**



Vincennes University
Vincennes, IN 47591
(812) 888-8888
Fax (812) 888-5868

www.vinu.edu

**VINCENNES
UNIVERSITY**
The Two-Year College

Page -1-

February 21, 2000

Dr. Summers:

Following our recent discussion, here are my recommendations and needs for my assuming the position of Interim Enrollment Manager for Vincennes University:

1. TERM- From April 20ᵗʰ through August 15ᵗʰ, 2000. I will spend time with Mike Davis between now and April 20ᵗʰ to orient myself to the duties.

2. If I am interested in the position permanently, I will apply for the job during the advertising period for a full-time replacement to close by July 1ˢᵗ.

3. I will spend an hour or two each day in the broadcasting department to stay abreast of any issues that need attention.

4. I will be taking earned vacation time over the summer to be coordinated with the Enrollment Management staff.

5. I will seek agreement with John Hitchcock to assume academic coverage of my Dept. Chair duties for the interim period and will seek Al Rerko's coverage of supervision of the facility for that time. Both are on 12 month contract and will only need a stipend for this additional effort.

6. A full-time temporary operations staff person for WVUB will be hired to help with station operations during the interim period.

7. If I do NOT apply for or do not get the Enrollment Management position as a permanent position, I will return to my full-time duties as Broadcasting Dept. Chair on August 15, 2000.



DEFENDANT'S
EXHIBIT

/

**127**



**VINCENNES UNIVERSITY**
The Two-Year College

Vincennes University
Vincennes, IN 47591
(812) 888-8888
Fax (812) 888-5866

www.vinu.edu

Page -2-

### 8. COMPENSATION

I calculate this interim period to be approximately 15 weeks.  The compensations I am requesting are based upon that time period.

A. Compensation for myself  $5,000

B. Compensation for Rerko & Hitchcock     $1,500 each

C. WVUB Temporary Staff 526 hours @ $7.50/hour = $4,215 total
(Plus Social Security and other temporary benefit costs)

TOTAL COST OF FUNDING THIS ARRANGEMENT =            $12,215 plus benefits

If these details are agreeable to you, please confirm in writing.  Following your confirmation, I will provide a written note of my agreement to the interim position.

Sincerely,

Jack A. Hanes
Chairman of Broadcasting
Vincennes University



**VINCENNES
UNIVERSITY**
The Two-Year College

Vincennes
Vincennes, IN 47591
(812) 888-8888
Fax (812) 888-8888

www.vinu.edu

MEMORANDUM OF CONTINUING AGREEMENT between Vincennes University, hereinafter called "University" and ___Jack Hanes_____, hereinafter called "Employee". The University hereby employs said Employee as ___Assistant Provost of Enrollment Management_____ for the period commencing on ___August 16_____, 20 00, and ending on ___June 19____, 20 01, for the stipulated compensation of $___78,928_____, payable in installments in accordance with the University's salary payment schedule. The Employee will also receive such fringe benefits as are provided to all of the employees at the University. These fringe benefits may be changed from time to time by the University. Fringe benefits shall terminate on the date the Employee's employment with the University terminates.

The Employee agrees to share in regular professional staff meetings and committee work, and in pre-registration, registration duty, and such other reasonable functions as may be assigned by the University from time to time during the period covered by this contract in furtherance of the program of the University.

Acceptance of this contract also includes agreement to work in harmony with the philosophy and objectives of Vincennes University and acceptance of the standards of professional behavior normally expected in an academic community.

The Employee's employment may be terminated by the University before the expiration date of this contract for reasons of incompetence, serious personal or professional misconduct, or insubordination by the Employee.

In addition to the above, the following additional stipulations are made in this contract: _____

_____

_____

Executed in duplicate this ___16th___ day of ___August___, 20 00.

VINCENNES UNIVERSITY

BY: _____
Phillip M. Summers, President

_____
Employee

EXHIBIT "C"

DEFENDANT'S EXHIBIT
4

129

Vincennes University
Vincennes, IN 47591
(812) 888-8888
Fax [812] 888-5868

www.vinu.edu

VINCENNES
UNIVERSITY
The Two-Year College

Page -1-

February 21, 2000

Dr. Summers:

Following our recent discussion, here are my recommendations and needs for my assuming the position of Interim Enrollment Manager for Vincennes University:

1. TERM- From April 20th through August 15th, 2000. I will spend time with Mike Davis between now and April 20th to orient myself to the duties.

2. If I am interested in the position permanently, I will apply for the job during the advertising period for a full-time replacement to close by July 1st.

3. I will spend an hour or two each day in the broadcasting department to stay abreast of any issues that need attention.

4. I will be taking earned vacation time over the summer to be coordinated with the Enrollment Management staff.

5. I will seek agreement with John Hitchcock to assume academic coverage of my Dept. Chair duties for the interim period and will seek Al Rerko's coverage of supervision of the facility for that time. Both are on 12 month contract and will only need a stipend for this additional effort.

6. A full-time temporary operations staff person for WVUB will be hired to help with station operations during the interim period.

7. If I do NOT apply for or do not get the Enrollment Management position as a permanent position, I will return to my full-time duties as Broadcasting Dept. Chair on August 15, 2000



**DEFENDANT'S EXHIBIT**

_1_

130



**VINCENNES UNIVERSITY**
The Two Year College

Vincennes University
Vincennes, IN 47591
(812) 888-8888
Fax (812) 888-5868

www.vinu.edu

Page -2-

## 8. COMPENSATION

I calculate this interim period to be approximately 15 weeks.  The compensations I am requesting are based upon that time period.

A. Compensation for myself  $5,000

B. Compensation for Rerko & Hitchcock     $1,500 each

C. WVUB Temporary Staff 526 hours @ $7.50/hour = $4,215 total
(Plus Social Security and other temporary benefit costs)

TOTAL COST OF FUNDING THIS ARRANGEMENT =          $12,215 plus benefits

If these details are agreeable to you, please confirm in writing.  Following your confirmation, I will provide a written note of my agreement to the interim position.

Sincerely,

Jack A. Hanes
Chairman of Broadcasting
Vincennes University

131

```
0001
 1
 2
 3
 4
 5
 6                         DUE PROCESS HEARING
 7                                FOR
 8                            JACK HANES
 9
10
11
12
13              Date:    January 8, 2004
14              Time:    9:00 a.m.
15              Place:   University Board Room
                         Vincennes University
                         Vincennes, Indiana
16
17
18
19
20
21
22
23                    CROSSROADS COURT REPORTING
                       Renee E. Dobson, CSR, RPR
24                          4815 Benjamin Road
                       Terre Haute, Indiana 47803
25                          (812) 478-9900
```

```
0002
 1                      A P P E A R A N C E S
 2    FOR JACK HANES:
          HACKMAN RIFKIN & HILL, P.C.
 3        Ida Coleman Lambert
          11550 N. Meridian Street
 4        Suite 115
          Carmel, Indiana 46032
 5
 6
 7    FOR VINCENNES UNIVERSITY:
 8        HARTNELL, LLC
          Brent Stuckey
          313 Main Street
 9        Vincennes, Indiana 47591-0979
10
11    ALSO PRESENT:
12        John R. Gregg, Interim President - Vincennes University
          Jim Messmer, Vice President, Statewide Services
13        Dale Bosten, Vincennes University Provost
          Jimmie Morrison, Board of Trustees
14        Brad Case, Board of Trustees
          Curt Viley, Board of Trustees
15
16
17
18
19
20
21
22
23
24
25
```

```
0003
 1                        I N D E X
 2                                                      PAGE
 3    COMMENTS BY MR. STUCKEY . . . . . . . . . . . . . . . . 4
      COMMENTS BY MS. LAMBERT . . . . . . . . . . . . . . . . 7
 4
      WITNESS   DALE BOSTEN
 5    DIRECT EXAMINATION BY MR. STUCKEY . . . . . . . . . . . 11
      QUESTIONS BY THE BOARD OF TRUSTEES . . . . . . . . . . . 20
 6    CROSS-EXAMINATION BY MS. LAMBERT . . . . . . . . . . . . 31
 7    WITNESS   JIM MESSMER
      DIRECT EXAMINATION BY MR. STUCKEY . . . . . . . . . . . 69
 8    CROSS-EXAMINATION BY MS. LAMBERT . . . . . . . . . . . . 72
      DISCUSSION & QUESTIONS BY THE BOARD . . . . . . . . . . 89
 9    CROSS-EXAMINATION CONTINUED BY MS. LAMBERT . . . . . . . 97
10    WITNESS   JOHN R. GREGG
      DIRECT EXAMINATION BY MS. LAMBERT . . . . . . . . . . . 115
11
      WITNESS   DAN BURGET
```

12    DIRECT EXAMINATION BY MS. LAMBERT. . . . . . . . . . . . .    110
      QUESTIONS BY THE BOARD. . . . . . . . . . . . . . . . . .    140
13    CROSS-EXAMINATION BY MR. STUCKEY. . . . . . . . . . . . .    144
      REDIRECT EXAMINATION BY MS. LAMBERT. . . . . . . . . . . .   140
14

15    WITNESS:  JACK A. HANES
      DIRECT EXAMINATION BY MS LAMBERT. . . . . . . . . . . . .    181
      QUESTIONS BY BOARD MEMBERS. . . . . . . . . . . . . . . .    181
16    CROSS-EXAMINATION BY MR. STUCKEY. . . . . . . . . . . . .    188
17    CLOSING STATEMENT BY MS. LAMBERT. . . . . . . . . . . . .    189
18    CERTIFICATE PAGE. . . . . . . . . . . . . . . . . . . . .    202
19                              EXHIBIT INDEX
20    NUMBER/LETTER              DESCRIPTION                      PAGE
21      A-R             Jack Hanes' Exhibits                         5
        S               Higher Education Statute                   194
22      T               Vacant Position Document                   198
        1-10            Vincennes University Exhibits              202
23
24
25

133

Page 4

(1) P R O C E E D I N G S
(2) MR. STUCKEY:
(3) Just some preliminaries to help the hearing
(4) committee with what our roles are and sort of set an
(5) agenda for this morning. And I think we have to
(6) acknowledge that this hearing—and I know Brad and Jimmie
(7) have been involved in other of these due process
(8) hearings. This one is a little bit unique just in that
(9) you all know Jack Hanes because of his role at the
(10) university and as a colleague. And I think this is a
(11) hearing where there won't be issues about factual issues
(12) like sometimes they are, which ought to make it in one
(13) sense more—not as difficult, but, of course, these
(14) things are always difficult. You will—you will hear
(15) what is said today, and then your job is to make a
(16) recommendation to the Board of Trustees on Jack's
(17) employment, continued employment at the university. The
(18) Board of Trustees meets again January 28th in
(19) Indianapolis, so that would be the meeting where you
(20) would make your recommendation to them. You're meeting
(21) in executive session as a subcommittee of the personnel
(22) committee, I guess, to hear Jack's appeal. The way it
(23) works is that because Jack is a tenured employee at the
(24) university, if the university administration decides that
(25) Jack's employment should be terminated, they can't do

Page 5

(1) that on their own. They have to come to you with a
(2) recommendation that that be done, and then Jack has the
(3) right to appeal that recommendation and to have this
(4) hearing. So that's how it has gotten to you because of
(5) Jack being a tenured employee.
(6) What I foresee happening this morning, and Ida may,
(7) you know, have a different course, but what I foresee
(8) happening is that Dale Dowden as the provost will give
(9) you an overview as to the employment, circumstances of
(10) Jack over the last three months and the decisions he
(11) administration made and the reasons why and sort of what
(12) gets us to here. We'll explain to you tenure at the
(13) university for professional staff and tenure for faculty
(14) and give you some understanding of that, and we'll
(15) explain to you the job that was offered Jack and that
(16) Jack decided not to take that job.
(17) Jim Messmer—the job that was offered Jack was in
(18) Jim's area, and Jim will testify about sort of more of
(19) the details and what he envisioned that job to be.
(20) John Gregg is here because he, of course, is
(21) involved in the decision-making in making that
(22) recommendation. And Ida has indicated she may want to
(23) ask him some questions, and so he's present for that.
(24) And he's also present because he's the president of the
(25) university, and this is a board matter, and it's an

Page 6

(1) important matter.
(2) Ida has told me that, of course, Jack will testify
(3) and that then Dan Burgel will testify, and I think that's
(4) the number of witnesses. So I hope—and, you know, Ida
(5) can correct me if I'm wrong, but I hope we're finished
(6) this morning.
(7) And my job—how I view my role is as a facilitator
(8) for you. And I think that's how the administration—I
(9) know that's how the administration views their roles. I
(10) mean, we have a covenant with you. This isn't a trial.
(11) It's—you know, nobody is on trial here. It's a meeting.
(12) It has some parameters. More than anything it needs to
(13) be fair, and it's an opportunity through this process for
(14) learning. And that's what—that's sort of the way that
(15) we'll try to do it.
(16) I want to acknowledge on the record that Ida has
(17) requested a separation of the witnesses; that Mr. Messmer
(18) and Mr. Gregg not be here while Mr. Dowden testify and
(19) vice versa, and in my view as the lawyer for the Board of
(20) Trustees is that that's not necessary. I think it will
(21) expedite things if you can—you know, if they're here,
(22) and so I'm not going to agree to that. We'll have them
(23) all here during the hearing. I hope we can keep
(24) President Gregg here. He may come and go, but we'll try
(25) to keep him here. And that's the procedure. The

Page 7

(1) witnesses will be sworn, and I don't intend to make an
(2) opening statement. I don't think that's appropriate in
(3) something like that. You'll hear it from the
(4) administrators and from Mr. Hanes. And we'll try to do
(5) it in that way.
(6) Ida, would you like to say anything on the record?
(7) MS. LAMBERT:
(8) Yes, I would. First of all, thank you very much for
(9) coming this morning. I appreciate your time and your
(10) effort in this matter. I would like to make a note on
(11) the record that I am requesting separation of the
(12) witnesses, and that is that I would like to have only Mr.
(13) Dowden present while he's testifying and that the other
(14) witnesses can join us as they are called to testify.
(15) I believe that that's an integral part of the due process
(16) hearing, and I'd like the record to show that I requested
(17) separation of the witnesses.
(18) Secondly, I have spoken to Mr. Stuckey already this
(19) morning and asked that we simply stipulate to the
(20) exhibits that each of us has provided to you this
(21) morning. And so for the record, on behalf of my own
(22) client, I would like the record to show that I am putting
(23) into the record Exhibits A through S—actually, A through
(24) R at this time. And I'd like the record to reflect that
(25) all of those records are included.

**Page 8**

(1) (HANES EXHIBITS A-R INTRODUCED)
(2) My name is Ida Coleman Lambert. I've met each of
(3) you individually before the hearing. I'm the attorney
(4) here to represent Jack Hanes. You know Jack Hanes
(5) because you've worked with him over the past years, and
(6) so you know that Jack Hanes is a tenured professor. He's
(7) a long-time, loyal employee of Vincennes University and
(8) has been recommended for termination for insubordination
(9) by your interim president, John Gregg. This is a due
(10) process hearing, and that means that Mr. Hanes is
(11) entitled to all of the process due to a tenured
(12) professor.
(13) The testimony and all of the evidence, all of the
(14) documents that you will see this morning will show that
(15) Jack Hanes maintains all of his rights and all of his
(16) protection as a tenured faculty member and that there is
(17) no basis for recommendation for tenure based on
(18) insubordination. In fact, your own counsel acknowledged
(19) this morning in his opening statement that Mr. Hanes is
(20) in fact a tenured faculty member. He is tenured at the
(21) university, and he therefore maintains all of those
(22) rights. As well, the documents, the university's own
(23) documents will reflect that Mr. Hanes is a tenured member
(24) of the Vincennes University faculty.
(25) It is undisputed that from all of the evaluations

**Page 9**

(1) from the time that Mr. Hanes began with the university in
(2) 1982 that his—all of his employment, whether as a
(3) professor or during his years in the administration, his
(4) evaluations have all been satisfactory or above. In
(5) fact, they have been excellent. They've been
(6) outstanding, whether he was tenured or working for the
(7) university in an administrative capacity. So that is
(8) undisputed. That will not be further discussed because
(9) that is not what is at issue here.
(10) The basis for the recommendation for termination is
(11) insubordination. Now, none of the documents that will be
(12) submitted in this hearing explain what your interim
(13) president means by insubordination. There has been no
(14) indication at all what this claim for termination based
(15) on insubordination means. None. In fact, the claim, the
(16) insubordination, appears to be based on the fact that Mr.
(17) Hanes simply wants to return to his teaching position
(18) after serving the administration well for the last three
(19) years. So the question is really, first of all, what is
(20) the basis for the claim of insubordination? What is your
(21) interim president basing this on when he claims
(22) insubordination?
(23) Insubordination was defined in an Indiana case years
(24) ago back in 1932, and in that case—and that was
(25) Evansville versus Culver. In that 1932 case

**Page 10**

(1) insubordination was defined as, "A willful refusal to
(2) obey the school laws of this state or reasonable rules
(3) prescribed for the government, that is, the operation of
(4) a school or such corporation."
(5) Now, clearly, Mr. Hanes is not refusing to obey
(6) school laws of this state, nor is that alleged, nor will
(7) there be any testimony or documents that show that.
(8) Moreover, he is not refusing to follow any reasonable
(9) rules for the operation of the university. There will be
(10) no testimony that shows that. Insubordination does not
(11) show that. Insubordination does not include, nor has
(12) there ever been any case or case law that suggests that
(13) insubordination can be based on a tenured teacher or a
(14) professor requesting to go back to the classroom to
(15) teach.
(16) In fact, what we have here this morning is that Mr.
(17) Hanes is being forced to accept a position for which his
(18) education does not prepare him, for which he has no
(19) experience and put him in a position in which he will
(20) tell you he does not believe he will be at his best
(21) service to the university. Testimony will show that he's
(22) been an excellent faculty member. He responded to your
(23) own university administration's request to come and help
(24) them in the year 2000, to help them during a very
(25) difficult time in VU's history. And you as board members

**Page 11**

(1) are well aware of that end and that he contributed a great
(2) deal to the university during these past three years. He
(3) served at the administration's request, not by his
(4) choice. He answered their response, their invitation,
(5) their recruitment for him to come and serve in the
(6) administration.
(7) So what can possibly be the reason for losing a
(8) long-time, 22-year employee who has given exemplary
(9) service to the university? What can possibly be the
(10) reason for now terminating him?
(11) MR. STUCKEY:
(12) Thank you, Ida. The only thing I think I would take
(13) issue—and I guess the record will reflect—I think I
(14) said that Jack is a tenured employee at the university.
(15) And one of the issues is whether he's a tenured faculty
(16) or tenured professional staff, and we believe he's a
(17) tenured professional staff. So to the extent—I don't
(18) think I said in my opening that he was a tenured faculty
(19) person because that's not what we believe, but that's one
(20) of the issues.
(21) Dale, if you would go ahead and be sworn, we'll have
(22) you share with the board.
(23) DALE DOWDEN,
(24) having been first duly placed under oath, was examined and
(25) testified as follows:

Case 2:04-cv-00140-RLY-WGH Document 58 Filed 06/16/05 Page 38 of 52 PageID #: 463

Page 12

(1) DIRECT EXAMINATION

(2) By Mr. Stuckey:

(3) MS. LAMBERTI: Excuse me, Counselor. Before we begin.

(4) I would, again, like to repeat my request that during

(5) this witness's testimony that the other two witnesses

(6) who will follow will leave the room.

(7) Q Dale, go ahead and share with the board sort of the

(8) background for the decision to take Jack out of his job as

(9) director of enrollment management.

(10) A As we started into the fall semester, and as we had been

(11) following throughout the summer, it became apparent early in

(12) the fall that we were experiencing another serious

(13) enrollment decline. We had had approximately a decade of

(14) enrollment decline followed by approximately two years of

(15) stabilized enrollment or slightly increased enrollment, but

(16) then this year our enrollment had taken a significant drop.

(17) And it was a cause for great concern, not only because it

(18) seemed to return to the previous trend, but because of the

(19) obvious budgetary impacts that it would have. In previous

(20) years because of the enrollment decline, we'd had to make a

(21) number of personnel reductions and budget reallocations to

(22) the point that we really don't have much flexibility left in

(23) our budgeting process because of enrollment. What we tried

(24) to do as the fall semester began was to take a look at our

(25) various processes, our procedures for recruiting and

Page 13

(1) enrolling students to try to make things better. It was our

(2) assessment after several months of working in that regard

(3) that the university would be better served if we had

(4) different leadership in that position. We felt that in

(5) order to recover and to grow the institution, there were

(6) things that needed to be done, and we believed that we could

(7) accomplish that better with new leadership in the area of

(8) enrollment management.

(9) Q As part—and that decision, Dale, was made—who was involved

(10) in that decision-making?

(11) A That was a shared decision that involved the president and

(12) the three vice presidents basically.

(13) Q Okay. And there were others in enrollment management in

(14) addition to Jack that lost their positions in that area?

(15) A Yes. We terminated the director of admissions. We also

(16) terminated the person who had been in charge of university

(17) relations. We didn't believe there had been enough synergy

(18) and enough cooperation in those areas. Both of those were

(19) nontenured employees, and they were terminated; also, as a

(20) part of the recognition that we have to do things

(21) differently than we had done them in the past.

(22) Q Okay. And as part of the decision to take Jack out of his

(23) position as director of enrollment management, was there a

(24) decision or a consensus as to what role Jack could play that

(25) would be good for the institution?

Page 14

(1) A Yes. From the outset we recognized that Jack was a tenured

(2) professional staff member with the university. That was

(3) never at issue. So while nontenured individuals were

(4) terminated, it was never a question of whether Jack would

(5) stay or leave the institution. It was always our assumption

(6) that he would stay. We looked at possible places where Jack

(7) might serve, and one of the opportunities came in the area

(8) of Business and Industry. And I would—I would offer to the

(9) board committee that in my view, and I believe in the view

(10) of the others who shared in the decision, there are many

(11) similarities between what someone would do in the Business

(12) and Industry position and what someone would do, for

(13) example, in the area of admissions. In the Business and

(14) Industry position the persons charged with representing the

(15) university would go out and call on corporations,

(16) businesses, industries and share with them the kinds of

(17) programs and services that the university can offer, would

(18) try to determine their training and employment needs and see

(19) if there are ways where the university could cooperate with

(20) them to build employee skills or training, to document prior

(21) training for college credit, to try to arrange on-the-job

(22) training, etc. In my view it's in many ways the same kinds

(23) of things that we do when we visit high schools. We try to

(24) talk with potential students about what kind of programs the

(25) university has to offer, the kinds of advantages of our

Page 15

(1) various degree programs, and how students might engage with

(2) the university. So it was my view, and I believe the view

(3) of others that in fact there were many similarities between

(4) the kind of work that Jack would be requested to do in the

(5) Business and Industry position and the kind of work that was

(6) being done in the area of enrollment management where he had

(7) been the supervisor.

(8) Q Under President Gregg's, I guess, new leadership, had the

(9) university made a decision to change its emphasis in the

(10) Business and Industry program?

(11) A We had been—yes, we have been limited in our—in the scope

(12) of our activities in Business and Industry by the CCI

(13) agreement, Community College of Indiana agreement. And I

(14) think quite frankly we've been a little reluctant to be very

(15) assertive in that area because we wanted to live within the

(16) letter of the agreement that we had with Ivy Tech in terms

(17) of how many persons we sent out to do business and industry

(18) training. When President Gregg arrived, we re-evaluated

(19) that. And with his leadership and that of Jim Messmer, we

(20) agreed that we needed to be much more assertive in that

(21) area; that there are lots of opportunities for providing

(22) training for employees. Many businesses and industries go

(23) unserved, and so we wanted to make a concerted effort to

(24) grow that area. It has the potential of not only being a

(25) great service to the employees in the southern Indiana area,

**Page 16**

(1) but it can also result in enrollment stabilization for the
(2) university. Many of the people who enroll through Business
(3) and Industry are able to be counted as part of our FTE
(4) enrollment which helps stabilize the state funding for the
(5) institution. So as the enrollment of campus students seemed
(6) to be in decline, we thought it was an appropriate thing to
(7) try to grow the business and industry effort. So that's a
(8) long answer to your question, but by all means, we made a
(9) renewed commitment to getting out and selling the idea of
(10) the business and industry training.
(11) Q Dale, did your group and you individually have a view as to
(12) whether Jack would be successful in this new position?
(13) A Yes, I thought Jack had the skills that would certainly make
(14) him well suited for that. As I said, in my mind, in my view
(15) many of the kinds of activities that we do in business and
(16) industry parallel what we do in our work with schools. It's
(17) to describe university programs, to promote cooperation and
(18) partnerships, and I saw that there was a very close
(19) parallel.
(20) Q Okay. Dale, if you'll look at document 5--and, Trustees,
(21) it's in this white packet--and this is the position
(22) description for the B & I job that was offered Jack. And I
(23) see that it had a base salary of $85,000 annually, and then
(24) according to a production that could earn an additional
(25) $20,000 annually. And we'll have Jim testify more about

**Page 18**

(1) Q And I guess what I want you to share with the trustees is
(2) was there a desire or an understanding by you and the
(3) management team of wanting to put together a job for Jack
(4) where he could earn in the same ballpark as to what he was
(5) earning in his old job?
(6) A Very few.
(7) Q And, Dale, jobs at the university--I mean, how many people
(8) at the university, just so the trustees will have a sense,
(9) would earn more than mid 80s annually?
(10) A Very few.
(11) Q Are we talking about five or ten?
(12) A 10 to 12 perhaps. I don't know. It's an easy number to
(13) get, but it's not a large number.
(14) Q Okay. Did you meet with Jack to share with him the decision
(15) to move him out of enrollment management and to offer him
(16) this new position?
(17) A Yes. We originally met with Jack to inform him of our
(18) decision that we were removing him from enrollment
(19) management, and we asked that he consider the position in
(20) Business and Industry. He returned the next day to
(21) respectfully--I believe his words were to respectfully decline
(22) the offer. We asked that he consider it further. He did
(23) request that he be allowed to go back to the classroom. I
(24) looked at the loads and--
(25) Q And let me just--going back to the classroom for Jack, where

**Page 17**

(1) what this agreement is, but I just want you to share with
(2) the trustees what input or thought pattern the group had as
(3) to establishing this salary for this job for Jack?
(4) A Well, you know, I can't necessarily speak for anyone else,
(5) but I can say in my own case, as I referred earlier, we
(6) have--we've known Jack. We thought that Jack was a valued
(7) member of the university. He was a valued university
(8) employee. And we believed that in this role he could make a
(9) significant difference. Jim would have to tell you exactly
(10) what the base salary was for the position, but it's my
(11) understanding that the base salary offered to Jack was
(12) significantly above what it would have been had we hired
(13) somebody from outside the institution. And so that base
(14) salary was set in recognition of Jack's years of service and
(15) his status with the university and that the incentive that
(16) was built into it was quite attainable so that he could with
(17) effort retain his--the salary level that he had had as
(18) assistant provost for enrollment management.
(19) Q And, Dale, then was going to be my next question, just for
(20) you to share with the trustees what Jack was earning as the
(21) assistant provost for enrollment management?
(22) A Well, I'll have to refer back here for sure.
(23) Q And just if you know an approximate?
(24) A I'm going to say mid 80s. I don't know that I have that
(25) exact number here, but mid 80s.

**Page 19**

(1) had he--what--where had he taught--and the trustees may know
(2) this, but they may not, so where had he taught before?
(3) A Jack made a request to go back to the department where he
(4) had taught which is broadcasting. And so I looked at the
(5) teaching loads in that area and found that there in fact has
(6) been some overload and some use of adjuncts, but not so much
(7) as to in my mind warrant the addition of initial full-time
(8) position in that department.
(9) Q If--can you share with--so that was an economic decision?
(10) A Yes.
(11) Q Can you share with the trustees how much--and I know it
(12) varies from semester, but did you actually look to see how
(13) much we were paying in overtime adjuncts?
(14) A Yes.
(15) Q What it was costing us to meet the course load in the
(16) Broadcasting Department?
(17) A Yes. I looked at the then current semester, for example,
(18) and found that we had about 28 hours of overload spread over
(19) 12 people, some of whom are full-time faculty, and some of
(20) whom are professional staff in the area. The direct cost
(21) for the semester was just over $15,000; plus, fringe
(22) benefits would have made it in the range of $16,000 to
(23) $20,000. And that's a fairly typical semester. Dr. Phil
(24) Pierpont has done an analysis of several semesters, and it
(25) varies up and down as enrollment fluctuates and as class

Case 2:04-cv-00140-RLY-WGH   Document 58   Filed 06/16/05   Page 40 of 52   PageID #: 465

## Page 20

(1) numbers fluctuate. Sometimes there has been more than one
(2) FTE in overload. But I can also say that for this semester
(3) coming up, spring of 2004, the estimated overload is
(4) somewhere between 9 and 16 contact hours. A full load would
(5) be 22 contact hours. So right now the anticipated overload
(6) is well less than one full-time equivalent position. And I
(7) would add also for the trustees' benefit that having
(8) part-time and overloads assignments in departments is very
(9) typical. You can look in most of the departments around the
(10) university, and you'll find instances where an additional
(11) class section is needed and is added. And either a
(12) full-time person will take it as an overload, or we'll hire
(13) an adjunct to come in and teach it. So just because there
(14) may be more than the—more FTE positions than we have
(15) contracted faculty doesn't necessarily mean that we add
(16) additional positions to cover it. And, again, that's—there
(17) are numerous examples where that's the case.
(18) Q Can you in your analysis, Dale, and I understand you to say
(19) it was an economic decision that Jack not be placed back in
(20) the classroom in that department, can you give the trustees
(21) your—your estimate as to cost of providing that
(22) instruction, the way it's being done now and the cost to
(23) provide that instruction if you'd put Jack back there as an
(24) additional person in that department?
(25) A Again, it would vary from one semester to the next depending

## Page 21

(1) upon the actual amount of overload. I would have estimated
(2) that had Jack gone back, his base salary would have been at
(3) least somewhere in the range of $60,000 per year. Fringe
(4) benefits would have taken it near $80,000, which would have
(5) been approximately double the cost of what it's costing us
(6) to do it by adjunct and overload.
(7) Q Okay. I want you to share with the trustees tenure at the
(8) university, faculty tenure and professional staff tenure?
(9) A In the case of faculty tenure, it means that the individual,
(10) whether it be English or social science, whatever it is, has
(11) tenure in a department in a discipline so that if someone is
(12) a tenured professor of machine trades, they have a
(13) guaranteed position in the Department of Machine Trades.
(14) They don't necessarily have the right to pick and choose
(15) which courses they would teach or which days of the week or
(16) the schedule, etc., but they have a guarantee of a position
(17) in that department.
(18) Professional staff tenure is different in that they have
(19) tenure within the university, but they do not have tenure in
(20) a particular position. I do not have tenure as provost, but
(21) I have tenure within the university. So if someone were to
(22) determine that they want new leadership in the Office of
(23) Provost, I could be assigned to any reasonable position
(24) within the university. But I am not guaranteed that I would
(25) have tenure as provost.

## Page 22

(1) When we looked at this situation, again, we—tenure for Jack
(2) was never an issue. I in fact went back and looked in his
(3) file and looked at every piece of paper that I could find to
(4) see if anywhere there was any evidence that when he accepted
(5) the position in enrollment management there had been an
(6) expectation of some sort that his tenure as a faculty member
(7) had been assured or guaranteed, and I could find nothing to
(8) that affect. I wasn't involved in all of those discussions,
(9) and so I wasn't certain what agreements may have been made.
(10) But when I examined the file, I could find no evidence that
(11) Jack had been promised that he was retaining faculty tenure
(12) where he would have the prerogative to go back to the
(13) Broadcasting Department if he chose. What I did find was
(14) that he in fact had signed a tenured professional staff
(15) contract which, again, assures that he will be given a job
(16) within the university, but that he does not necessarily
(17) retain—or does not have any property right to a particular
(18) job.
(19) Q Dale, when Jack became director of enrollment management,
(20) he—did he continue to teach any classes in the Broadcasting
(21) Department?
(22) A No.
(23) Q Did he have any direct involvement with the Broadcasting
(24) Department?
(25) A No, except as he had with—in your all departments within

## Page 23

(1) the university.
(2) Q Sure. And I know that one of the issues under our tenure
(3) policy, when people—when departments are deciding whether
(4) to grant tenure to new faculty that part of the
(5) that's been approved by the Board of Trustees, they look at
(6) how many tenured faculty in that area and how many
(7) untenured faculty and to make a decision on whether new
(8) people can become tenured, and that's all part of enrollment
(9) management. Would somebody like Jack in his job be
(10) considered back in the Broadcasting Department when they're
(11) making a decision on giving tenure to somebody who is coming
(12) up through the ranks?
(13) A If your question is would he be counted as a tenured faculty
(14) member in Broadcasting, the answer is no.
(15) Q Okay. Just as you would not be considered a tenured faculty
(16) in Chemistry?
(17) A That's correct.
(18) Q Or Jim Messmer a tenured faculty in Horticulture?
(19) A That's correct.
(20) Q In the documents we've provided the trustees, if you go to
(21) document 8 and document 9—okay—Dale, I want you to explain
(22) to the trustees—these are form documents, but the
(23) difference between these documents?
(24) A Well, in number 8 there really are two documents. I'll
(25) begin with the white—what for me is a white copy, the

Case 2:04-cv-00140-RLY-WGH   Document 58   Filed 06/16/05   Page 41 of 52 PageID #: 466

**Page 24**

(1) second page under that tab. I believe it was about 1990 the
(2) trustees determined that we would no longer offer tenure to
(3) professional staff members, and so any new hires in
(4) professional staff areas really don't get a contract per se.
(5) They get a letter of notification that outlines their
(6) position, their compensation level, etc., but there is no
(7) mention, and certainly in our manual there's no mention of
(8) any eventual opportunity to earn tenure. The blue copy, on
(9) the other hand, the key words there, "Memorandum of
(10) Continuing Agreement" indicates that this is the contract
(11) used for tenured professional staff members. It's a
(12) continuing agreement. And, again, it outlines the position
(13) that will be held, the period of the contract, and the
(14) amount. Do you want me to go ahead to number 9?
(15) Q Yes.
(16) A Under tab 9, again, there are two forms. The second page,
(17) the white page, is a teaching contract
(18) between Vincennes University and the employee, and that's
(19) the contract that would be used for nontenured faculty. The
(20) blue one, the Memorandum of Continuing Teaching Contract, is
(21) the contract that would be used for tenured faculty. The
(22) If you were to compare the blue copies under tab 8 and 9,
(23) you will see, for example, under tab 9 the language in the
(24) contract refers to the fact that the employee will attend
(25) faculty meetings, committee work, will do advising of

**Page 25**

(1) students, will submit course syllabi, may be assigned to
(2) teach at Jasper, etc., etc. All of the language refers to
(3) agreements between faculty.
(4) Under tab 8, the blue contract, on the other hand, makes no
(5) mention of teaching. It refers to professional staff
(6) meetings, registration, other kinds of administrative duties
(7) the person might be asked to perform, but there is no
(8) mention whatever of any teaching obligation. And so it's
(9) pretty clear that these contracts are intended to cover
(10) different classes of employees.
(11) Q And, Dale, I guess that's consistent with your testimony
(12) that it's recognized at the university that there is
(13) professional staff tenure which is different than faculty
(14) tenure?
(15) A Correct.
(16) Q And I know the trustees know this, but Vincennes University
(17) is unique, is it not, as far as you know, in all—
(18) A All the world.
(19) Q —in all the world as far as having tenure for professional
(20) staff?
(21) A Yes.
(22) Q Now—and then, Dale, if you go to tab 6 of the documents and
(23) tell the trustees what that document is?
(24) A That document is the, as it says at the top, it's the
(25) Continuing Teaching Contract. Again, the term, continuing,

**Page 26**

(1) being the key word there; that it's a tenured contract. And
(2) it was issued when Jack was promoted to professor. And,
(3) again, it outlines his duties as a member of the faculty of
(4) attending faculty meetings, of advising students, submitting
(5) course syllabi, etc., etc.
(6) Q Okay. And, Dale, the one that we've got in the document is
(7) not signed by Jack, but we got from the business office this
(8) morning that Jack had one with his signature on it?
(9) A That's correct.
(10) Q And, again, it says continuing teaching contract. Prior
(11) to—at some time prior to 1996 was the word "teaching" not
(12) used at the very top of it?
(13) A That's correct. It was not.
(14) Q Okay. But sometime prior to 1996 the contract—tenured
(15) contract for faculty, the word "teaching" was used in the
(16) very first line?
(17) A That's correct.
(18) Q And the rest of the contract, though, has always been the
(19) same?
(20) A Essentially, yes.
(21) Q And there's always been two contracts, one for teaching—
(22) teaching tenure and one for professional staff tenure?
(23) A Yes.
(24) Q Okay. Now, and then, Dale, tab 7, if you would move to
(25) there—maybe you already have—would you identify this for

**Page 27**

(1) the trustees?
(2) A That is the contract that was signed—that was entered into
(3) by Jack—Jack and the university when he accepted the
(4) full-time position as assistant provost of enrollment
(5) management in August of 2000, and it was the position he
(6) held until this fall. And it clearly, again, is a
(7) Memorandum of Continuing Agreement, but it is the
(8) professional staff version of a tenured contract.
(9) Q Okay. Dale, I'm going to then go to these other documents
(10) and just have you comment on those and bring them to the
(11) attention of the trustees which will sort of, I think, put
(12) in context your meetings with Jack and his decision. And,
(13) again, there's no claim that Jack was in any manner
(14) unprofessional in declining the job, but that he just said
(15) that the job that you wanted him to do he wasn't going to
(16) do. The first tab, if the trustees could turn to that,
(17) number 1, and would you put that letter in context for us?
(18) A Again, we first met with Jack on Thursday, November 13th,
(19) and notified him of our decision. He came back the next day
(20) on Friday and asked that—or indicated his—that he was
(21) going to decline our offer of that position and asked that
(22) we consider assigning him back into the classroom.
(23) Following that, again, that's when I looked at the loads.
(24) That's when I looked to find if there was any documentation
(25) of any kind that gave him the property right of faculty

Page 28

(1) tenure, and I could find nothing. And so this letter
(2) restates our position that it was our desire that he accept
(3) the position in Business and Industry and that he would
(4) contact Vice President Messmer who arranged to begin his
(5) duties.
(6) Q And I see in that letter, Dale, where you gave him a period
(7) of time to consider it further?
(8) A Yes.
(9) Q Through the Thanksgiving vacation?
(10) A Right.
(11) Q Okay. And this letter then was given to Jack personally at
(12) a meeting or not?
(13) A I believe it was sent to him.
(14) Q Okay. And then the—the second tab is a letter from Jack's
(15) attorney at that time, Paul Ledford, to you, and it says
(16) what it says. I guess there's no need for us to
(17) characterize what it says. The trustees can read them.
(18) I'll give them a chance to look at it.
(19) And then the third letter is me back to Paul
(20) Ledford, Jack's attorney at that time, which, again, says
(21) what it says. I'll just let the trustees have a chance to
(22) read that.
(23) And the fourth letter is then the letter which I had told
(24) Paul Ledford would be coming from John in which he
(25) officially notified Jack that would have to recommend

Page 29

(1) termination for insubordination for Jack refusing to accept
(2) the assignment that he was to take.
(3) And, Dale—and I don't know if there's an issue about this
(4) or not, but I'll just ask—I mean, was it clear to you that
(5) although Jack—is it clear to you that Jack understood that
(6) he was being directed to take this new job?
(7) A Yes.
(8) Q And is it clear to you that Jack refused to take the new
(9) job?
(10) A Yes.
(11) Q Anything else that you think would help the trustees, any
(12) additional information that you'd want to share with them?
(13) A Not that I know. I would simply reiterate that, again,
(14) whether Jack had tenure with the university has never been
(15) at issue. Whether we would work with Jack to find a
(16) reasonable position for him, one where we thought his skills
(17) could be used to the benefit of the university was never at
(18) issue. Never has been. The only thing that appears to be
(19) at issue is whether he has in some way retained a property
(20) right as a tenured faculty member in the Department of
(21) Broadcasting, and it's our position that he does not; that
(22) he has signed a contract, a tenured contract as professional
(23) staff knowingly in response to an advertisement for that
(24) position and that based on the information we have in the
(25) file, he understood that he was converting from a faculty

Page 30

(1) member in the Department of Broadcasting to a professional
(2) staff position as Assistant Provost of Enrollment
(3) Management. And I believe when all else is said and done,
(4) it boils down to that issue. And we've proceeded on the
(5) basis that it is our belief that Jack had—has tenure as
(6) professional staff and as such could be asked to be
(7) reassigned to reasonable professional staff assignments
(8) within the university where his skills could be used to the
(9) benefit of the university. It was upon that basis that we
(10) made our decisions.
(11) MR. STUCKEY: I'll ask the trustees if you have any
(12) questions, and I'm sure Ida will have some questions.
(13) MR. CASE: Just one quick question. On item number 7
(14) on the contract it's dated June 19th of 2001. The idea
(15) there is that's just a continuing contract?
(16) MR. DOWDEN: That's correct. The Continuing Agreement
(17) Contract is issued for the first year that it is in
(18) effect.
(19) MR. CASE: Okay.
(20) MR. DOWDEN: Subsequent to that individuals get letters
(21) that provide an update for compensation, etc., but we
(22) do not reissue tenure contracts annually.
(23) MR. CASE: Okay.
(24) MR. WILEY: I noticed the difference in salary between
(25) the two positions went from $64,000 to $78,000. Is

Page 31

(1) that a natural progression for an employee in the
(2) Communications Department if they would stay in that
(3) position, or is it a sizable increase in salary?
(4) MR. DOWDEN: Which—I'm sorry, Mr. Wiley.
(5) MR. WILEY: The salary as a professor was $64,000—
(6) MR. DOWDEN: Yes.
(7) MR. WILEY: —in 1996, and then it jumped to $79,000
(8) when he took this position. Was that a normal increase
(9) by university standards, or was that—
(10) MR. DOWDEN: I would say it was generous. We try and
(11) I wasn't—I don't recall exactly how that salary was
(12) set, and I'm going to guess that there was some
(13) negotiation between Jack and the president at the time.
(14) I don't believe there was a conversion from 9 months to
(15) 12 months because Jack had already been a 12-month
(16) employee in Broadcasting. But I would say that it
(17) was—that it was a fairly generous increase in salary.
(18) I can tell you without—I don't have the numbers in
(19) front of me, but the salary was significantly above
(20) what a number of deans in the divisions are making.
(21) MR. DOWDEN: I would say it was generous.
(22) MS. LAMBERTI: Yes, thank you.
(23) CROSS-EXAMINATION
(24) By Ms. Lamberti:
(25) Q Just so it's fresh in our mind, in responding to Mr. Wiley's

CROSSROADS COURT REPORTING           *Depo-Merge*           Page 9

140

Page 32

(1) question, he seems to be asking why there was a jump from a
(2) salary of $64,000 to $79,000.
(3) MS. LAMBERTI: Did I understand your question
(4) correctly?
(5) MR. WILEY: Realizing that there was some time
(6) differential, but I was wondering for the normal
(7) progression.
(8) Q Actually, Provost Dowden, Mr. Hanes' salary for the academic
(9) year of 1999 and 2000 in Broadcasting, his salary at that
(10) time was actually $72,592; isn't that correct?
(11) A Right. I should have noted that because this was a contract
(12) for '96 and '97. I'm sorry. That was an oversight on my
(13) part. So there were at least three more years of salary
(14) increases.
(15) MR. WILEY: So his immediate salary before he took this
(16) position was $72,000?
(17) MS. LAMBERTI: Yes.
(18) MR. WILEY: And he would have gotten a 10 to 12 percent
(19) increase to take this position, right?
(20) MR. DOWDEN: I don't have that number.
(21) MR. WILEY: Okay. No, I understand.
(22) A I'm sorry. That was an oversight on my part.
(23) Q So to clarify for the record, his salary for the academic
(24) year, 1999-2000, in his position as part of the Broadcasting
(25) faculty was $72,592; correct?

Page 33

(1) A Again, I don't have the number to verify that, but it sounds
(2) reasonable.
(3) Q Yes. And so when he took the position in Administration, he
(4) was actually getting maybe about a $6,000 increase?
(5) A Accepting your numbers as accurate, yes.
(6) Q Thank you. I'd like to go back to some of the information
(7) that you provided this morning. You started out by talking
(8) about the fact that there had been an enrollment decline
(9) that you noted in 2003; am I correct?
(10) A Yes.
(11) Q And in the prior time the enrollment had actually been
(12) increasing; isn't that correct?
(13) A For about a two-year period there. It had been—as I
(14) mentioned, there had been nearly a decade decline. Then
(15) there had been a leveling off, a slight increase, and then
(16) this year another precipitous drop.
(17) Q And isn't it correct then that the period of increased
(18) enrollment was actually while Jack Hanes was in the position
(19) of Assistant Provost for Enrollment Management?
(20) A There was an increase during part of the time he was there,
(21) yes.
(22) Q Actually, from the time when he came in in 2000 through the
(23) year of 2002 and 2003; isn't that correct?
(24) A Again, I don't have the—the enrollment numbers in front of
(25) me, but I'm saying that there were increases during the time

Page 34

(1) that he served in that position.
(2) Q Thank you. You said that you believed the university would
(3) be better served with a reorganization that in effect
(4) eliminated the position that Jack had been in; isn't that
(5) correct?
(6) A No.
(7) Q Well, you have eliminated his position as enrollment
(8) management, haven't you?
(9) A We have not made our final decisions on exactly what
(10) structure we will have. We have a person currently serving
(11) in an interim basis in that position. We have discussed the
(12) possibility of how to—how to bring the areas of university
(13) relations marketing and enrollment management more closely
(14) together, but we have not arrived at a final plan of how
(15) we're going to accomplish that.
(16) Q So the position that Jack Hanes was in as Assistant Provost
(17) Enrollment Management still exists; is that correct?
(18) A Today it does. Currently, it exists.
(19) Q And who is filling that position?
(20) A Lorethea Potts-Rusk.
(21) Q What is the name, please?
(22) A Lorethea, hyphenated, Potts--P-o-t-t-s--Rusk. She's filling
(23) in on an interim basis.
(24) Q And what is her status with the university?
(25) A She is tenured professional staff. Previously, she—well,

Page 35

(1) still for that matter has the title of curriculum specialist
(2) working in Academic Affairs. And we've simply asked her for
(3) an interim period to assume the responsibilities in
(4) enrollment management.
(5) Q How long has she been at the university?
(6) A Estimated, 20 years—18, 20 years. I don't know. I don't
(7) have that number with me.
(8) Q And when she first came into the university, what position
(9) did she come in as?
(10) A I don't know the title. She came in—at the time we had a
(11) structure where we had an associate dean responsible for
(12) academic transfer programs and another associate dean
(13) responsible for occupational programs. She came in the
(14) Office of Occupational Programs and worked with that
(15) associate dean, and I believe worked primarily on working
(16) with the State Board of Vocational Technical Education on
(17) equipment purchases and record keeping, developing new
(18) programs, etc. But I didn't supervise her work then, but
(19) that's my understanding.
(20) Q So she came in in an administrative position; is that
(21) correct?
(22) A Yes.
(23) Q So she's always worked in administration?
(24) A Yes, I believe. I'm not—I'd have to go back and check her
(25) file, but she's always had that kind of position.

Case 2:04-cv-00140-RLY-WGH   Document 58   Filed 06/16/05   Page 44 of 52 PageID #: 469

Page 36

(1) Q Has she ever been in an academic department?
(2) A Not to my knowledge.
(3) Q And what other positions have been developed or are in the
(4) process of being developed as a result of your reorganizing
(5) the area of enrollment?
(6) A There will not be any additional positions of any kind. We
(7) may reassign some responsibilities and try to do some things
(8) that we have not previously done, but we're not going to be
(9) adding additional positions into that area. It may be a
(10) reassignment of duties, a realignment of duties, but there's
(11) not going to be additional people hired into it.
(12) Q Well, aren't you currently advertising for two positions?
(13) A We're advertising for a replacement for Director of
(14) Admissions, and we're advertising for a Director of
(15) University Relations and Marketing.
(16) Q University Relations and Marketing?
(17) A Yes.
(18) Q And you haven't had that position before, have you?
(19) A We've had a Director of University relations, and we had a
(20) Director of Marketing, but they were two different people
(21) with two different reporting structures. And it was our
(22) belief that it would--we would be better served if we had
(23) them consolidated under one function.
(24) Q So that's one of the positions you're now advertising for?
(25) A Yes.

Page 37

(1) Q And a Director of Admissions, you're looking for a new
(2) Director of Admissions?
(3) A Correct.
(4) Q Did you have a Director of Admissions before?
(5) A Yes.
(6) Q And then this coordinator position, that's a new position,
(7) isn't it, Coordinator of Southern Indiana Business and
(8) Industry, that's a new position, isn't it?
(9) A I don't know if it's a new position. I don't know whether
(10) it's been there. We've had--I know we've had--we've had
(11) three positions in Business and Industry at various times.
(12) We had a Northern Indiana, a Central Indiana, and a Southern
(13) Indiana. I don't know whether those have been filled always
(14) or not. That's not in my area of responsibility, so I
(15) haven't always watched.
(16) Q Well, in fact, the position of Coordinator of Southern
(17) Indiana Business and Industry has not been filled before;
(18) isn't that correct?
(19) A Well, I don't know. That's what I'm saying. That's not my
(20) area of responsibility, so I--
(21) Q Who would know that?
(22) A Mr. Messmer would know that.
(23) Q All right. We'll ask Mr. Messmer that. Do you have any
(24) documentation to show that that position was in fact filled
(25) before?

Page 38

(1) A I don't. Again, that's not my area of responsibilities, so
(2) I wouldn't.
(3) Q Well, even if it existed before, it's obviously not filled
(4) now because that's a position that you're trying to thrust
(5) on Mr. Hanes, isn't it?
(6) A Yes. It's a position we've asked him to accept.
(7) Q But you weren't working with anyone over the past three
(8) years that was in that position of working in southern
(9) Indiana?
(10) A I was not personally, no.
(11) Q Now, you said you were in the process of doing things
(12) differently. What exactly do you mean by that?
(13) A We're looking at all of the efforts that we're doing in
(14) admissions and enrollment management to determine whether
(15) they are in fact the best ways for us to deploy our folks
(16) and our resources. We have an admission office that has
(17) five counselors, admissions counselors, plus a Director of
(18) Admissions. We have an admissions person at the Jasper
(19) campus. We have an admissions person in Indianapolis--two
(20) in Indianapolis as a matter of fact. And we have yet
(21) another person who has been assigned to do work to recruit
(22) for our technology area. There doesn't appear to be the
(23) level of coordination and cooperation that we expect there,
(24) but right now we have a total of ten people who are working
(25) in that general area of admissions. We have no one, on the

Page 39

(1) other hand, who is going around to campus meeting with
(2) departments, doing articles for publication about those
(3) departments, providing sound clips that might be sent to
(4) radio stations to inform potential clients about our
(5) programs. We have no one addressing development of video
(6) clips. We believe there are a lot of opportunities where we
(7) could provide that kind of marketing information to radio
(8) and TV stations, various media outlets. And so we believe
(9) it's appropriate that we reassign someone out of that group
(10) of ten folks who could address those kinds of issues.
(11) Q So is that the position of University Relations and
(12) Marketing that you referenced?
(13) A That would be a part of the responsibility of that
(14) individual to help us determine how best to do that.
(15) Q Well, then, actually, then, this is all still fluid; is that
(16) correct?
(17) A Yeah, there's some fluidity in it, yes.
(18) Q So you really according to your testimony haven't determined
(19) at this point yet then exactly what the plan is or exactly
(20) what those positions are going to be; isn't that correct?
(21) A That's correct.
(22) Q Okay. So--
(23) A Our hope is that the person that we hire in this new
(24) position will have expertise that will help us determine
(25) that.

**Page 40**

(1) Q Which person?
(2) A The person as the Director of University Relations and
(3) Marketing.
(4) Q And that is a new position. You haven't had someone doing
(5) those things before, and that's what you're saying?
(6) A As I explained before, we've had a Director of University
(7) Relations, and we had a Director of Marketing. and we're
(8) advertising for someone who will oversee both areas as well
(9) as enrollment management.
(10) Q So that's the new position, the combination?
(11) A It's a combination. It's not an additional position.
(12) Q But the other things that you were looking at then are still
(13) fluid at this point--
(14) A That's correct.
(15) Q --according to your own testimony?
(16) A That's correct.
(17) Q Now, you've talked about this position of Coordinator of
(18) Business and Industry in Southern Indiana, and we will ask
(19) Mr. Messmer it--we've had no documentation showing that
(20) position in southern Indiana has ever existed or it's ever
(21) been filled; isn't that correct? You're saying you don't
(22) know that?
(23) A I just don't know.
(24) Q Okay. But you said that part of the duties would be to call
(25) on corporations and businesses that would be asking them--

**Page 42**

(1) Q They're all under your supervision. And certainly, Jack
(2) Hanes was under your supervision; isn't that correct?
(3) A Correct.
(4) Q And the people who would be dealing with these positions,
(5) they're actually under your position on the organization?
(6) A When you say these positions, what are you referring to?
(7) Q Well, let me refer you to Exhibit Number R.
(8) MS. LAMBERTI: And I would invite you to look at the
(9) organizational chart, which is in the black binder at
(10) R. And we've already made a note on the record that
(11) all of our exhibits in the black binder, which includes
(12) Exhibits A through R are part of the record, so I'd
(13) reference you to Exhibit R.
(14) Q And, Dean Dowden, my understanding is that your position,
(15) you are in that position quite close to the top there of
(16) Provost and Vice President of Instructional Services/Dean of
(17) Faculty; isn't that correct?
(18) A Correct.
(19) Q Okay. So all of those areas, the Assistant Provost for
(20) Student Affairs, is under your jurisdiction?
(21) A Yes.
(22) Q And all of the instructional divisions?
(23) A Yes.
(24) Q All right. Assistant Provost for Academic Affairs under
(25) your supervision?

**Page 41**

(1) you'd be looking for students that could gain college
(2) credit. Now, when this individual, whoever it is, goes out
(3) to do this job, are they going to the industry itself to
(4) recruit these students?
(5) A I would assume so.
(6) Q Well, isn't that area under your--
(7) A No, it isn't.
(8) Q So you're testifying here about an area that isn't
(9) ultimately under your supervision?
(10) A That's correct. That's why I'm telling you that the job in
(11) business--at least, and I'm familiar enough with university
(12) operations that I know what the position entails, but it is
(13) not under my direct supervision.
(14) Q No, I understand it's not under your direct supervision
(15) because you're higher up on the administrative ladder.
(16) A I'm just in a different position.
(17) Q Well, you are the Provost and Vice President for
(18) Instructional Services; isn't that correct?
(19) A Yes.
(20) Q And do you--by that, also, you're considered to be Dean of
(21) the Faculty?
(22) A That's correct.
(23) Q Okay. And under you is all--all of the instructional
(24) divisions; isn't that correct?
(25) A Correct.

**Page 43**

(1) A Yes.
(2) Q And Assistant Provost for Enrollment Management under your
(3) supervision?
(4) A Yes.
(5) Q So all of these positions, whatever they ultimately turn out
(6) to be, are under your jurisdiction; isn't that correct?
(7) A Yes.
(8) Q Okay.
(9) MR. STUCKEY: Ida, I thought you were asking him about
(10) the Business and Industry position. That's what you
(11) started, and that's under Messmer.
(12) MR. DOWDEN: That's what I understood.
(13) MR. STUCKEY: Yeah, I mean, that's what you were asking
(14) him about.
(15) MS. LAMBERTI: I think, Brent, if you wish to enter
(16) into the discussion here, I think it's inappropriate
(17) for you to be redirecting this witness when I'm
(18) questioning him. I did not do that to you, and I would
(19) appreciate it if when I'm asking questions that I be
(20) allowed to ask the questions. He needs to answer them,
(21) not you, Counselor.
(22) MR. STUCKEY: I'm just trying to be helpful.
(23) MS. LAMBERTI: Well, I'd prefer that you didn't help me
(24) by interrupting me when I'm asking you questions. I
(25) thank you very much for not doing that. Thank you.

Page 44

(1) MR. STUCKEY: I think you were finished such that I
(2) didn't interrupt you, but it's 20 after 10:00, Ida, and
(3) you do need to move it along.
(4) MS. LAMBERTI: No, I need to ask the questions on
(5) behalf of my client, and I will do that.
(6) Q So the admissions person and the Assistant Provost for
(7) Enrollment Management were in fact under your supervision;
(8) isn't that correct?
(9) A That's correct.
(10) Q Are you now saying that the--so the Business and Industry
(11) will report to Jim Messmer?
(12) A That's correct.
(13) Q So are you actually then in this fluid state that you've
(14) described, you're actually going back and forth between what
(15) is enrollment and some of the areas under the Statewide
(16) Services?
(17) A No, what--what I was referring to, the fluid state in
(18) enrollment management, I'm talking about the admissions
(19) office. I'm talking about marketing that are currently in
(20) the area of enrollment management.
(21) Q And they're under your jurisdiction?
(22) A That's correct.
(23) Q All right. So you're saying that those are the positions
(24) that are fluid?
(25) A Yes.

Page 46

(1) position? What kind of students are you looking for there?
(2) A Typically, adult students, many of whom are currently
(3) employed looking to upgrade their skills, people who may be
(4) unemployed and taking part in work force development
(5) programs, people who are in apprenticeship programs, anyone
(6) who is in a skill development area where there may be some
(7) opportunity for collaboration between the training they are
(8) receiving and the kind of instruction that we offer to
(9) students here.
(10) Q Okay. Could these be students that would be seeking to get
(11) an associate degree?
(12) A Many times, not necessarily, but they could be people who
(13) simply want to upgrade their skills and in the process earn
(14) some college credit. Of course, our goal would be to have
(15) them pursue a degree, but they don't have to be degree
(16) seeking in order to be enrolled in this area.
(17) Q So some of them might take one course; might take one
course
(18) in computer work to upgrade their skills at work?
(19) A Sure, exactly.
(20) Q So you'd actually be seeking anybody that would be willing
(21) to take any individual course?
(22) A Sure, correct.
(23) Q And they might in fact just take one course?
(24) A That's right.
(25) Q Okay.

Page 45

(1) Q But the Business and Industry position will be under Mr.
(2) Messmer?
(3) A That's correct.
(4) Q And there's a position that you have no knowledge about
(5) whether it's ever been filled before or whether that's a
(6) brand new position; that's your testimony that you're not
(7) personally familiar with that?
(8) A I don't know--that's correct. I don't know that they've had
(9) somebody in the position. I know that the--we had long ago
(10) divided the state into the three regions and had intentions
(11) of having a coordinator in each region.
(12) Q But you don't know if it's ever been filled?
(13) A No, I simply don't know.
(14) Q But now you're somehow combining that with efforts at
(15) recruitment, are you, in order to recruit those students?
(16) A No, no. It's simply that the Statewide Services area is
(17) responsible for the outreach of the university, and they
(18) would be contacting Business and Industry and telling them
(19) about programs and services that we can offer. The person
(20) of the dotted line, I might add, is because of the obvious
(21) connection of academic programs with what is done in
(22) Business and Industry. There is cooperation between the
(23) departments and what goes on in Business and Industry.
(24) Q Okay. Then could you tell us, Provost Dowden, what kinds of
(25) students will be recruited under this Business and Industry

Page 47

(1) A It could be one course to an entire degree plan.
(2) Q Okay. When you go out to seek these students, if you know,
(3) would the contact be made with the industry or the
(4) corporation?
(5) A I'm--I don't know exactly how they do it. I'm assuming it
(6) might be a personnel director. It might be a plant
(7) supervisor. In the case of smaller businesses, it might be
(8) the owner.
(9) Q Would those be questions I should direct to Mr. Messmer?
(10) A Yes, he would be better able to answer those.
(11) Q Okay. You mentioned also that with the change in emphasis
(12) in Business and Industry under Interim President Gregg,
(13) you're limited by the Community College Agreement. What did
(14) you mean by that?
(15) A When we entered into the Community College Agreement, we
(16) were limited in our Business and Industry effort to a level
(17) that we had had prior to 1999 which had been three FTE
(18) positions, and we agreed as a part of the CCI Agreement that
(19) we would not expand beyond that. In other words, we
(20) wouldn't go out and hire a staff of 50 business and industry
(21) representatives, but we would keep it to the three FTE
(22) positions that we had had prior to the advent of the CCI
(23) Agreement. And, again, we had long--in fact, we've set up
(24) campus codes to acknowledge that we have a northern region
(25) for the state, a central region for the state and a southern

**Page 48**

(1) region.
(2) Q Right. And it's the southern one that you don't know
(3) whether it's ever been filed?
(4) A Yeah, I don't know.
(5) Q Okay. I wanted to ask you some other questions. Now, you
(6) also talked about FTEs, and that's referenced actually on
(7) the offer that was made to Jack Hanes. You're talking about
(8) full-time enrollees?
(9) A Full-time equivalent students.
(10) Q Okay. Okay. So what would a full-time equivalent be? Is
(11) that about 30 hours?
(12) A It's 30 credit hours annual.
(13) Q And that's what you'd be seeking through this Business and
(14) Industry, trying to get those FTEs, but some of them might
(15) be coming in with three credit hours because they're only
(16) going to take one course?
(17) A Sure.
(18) Q In fact, probably many of them would come in maybe taking
(19) one course?
(20) A Sure.
(21) Q That's what you're going after really, isn't it?
(22) A Right.
(23) Q Okay. Who pays for them?
(24) A Well, again, that would be better directed to Mr. Messmer.
(25) Some of them, I think, are funded under work force

**Page 49**

(1) development grants. Some may be self-pay. Some may be
(2) corporate pay. Some may be union supported. There's a
(3) variety of mechanisms for supporting that.
(4) Q Okay. Some of them might be paying their own way because
(5) they want to—
(6) A Could be.
(7) Q Okay. You mentioned that in the job description you thought
(8) that this new position of Southern Indiana Coordinator
(9) because of going out to meet with these people in business
(10) and industry would be a match with Jack Hanes
(11) Business and Industry would be a match with Jack Hanes
(12) A Yes.
(13) Q And that that would correlate with his position in the past
(14) of going out to visit schools. Now, are you aware of the
(15) fact that Jack Hanes never went out to visit any of the
(16) schools in his position?
(17) A No, I didn't follow his activities day to day, but I know he
(18) was responsible for the area and surely knew what was going
(19) on when they went out.
(20) Q Are you aware of the fact that he never went out to visit at
(21) the high schools; that that was done by his staff?
(22) A I'm not aware, but I'm disappointed to find out that he
(23) didn't.
(24) Q The fact is he had that handled through his staff. They
(25) were the ones who went out and made the visits to the

**Page 50**

(1) school. Were you aware of that?
(2) A I'm sure that we have the five counselors that I mentioned
(3) who visit the high schools, yeah.
(4) Q And that's what they do, isn't it?
(5) A That's correct.
(6) Q That isn't his job as administrator to try and get out to
(7) all those schools, isn't it?
(8) A Not at all.
(9) Q He's the administrator?
(10) A That's correct.
(11) Q Now, you talked about the overloads, and you said
(12) there was about a 28-hour overload in the fall?
(13) A Yes.
(14) Q And you said there was about between a 9 and 15 overload in
(15) the spring?
(16) A Yes.
(17) Q Actually, that overload is 13.5, isn't it? Have you looked
(18) that up?
(19) A For spring?
(20) Q For spring.
(21) A No, I made a call to the dean of the division and asked, and
(22) he said it would vary based on enrollment.
(23) Q And when you looked at the overload, you actually average
(24) those overloads, isn't that correct? You combine the fall
(25) and the spring together; isn't that correct when you look at

**Page 51**

(1) overloads?
(2) A When we look at overloads?
(3) Q Right.
(4) A Well, we have to staff for each semester.
(5) Q But you look at them together?
(6) A Well, sure.
(7) Q So it's actually the average of the fall and the spring to
(8) determine what the actual overload; isn't that correct?
(9) A Sure.
(10) Q Now, you talked about adjunct faculties. You don't bring
(11) adjunct in if you have tenured professors to fill those
(12) positions, do you?
(13) A Of course not.
(14) Q Now, you had some discussion with Jack Hanes when he
(15) requested that he be allowed to return to his faculty
(16) position, and he had discussions with you about the fact
(17) that he would go back to his teaching salary plus the normal
(18) cost-of-living increases that he would be expected to
(19) receive during the three years he served the administration.
(20) You had discussion with him about that?
(21) A Yes, he requested that he would be placed back in
(22) adjunct in if you have tenured professors to fill those
(23) Q And that he would go back to his regular teaching salary—
(24) A Yes, yes.
(25) Q —isn't that correct? Okay. So there was no question that

Page 52

(1) It was going to cost the university any more if he went back
(2) to his teaching position; isn't that correct?
(3) A Wouldn't cost the university more in sum.
(4) Q Right.
(5) A It would affect the department, of course, the expense in
(6) the department.
(7) Q But actually, as to Jack Hanes' salary, if he went back to
(8) his teaching salary, it would be less than the $85,000 he
(9) had been earning as the administrator; isn't that correct?
(10) A Certainly, but it would have added expense at the
(11) departmental level.
(12) Q Well, because that's where he would be paid from?
(13) A Correct.
(14) Q But the salary would be significantly less; isn't that
(15) correct?
(16) A Yes.
(17) Q Now, you talked at some length about the distinction between
(18) faculty tenure and professional staff. Now, when a faculty
(19) member seeks tenure, they go through a process in order to
(20) seek that tenure; isn't that correct?
(21) A Yes.
(22) Q And do you know what that process is?
(23) A Yes.
(24) Q Did you in fact receive tenure in your academic department?
(25) A Yes.

Page 53

(1) Q And so you're personally familiar with how that works?
(2) A Yes.
(3) Q Could you just very briefly describe for the board because
(4) some of them may be familiar with the process of tenure;
(5) some of them may not be--would you just briefly describe
(6) what the process is to receive tenure in an academic
(7) department?
(8) A Okay. Well, because you asked me about my own, I'll
(9) describe it as it was at the time.
(10) Q When was that?
(11) A 1975, I believe. I believe '75.
(12) Q All right.
(13) A At that time tenure was something that was requested by the
(14) individual. It went to the immediate supervisor, which in
(15) many cases was a department or program chair. If that
(16) person approved it, it went on to the division chair at the
(17) time. Now we call them division deans. Then it would have
(18) gone to the vice president and ultimately to the president
(19) and finally to the board. So it was an approval through
(20) administrative channels. Today we have committees set up at
(21) those levels. There is a departmental committee, a
(22) divisional committee, and then a university committee that
(23) reviews the applications. The recommendations of each
(24) progress to the next level. The university committee
(25) submits their recommendations to me as provost. I in turn

Page 54

(1) recommend--make my recommendations to the president, and the
(2) president makes his recommendations to the trustees.
(3) Q Thank you. And that's, if you recall, a fairly arduous
(4) process, isn't it?
(5) A It is.
(6) Q And that would be the same process essentially that Jack
(7) Hanes went through when he received tenure through the
(8) academic Department of Broadcasting?
(9) A His would have been more like the first case where it was
(10) handled through administrative layers.
(11) Q Right. But it had to go through each one of those levels
(12) for approval?
(13) A Yes, that's correct.
(14) Q And typically, that process is gone through after six years
(15) typically as one is going into the seventh year; that's kind
(16) of the typical?
(17) A After the fifth year and going into the sixth year.
(18) Q At Vincennes--
(19) A Yes.
(20) Q --is that correct? Okay. All right. So that's the
(21) process, and that's the process then that Mr. Hanes went
(22) through when he received tenure in Broadcasting?
(23) A Correct.
(24) Q Thank you.
(25) (A SHORT BREAK WAS TAKEN)

Page 55

(1) Q Thank you. Provost Dowden, you described in detail, and I
(2) appreciate your description of the faculty tenure process.
(3) Now, there is no such process for what you're referring to
(4) as professional staff tenure; isn't that correct?
(5) A Well, there is. In the past the professional staff tenure
(6) was like the original form of faculty tenure where it went
(7) through the administrative levels. Subsequent to when Jack
(8) would have received his tenure, the professional staff
(9) congress has likewise developed a committee structure. It's
(10) somewhat different than faculty because we don't have the
(11) department structure and professional staff like we had in
(12) faculty, but there is a similar professional staff process.
(13) Q But since someone would be in a staff or administrative
(14) position, there is no body of peers such as there is in a
(15) faculty?
(16) A That's correct.
(17) Q So there's--
(18) A I'm sorry. I misspoke. That is for our promotion policy.
(19) We currently have no tenure policy because we have no tenure
(20) to be offered to professional staff. I misspoke. It was
(21) for promotion and not tenure.
(22) Q Right. And promotion from assistant--excuse me--instructor
(23) to assistant professor to associate professor to full
(24) professor is the process that, again, requires that type of
(25) review; isn't that correct?

Case 2:04-cv-00140-RLY-WGH   Document 58   Filed 06/16/05   Page 49 of 52 PageID #: 474

Page 56

(1) A Correct.
(2) Q And that's also gained through an academic department; isn't
(3) that correct?
(4) A That's correct.
(5) Q And Jack Hanes also went through that process and was
(6) promoted from his beginning position as instructor to full
(7) professor; isn't that correct?
(8) A That's correct.
(9) Q And as you corrected yourself, there is no such process—
(10) A That's correct. I misspoke.
(11) Q —to what you're referring to as professional or staff
(12) tenure?
(13) A That's correct.
(14) Q And in fact, there is no such thing as professional staff
(15) tenure at Vincennes University; isn't that correct?
(16) A No, it is not correct.
(17) Q Wasn't that abolished by your own testimony in 1990?
(18) A It was abolished for any new employees, but any existing
(19) employees who had earned professional staff tenure will
(20) retain.
(21) Q They would be in a sense grandfathered in under that?
(22) A Correct.
(23) Q But anyone coming into the university after 1990, there is
(24) no such thing as professional staff tenure?
(25) A They are not—that's correct. They are not eligible for

Page 58

(1) tenured?
(2) A That's correct, as long as he retained that rank, yes.
(3) Q And he has retained that rank?
(4) A Actually, he was promoted to professor.
(5) Q Right. And he didn't have to sign a new contract?
(6) A He did sign a new contract when he was made professor of
(7) broadcasting.
(8) Q Do you have a copy of that tenure—of that contract?
(9) A Tab 6.
(10) MR. STUCKEY: Ida, here's tab 6 that he signed. The
(11) one in the book is not signed.
(12) Q Isn't it correct, Provost Dowden, that the faculty, the
(13) tenured faculty don't have to sign a new contract each year
(14) just as President Summers is explaining here? Once they're
(15) tenured, and they've signed the contract, the continuation
(16) is to notify them of their salary that's based on whatever
(17) their status is at the time? In this case with full
(18) professorship there is a raise in the salary that's tied to
(19) that promotion to full professor; isn't that correct?
(20) A Right. There's no need to sign an additional contract
(21) unless there is some change that has occurred such as a
(22) promotion or some change in responsibilities. In this case
(23) obviously he was promoted from associate professor to
(24) professor, and so he signed a new contract indicating that
(25) higher rank.

Page 57

(1) tenure.
(2) Q All right. And so anyone coming into a new position would
(3) not be granted professional staff tenure?
(4) A That's correct.
(5) Q I'd like you to just look at Exhibit D.
(6) A I'm sorry?
(7) Q Exhibit D in the defendant black binder. Exhibit D, if you
(8) would. And Exhibit D, for the record, is a letter dated
(9) July 3rd, 1991. It's directed to Jack Hanes, and it's from
(10) former President Summers; isn't that correct?
(11) A Yes.
(12) Q Okay. And I'd like you to just read into the record the
(13) first paragraph of that letter.
(14) A Of the letter?
(15) Q Of the letter, sir.
(16) A "This letter is notification of your contract amount for the
(17) Fiscal Year 1991-92. Since you are tenured, it is not
(18) necessary for you to sign a new contract form each year."
(19) Q All right. So the contract that is attached to this cover
(20) letter is the contract for Jack Hanes from the year 1991;
(21) isn't that correct?
(22) A Yes.
(23) Q And the document states—this document, this cover letter
(24) from former President Summers states that he doesn't have to
(25) sign any new contract form after that year since he's

Page 59

(1) Q And indicating his increased salary; isn't that correct?
(2) A Correct, yes.
(3) Q And going forward, he simply received a letter each year
(4) telling him what his increase in salary is; isn't that
(5) correct?
(6) A Correct.
(7) Q Now, you talked about your exhibit—Defendant's Exhibit
(8) Number 8 and your description of both the blue and the white
(9) copy—excuse me just one second—excuse me one second. Just
(10) to clarify, Defendant's Exhibit 8 deals with the
(11) professional staff contract—
(12) A Yes.
(13) Q —is that right? And 9 deals with the faculty contract?
(14) A Yes.
(15) Q But there is no such thing as a professional staff tenure
(16) contract being offered since 1990?
(17) A That's correct; for new employees I should add.
(18) Q Now, Exhibit Number 7, Defendant's Exhibit Number 7—
(19) University's Exhibit Number 7, describes the duties that
(20) Jack Hanes would be performing in that position; isn't that
(21) correct?
(22) A Yes.
(23) Q There at the top it tells that he's been an assistant
(24) provost for enrollment management; isn't that correct?
(25) A Yes

Page 60

(1) Q That's what the document says, so it's actually a
(2) description of his duties?
(3) A Yes.
(4) Q And in the--if an individual has a contract where they're
(5) going to teach, the preliminary paragraph describes their
(6) duties as teaching; isn't that correct?
(7) A Correct.
(8) Q So that's the purpose of the beginning paragraph, isn't it,
(9) to describe what the duties of the employee will be?
(10) A I would say, you know, it's part of it, but the entire body
(11) of the contract is relevant.
(12) Q Of course. But the purpose of the first paragraph is just
(13) to describe what the individual is going to be doing; isn't
(14) that right?
(15) A Correct.
(16) Q Thank you. Okay. Now, you said in your testimony that you
(17) made a significant search, and there were no documents
(18) showing that Jack Hanes' faculty tenure in the academic
(19) department was continued. Wasn't that your testimony?
(20) A Yes.
(21) Q Neither did you find any documents that showed that he had
(22) waived his faculty tenure, did you?
(23) A None other than the fact that he signed a professional staff
(24) tenure contract.
(25) Q And you're referring to this document?

Page 62

(1) person.
(2) Q Right, because you weren't present?
(3) A I was not present.
(4) Q And you certainly didn't advise him that he was in any way
(5) waiving his faculty tenure rights, did you?
(6) A I did not.
(7) Q And you're not aware of anyone else so advising him?
(8) A I don't know.  I can't speak to that.
(9) Q Okay.  And there is nothing in this document that says he is
(10) waiving his faculty tenure rights?
(11) A That's correct.
(12) Q Okay.  I'd like to ask you some other questions.  Provost
(13) Dowden, maybe you can tell me here.  Are you familiar with
(14) who wrote the job description for the new position of
(15) Coordinator Southern Indiana Business and Industry?
(16) A I can't say for certain, but I'm confident that Jim Messmer
(17) was ultimately responsible for it.
(18) Q So he would be the person to whom direct questions about
(19) that?
(20) A Yes.
(21) Q Okay.  Thank you.  Now, in the past year, in fact, last
(22) summer at Vincennes University, there were tenured faculty
(23) who had falsified records regarding enrollment and their
(24) life funds coming into the university; isn't that correct?
(25) A Enrollment?

Page 61

(1) A Yes.
(2) Q And is there anything in this document whereby he states
(3) that he is waiving his faculty tenure?
(4) A No.
(5) Q And there's no other document that you're aware of where he
(6) states that he's waiving his faculty tenure?
(7) A No.
(8) Q Are you--were you present when Mr. Hanes signed this?
(9) A No.
(10) Q So are you aware of whether anyone advised him when he
(11) signed this that by signing this he was waiving his faculty
(12) tenure?
(13) A I'm assuming it was sent to his home or sent to his office,
(14) and he signed it and returned one copy to the business
(15) office, which is our standard practice.
(16) Q Right.  So no one would have advised him, or you certainly
(17) didn't advise him that he was giving up--
(18) A No.
(19) Q --his faculty tenure rights because you weren't present?
(20) A I'm assuming--I cannot speak to any conversations he may
(21) have had with President Summers.  What seems clear to me
(22) from the documentation was that he signed a tenured
(23) professional staff contract which is clearly different than
(24) a tenured faculty contract, but I can't speak to any
(25) discussion that may have occurred between him and any other

Page 63

(1) Q Excuse me.  Admissions documents?
(2) A Yes.
(3) Q And it's correct that actually Jack Hanes and others in his
(4) department discovered the falsification of those records;·
(5) isn't that correct?
(6) A Yes.
(7) Q And Anne Skuce--am I saying her name correctly?
(8) A Skuce.
(9) Q Skuce was one of the individuals who was involved in
(10) discovering the falsifications of those records; isn't that
(11) correct?
(12) A That's correct.
(13) Q And she's been terminated, hasn't she?
(14) A Correct.
(15) Q And there was another individual that also was involved, a
(16) male, wasn't there?
(17) A I don't know to whom you're referring.
(18) Q I'll find out.  Jack Hanes also was involved in the
(19) discovery of the falsification of those records; isn't that
(20) correct?
(21) A He's the one who called it to my attention.  What role he
(22) played in the initial part, I don't know.  But he and others
(23) came to me with the information, so he was very much
(24) involved in the discussion.
(25) Q Okay.  Thank you.  And the faculty--excuse me--it was

Case 2:04-cv-00140-RLY-WGH   Document 50   Filed 06/16/05   Page 51 of 52 PageID #: 476

Page 64

(1) actually determined that the records were being in fact
(2) falsified; isn't that correct?
(3) A That's correct.
(4) Q And because of the falsification monies made or in fact did
(5) come into the university to which the university wasn't
(6) entitled because of the falsification: isn't that correct?
(7) A No, I don't believe it is correct.
(8) Q Well, it deal—
(9) MR. WILEY: I'm sorry. Is this relevant to this?
(10) MS. LAMBERTI: It is. It is indeed. Thank you.
(11) Q That was the issue, however, wasn't it, that because of the
(12) falsification of records money may or could be coming in
(13) which shouldn't have been coming in because of the
(14) falsification?
(15) A No, I don't believe that's the case at all. I believe what
(16) was at issue was that an application for admission had been
(17) falsified. It appeared that we had a bogus high school
(18) transcript that was presented as factual, and it put us in
(19) jeopardy from simply a legal standpoint that we may be
(20) admitting a student who was entering under false pretenses.
(21) But it was not a financial situation. It was a matter of
(22) professional ethics.
(23) Q But had the falsification not been discovered and noted,
(24) weren't there funds that would have gone to that student in
(25) the form of scholarship and athletic stipend?

Page 65

(1) A Could have been certainly.
(2) Q And the faculty who were involved with falsifying those
(3) records, they have not been terminated, have they?
(4) A No.
(5) Q What is the connection between that situation which Jack
(6) Hanes and his colleagues in his area discovered and his
(7) being threatened with termination now?
(8) A None in my opinion.
(9) Q Do you know of any connection between those two?
(10) A I don't know of any.
(11) Q Who would know that?
(12) A I can't speak to that. I don't—I quite frankly don't
(13) understand the point of your question.
(14) Q Well, I'm asking what is the connection between the fact
(15) that he discovered the falsification of those records and
(16) now within a few months after that he's being threatened
(17) with termination; that's my question?
(18) A If you are asserting that in any way this action was taken
(19) because he participated in that decision, you're absolutely
(20) completely off base. As a matter of fact, I would applaud
(21) him for having taken the stand that he did, and it had
(22) absolutely nothing whatsoever to do with the decision
(23) regarding his reassignment.
(24) Q But he's being threatened with termination, and those who
(25) falsified records are still employed; isn't that correct?

Page 66

(1) A He's being threatened with termination because he refused to
(2) accept an assignment.
(3) Q Yes, I believe your claim is insubordination, right?
(4) A That's correct. But the inference that somehow he's being
(5) punished is quite frankly outlandish because then I would
(6) have to be punished as well because I supported his decision
(7) and represented the position to the Board of Trustees on the
(8) matter.
(9) Q Why is Jack Hanes being terminated?
(10) A Because he refused to accept the assignment that he was
(11) given, the position that he was offered. We felt that we
(12) met the obligation of the university in terms of offering a
(13) tenured professional staff member a reasonable professional
(14) equivalent position, and he refused to accept it.
(15) Q But there isn't any tenured professional staff status for
(16) someone who has come into a position since 1990?
(17) A Well, clearly, there was an exception made in his case in
(18) recognition of the fact that he had previously earned tenure
(19) as a faculty member.
(20) Q Absolutely. And where is it documented that he was an
(21) exception to what is clearly by your own testimony the
(22) status that since 1990 no one coming into a new position has
(23) professional staff tenure? Where is that documented that
(24) there was in his case an exception—
(25) A By virtue of the fact that—I'm sorry.

Page 67

(1) Q —where there was some kind of shift where he received
(2) professional staff tenure? Where is the documentation of
(3) that?
(4) A By virtue of the fact that he had a tenured contract which
(5) he signed.
(6) Q Show me on that contract where it says that he's a tenured
(7) professional staff. Where does it say, tenured professional
(8) staff?
(9) A "Memorandum of Continuing Agreement between Vincennes
(10) University, hereinafter called 'University' and Jack Hanes.
(11) University hereby employs said employee as Assistant Provost
(12) of Enrollment Management." Continuing agreement. That's a
(13) tenured contract.
(14) Q Where does it say it's a tenured professional staff
(15) contract? Does it say that any place in this document, sir?
(16) A That's the standard form. It's the standard format. It's
(17) the language that we've used here for years that the term
(18) "continuing" is the term used to mean tenured employment.
(19) Q Where is that documented? That does not say that on this
(20) document. Where is that recorded?
(21) A Well, I'm just telling you that's the standard protocol for
(22) the University that the term "Continuing Agreement" means
(23) tenure.
(24) Q And that's what you're basing this on?
(25) A Yes.

Page 68

(1) Q And when--and there's no other documentation to show that
(2) someone told Jack Hanes that that's what this contract meant
(3) even though it doesn't say that?  No one advised him of
(4) that, did they?
(5) A It's standard procedure for all faculty and staff at the
(6) university who have tenure that that's the language that
(7) we've used, and we've used it for many, many years.  It's
(8) standard--
(9) Q No, sir, that isn't the standard because when someone
(10) receives faculty tenure, they're notified by way of a
(11) letter.  And I will refer you to Exhibit C if you'll refer
(12) to C in our exhibits.  Exhibit C is a letter dated April
(13) 21st, 1987.  Would you read the first paragraph of that into
(14) the record, please?
(15) A "On behalf of Vincennes University and the Board of
(16) Trustees, it is my pleasure to inform you that you have
(17) received tenure.  You can be very pleased with the fact that
(18) your request and application has been viewed positively.
(19) The recommendations from the Administration and President
(20) were taken to the Board of Trustees at the April 16th
(21) meeting and approved."
(22) Q And by that he received his faculty tenure.  Now, do you
(23) have any similar document that informs Jack Hanes that he's
(24) receiving professional staff tenure?
(25) A The only thing we have is the fact that he signed a

Page 69

(1) professional staff tenured contract.  There is no letter of
(2) that.
(3) Q Right, nor is there any language in the contract to which
(4) you're referring, which is Exhibit 7, that says that; isn't
(5) that correct?
(6) A That's correct.
(7) Q Thank you.  I think I'm just about finished here.  Just one
(8) more, and then we'll let this witness go.  Excuse me just
(9) one second, please.  Thank you very much, Provost Dowdon,
(10) for your testimony.
(11) MR. STUCKEY:  Thank you, Dale.  Do you have any other
(12) questions for Dale?
(13) MR. WILEY:  I thought that was thorough questioning.
(14) MR. STUCKEY:  Would you swear in Jim Messmer, please?
(15) JIM MESSMER,
(16) having been first duly placed under oath, was examined and
(17) testified as follows:
(18) DIRECT EXAMINATION
(19) By Mr. Stuckey:
(20) Q Jim, do you have the position description statement with
(21) you?
(22) A Yes, I do.
(23) Q Are you comfortable there?
(24) A Sure.
(25) Q Is that line?

Page 70

(1) A Uh-huh.
(2) Q You've heard Dale's testimony as far as the, you know,
(3) relationship of Jack Hanes and offering him the B & I job.
(4) Do you have any corrections to make or any different
(5) understandings of what Dale has testified to?
(6) A No, I concur with what he said.
(7) Q The position description for B & I, were you the one
(8) involved in putting that together?
(9) A The staff that report to me, John Ludlow is the director--
(10) statewide director of Business and Industry, prepared the
(11) position description.  I worked with the business office in
(12) preparing the schedule at the bottom.
(13) Q And the salary that was offered Jack as part of this,
(14) was it higher than the salary would have been to someone
(15) else that you were recruiting off the street?
(16) A The position request that I had submitted, the range was
(17) $40,000 to $50,000.
(18) Q Okay.  And you increased the base salary to $55,000 in
(19) recognition of who Jack was in the university community?
(20) A Yes.
(21) Q And there's also on this position description a--sort of a
(22) bonus schedule depending on FTEs that Jack were able to
(23) recruit?
(24) A Uh-huh.
(25) Q Just share with the board how that would work and whether

Page 71

(1) that was something that was realistic and how you came to
(2) those numbers.
(3) A In preparing that in recognition that we were increasing the
(4) base salary by $15,000 to $25,000, we wanted to establish
(5) some goals and performance goals, if you will, and that's
(6) the way the schedule came up.  Last year without a Southern
(7) Indiana Business and Industry Coordinator, we had generated
(8) 45 FTE.  In talking with John, he felt that 200 was a very
(9) realistic number of what could be done and that the
(10) incentives on there, the extra 70, were credit hours that
(11) should be--could be able to be generated with substantial
(12) work.  But it was going to be something that could be done,
(13) and that's the way that came about.
(14) Q Okay.  Jim, in--in your judgment if Jack had, you know,
(15) accepted this job and worked this job with his talents and
(16) abilities, how much do you believe he would have earned
(17) doing this work?
(18) A Well, it was my hope that he would have been able to earn
(19) the full bonus amount that's in here and coupled with in the
(20) last two months we've already--working on contracts and
(21) things that basically have about half of that already in
(22) place.
(23) Q And the bonus amount that you said that it would be your
(24) hope, is that the $19,600 on top of the $55,000?
(25) A Yes.

*Dean Mover*