**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

JACK A. HANES                                    CAUSE NO:  2:04-cv-0140-RLY-WGH
         Plaintiff

         vs.

JOHN R. GREGG, Interim President of
Vincennes University, in his individual
capacity and in his official capacity;
DALE DOWDEN, University Provost and
Vice President for Academic Affairs, in
his individual capacity;
PHILLIP RATH, Vice President for
Finance and Government Relations, in his
individual capacity;
JIM MESSMER, Vice President for
Statewide Services, in his individual capacity; and
THE BOARD OF TRUSTEES OF VINCENNES
UNIVERSITY in their official capacity
         Defendants

**APPENDIX OF DESIGNATED MATERIALS
VOLUME III
PAGES 151-200**

                                    Respectfully submitted,

                                    KELLEY, BELCHER & BROWN

                         By:    s/ Thomas J. Belcher
                                Thomas J. Belcher, #3773-53
                                Attorneys for Defendants
                                301 West Seventh Street
                                Post Office Box 3250
                                Bloomington, Indiana  47402-3250
                                Telephone:    812-336-9963
                                Fax:               812-336-4588
                                E-mail: tbelcher@kelleybelcherbrown.com

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Appendix of Designated Materials -- Volume I was filed electronically on the 16th day of June, 2005.  Notice of this filing was sent to the following by operation of the Court's electronic filing system:

Ida Coleman Lamberti
MAURER RIFKIN & HILL, P.C.
E-mail:  iclamberti@mrhlaw.com


<u>s/ Thomas J. Belcher</u>
Thomas J. Belcher

## Page 72

(1) Q Okay. In your view with the trustees—I mean, is this a
(2) professional position?
(3) A Absolutely.
(4) Q Okay. An important position with the university?
(5) A An important professional position. Without a doubt we
(6) have—we were limited by the number of people. We changed
(7) our strategy regarding the Community College Initiative and
(8) decided to fill this position and to move forward. Last
(9) year the limited staff that I have in that area, we were
(10) able to double the number of credit hours that we generated
(11) in Business and Industry over the previous year. And that
(12) number was 300, so, I mean, we were looking at, I thought,
(13) was something very realistic.
(14) MR. STUCKEY: That's all the questions I have of Jim.
(15) Do any of you have questions before Ida?
(16) (BOARD MEMBERS SHAKE THEIR HEADS NEGATIVELY)
(17) CROSS-EXAMINATION
(18) By Ms. Lamberti:
(19) Q Mr. Measmer—
(20) A Yes.
(21) Q —I haven't met you before, so I'm going to be meeting you
(22) for the first time and asking you these questions. First of
(23) all, you said that the salary that you would offer to an
(24) outside person coming in would have been in the $40,000 to
(25) $50,000 range—

## Page 73

(1) A That's correct.
(2) Q —is that correct? And the salary that you were proposing
(3) to Jack Hanes would have been $65,000?
(4) A That's correct.
(5) Q So there clearly would be some savings of salary if Mr.
(6) Hanes returned to his teaching position, wouldn't there, in
(7) that position?
(8) A If we had someone else who came in at the originally
(9) prescribed rate, there would have been some savings—
(10) Q Right.
(11) A —to my area.
(12) Q Perhaps $20,000 to $25,000 savings in your area—
(13) A Perhaps.
(14) Q —right?
(15) A Uh-huh.
(16) Q All right. Now, you talked about FTE?
(17) A Yes.
(18) Q And, again, for the record, what exactly is FTE?
(19) A It's full-time equivalent credit hours or—and that's 30
(20) credit hours is one FTE.
(21) Q Okay. So it takes 30 credit hours to equal one FTE?
(22) A Uh-huh.
(23) Q So in order to get 45 FTEs, you'd have to multiply the 45
(24) times the 30—
(25) A Correct.

## Page 74

(1) Q —right? And how many—how many hours would that be?
(2) A Something over 1,200. I don't have a calculator with me.
(3) Q Okay. Well, if you multiplied it out, it would be
(4) significantly over 1,200, wouldn't it? Isn't that what
(5) you're talking about here?
(6) A Whatever.
(7) Q In order to—to reach that goal that you're talking about;
(8) isn't that correct?
(9) A Uh-huh.
(10) Q So in other words, to put it in plain English, if they go
(11) out and recruit and get one individual who signs up for a
(12) three-hour class, wants to improve his computer skills, is
(13) taking a three-hour computer class, you have to get ten of
(14) those to make that one FTE—
(15) A That's correct.
(16) Q —isn't that right?
(17) A That's correct.
(18) Q So then in order to get the 45 FTEs, you're talking about
(19) bringing in over 1,200 individuals to sign up for a class;
(20) isn't that correct?
(21) A If each student is taking three credit hours and only three
(22) credit hours, that would be more of the credit into the 1,200. I
(23) think you'd be looking at 400 students.
(24) Q Well, if you get an enrollee to take a three-hour class, it
(25) will take 10 such enrollees to make one full-time

## Page 75

(1) equivalent; isn't that correct?
(2) A Right.
(3) Q So isn't that going to have to be multiplied out in order to
(4) get 45 full-time equivalents?
(5) A Uh-huh, so it would be 450 students.
(6) Q All right. Now, you testified that you have already
(7) achieved about half of a certain amount. What amount were
(8) you talking about that you'd already received?
(9) A We had two contracts, two grants. Pardon me. One grant
(10) from—for a client over in Columbus that should generate 70
(11) FTE. And we just signed the final memorandums with the
(12) National Guard that should be able to generate another 70
(13) FTE.
(14) Q All right. Now, who did you send out to do this down in
(15) Columbus?
(16) A The one in Columbus that we had a consultant that was
(17) working with the company, the Department of Work Force
(18) Development and with another consultant we have and came
(19) together and developed curriculum and worked with John
(20) Ludlow in developing the curriculum and things. It was a
(21) collaboration of people. This is a coordinator's position,
(22) and they're going to have to work with the grants
(23) Resources. They're going to have to work with the grants
(24) people and the state agencies that we deal with, going to be
(25) working with the faculty here in developing the curriculum,

Page 76

(1) specific courses in curriculum, and we're coming together
(2) for an associate's degree.
(3) Q Who was the individual from Vincennes University that was
(4) involved in this contact at Columbus? Who was that?
(5) A John Ludlow.
(6) Q And who is John Ludlow?
(7) A John Ludlow is the statewide director--well, now he's the
(8) Assistant Vice President for Statewide Business and
(9) Industry.
(10) Q So he's your assistant? I'm sorry.
(11) A Assistant Vice President, yes. He reports to me.
(12) Q Okay. So he's the assistant to you in the statewide
(13) services?
(14) A For Business and Industry. I have a number of areas that I
(15) deal with.
(16) Q Right. But he's the assistant to you for the Business and
(17) Industry portion of it?
(18) A Correct. That's correct.
(19) Q Okay. When did he come in? When was he hired?
(20) A He was part-time beginning in February, I believe it was, of
(21) 2002, and he moved full-time last Thursday, I guess.
(22) Q So you brought in a person who now is full-time as vice
(23) president?
(24) A Correct.
(25) Q How much are you paying him?

Page 77

(1) A I don't know. I don't have that number.
(2) Q Well, you hired him, didn't you?
(3) A I transferred his budget from one to mine. I think it's
(4) over $90,000.
(5) Q Big salary, isn't it?
(6) A Well, when he's generated 600 FTE and doubled the growth,
(7) he's a good man.
(8) Q And what was the increase in the salary from when he was
(9) part-time to when you hired him as full-time $90,000?
(10) A He was full-time university employee. He had
(11) responsibilities for the manufacturing department, and I
(12) carried a percentage of his salary out of Business and
(13) Industry. He did not get a raise when he moved to full-time
(14) Business and Industry.
(15) Q Was he a faculty member before? Is that what you're saying?
(16) A Yes, faculty and department chair in the Technology
(17) division.
(18) Q Okay. And was he tenured in that position?
(19) A I believe that is correct. He's been here a long time.
(20) Q Did you advise him that when he came into this position that
(21) he was waiving all his faculty tenure rights?
(22) A No.
(23) Q Who else have you hired to assist with this program of
(24) coordinating Business and Industry?
(25) A We had a replacement in Indianapolis for the Central Indiana

Page 78

(1) Business and Industry Coordinator.
(2) Q And who was that?
(3) A That's Pat Bolt.
(4) Q So is that male or female?
(5) A Female.
(6) Q And she's the replacement?
(7) A Uh-huh.
(8) Q What's her salary?
(9) A Mid $36,000 or $37,000, I believe.
(10) Q Is she full-time?
(11) A Yes.
(12) Q And who else did you hire?
(13) A I don't have anyone else. I mean, there's a position in
(14) northern Indiana. We have a coordinator in northern
(15) Indiana.
(16) Q How much do you pay that person?
(17) A Slightly less than $50,000.
(18) Q And how about the coordinator in central Indiana? Is that
(19) Pat?
(20) A Uh-huh.
(21) Q And you have never filled the position in southern Indiana
(22) prior to very recently; is that correct?
(23) A I didn't fill it at all. We still haven't filled it.
(24) Q Okay. And it has never been filled in the past; isn't that
(25) correct?

Page 79

(1) A Not since I've been in this position for two years.
(2) Q Okay. So--and that position still is not filled?
(3) A Correct.
(4) MR. WILEY: Can I ask a question? Does that have
(5) anything to do with Community College of Indiana
(6) initiative?
(7) MR. MESSMER: Yes, it did. It certainly did. We were
(8) limited to three full-time people. And like I said, in
(9) February of 2002 I brought John in part-time to kind of
(10) oversee and coordinate all of the statewide industry
(11) things. And we kept that southern Indiana position
(12) vacant, if you will, because we didn't want to get over
(13) the three people that we had agreed to within the
(14) Community College partnership.
(15) Q And in that partnership what were you saying that you were
(16) limited to three? What exactly do you mean by that?
(17) A Three full-time equivalent staff going out, contacting
(18) businesses, and selling our educational services.
(19) Q And was the reason you were limited to three to--was that
(20) supposed to somehow put it on equity with the new developing
(21) community college system? Was that the--
(22) A No, we were never equal with them.
(23) Q Well, you were superior to them, weren't you?
(24) A We would like to think so, but in terms of the resources and
(25) so forth that were put into this, Ivy Tech has 14 regions,

Page 80

(1) and each of those regions has at least one and in some cases
(2) three Business and Industry people. And we were limited to
(3) three for the whole state; where they have 35, 40 or
(4) whatever.
(5) Q For a long time you've had someone up in the northern area—
(6) A Correct.
(7) Q —isn't that right? And you've had someone in the central
(8) area for a long time?
(9) A Uh-huh.
(10) Q You also made reference to 300. You were asked a question
(11) by Brent Stuckey, and you responded that you had gotten 300.
(12) A 300 FTE increase over the previous year.
(13) Q So are you saying that you have 300 more FTE now than you
(14) had a year ago at this time; is that what you're saying?
(15) A No, I'm saying at the end of last academic year, we had 300
(16) FTE more than we had for the previous period a year earlier.
(17) Q So you had 300 more at the end of the 2002-2003 year than
(18) you'd had in the 2001 to 2002?
(19) A Uh-huh.
(20) Q Okay. And that's actually while Jack Hanes was working as
(21) vice provost of enrollment?
(22) A Those time periods overlapped, yes.
(23) Q Because he was there until just last fall; wasn't that
(24) correct?
(25) A Uh-huh.

Page 81

(1) Q Thank you. Are you in competition with the State Community
(2) College System for students?
(3) A Certainly, not only the Community College system, but also
(4) with all the other public and private institutions and on-
(5) line institutions from out of state.
(6) Q And that would be true also in southern Indiana?
(7) A Uh-huh.
(8) Q Southern Indiana is kind of a new area for you in the sense
(9) of having a coordinator for southern Indiana?
(10) A We're redoubling our efforts in southern Indiana and trying
(11) to claim back some territory.
(12) Q Claim back, what do you mean by that?
(13) A Well, we have in previous years have had a—I believe there
(14) was—I know there was a full-time coordinator before I got
(15) involved in statewide services. And we had done more work,
(16) if you will, more credit hours in southern Indiana, and
(17) we're going to increase those efforts. My hope was that
(18) Jack would be able to make those contacts and increase the
(19) knowledge of people out there what we can do so that we
(20) could be generating credit hours and helping the
(21) university's enrollment.
(22) Q So that was some time ago that there was—that you—that was
(23) before—
(24) A It was prior to my being vice president.
(25) Q And you came in as vice president in—

Page 82

(1) A January of 2002.
(2) Q Okay. And was that your first employment with the
(3) university?
(4) A No, no, I'd been here since 1969.
(5) Q In what area?
(6) A Horticulture.
(7) Q Okay.
(8) A Instructional division, the same division Jack was in.
(9) Q Okay. Okay. So any coordination that was done in southern
(10) Indiana is some time ago?
(11) A Uh-huh.
(12) Q Is that correct?
(13) A With a full-time person, yes. I mean, as I said before,
(14) John Ludlow had done work with this impact Forge over at
(15) Columbus and has been working with the National Guard to
(16) pull that program together.
(17) Q Did he recruit the FTEs with the National Guard?
(18) A Uh-huh.
(19) Q All right. I'll come back to your document in just a few
(20) minutes where you proposed to Jack a base salary of $65,000
(21) with the commissions dependent upon what he brought in.
(22) I'll come back to that in just a minute. So you've been in
(23) your current position two years since 2002?
(24) A Uh-huh.
(25) Q Okay. And you're the one who wrote the job description for

Page 83

(1) the new position of coordinator?
(2) A No.
(3) Q Who wrote that?
(4) A John Ludlow.
(5) Q Okay.
(6) A John wrote the top half, and I worked with the business
(7) office to develop the bottom—I'm sorry—the top two-thirds
(8) is John's work.
(9) Q Okay. And then you came in at the point with the base
(10) salary? That's where you came in?
(11) A In conjunction with the business office.
(12) Q Okay. But you're responsible for this because he works for
(13) you?
(14) A Correct.
(15) Q All right. I think you told us a little bit about this
(16) position, but what exactly was it that you wanted this
(17) person to do, this Coordinator of Southern Indiana Business
(18) and Industry? What exactly would they do?
(19) A This person would be responsible for making contacts with
(20) businesses, following up on calls that we get.
(21) Q From whom?
(22) A From businesses out there, contacts with representatives of
(23) Department of Commerce or Department of Work Force
(24) Development, dealing with companies that find that they need
(25) training to be more competitive in some way or another; that

Page 84

(1) there's some state grant monies perhaps available that can
(2) be used to train workers.
(3) Q Through the Work Force Development?
(4) A Uh-huh, or Department of Commerce and work with companies
in
(5) putting a grant together, work with--
(6) Q Okay. What companies would these be?
(7) A Any companies that contact us. We've got a sand and gravel
(8) company that we're going to do a two Saturday morning
(9) program on telephone etiquette for their office employees.
(10) Q And this person would also go out and contact companies; is
(11) that correct?
(12) A Yes.
(13) Q So it's not just that companies are going to contact you?
(14) A No.
(15) Q The person who does this is going to have to hustle out
(16) there and contact companies?
(17) A Sure.
(18) Q They're going to have to initiate the contact, aren't they?
(19) A Make contacts through Chamber of Commerce, Economic
(20) Development, business manufacturing groups and so forth,
(21) absolutely.
(22) Q So the person that is in this job doesn't just sit there by
(23) the telephone and wait for these calls to come in?
(24) A Oh, no, no, no. It's a coordinator. You know, it says you've
(25) got to travel throughout southern Indiana.

Page 85

(1) Q Okay. And the traveling is to go out and initiate the
(2) contact and drum up the business, in other words?
(3) A There are a lot of ways that we get clients.
(4) Q Okay.
(5) A And some of it might be a cold call. Some would be through
(6) a reference that--again, a field representative of the
(7) Department of Commerce is working with a company that's
(8) having trouble with--in foreign competition, and they need,
(9) you know, workers that are more--can be better trained to be
(10) more competitive and that there's a state grant to help them
(11) become--to maintain that business.
(12) Q Okay. Would it be helpful for the person then to
(13) have some--this person that's going to fill this position to
(14) have some background or some contacts in business and
(15) industry?
(16) A When we looked at--when John and I talked about the
(17) position, there were several ways that we could go. One was
(18) to have someone who had a broad, expansive background in the
(19) university and its educational offerings. And that
(20) certainly was something that we thought was Jack's major
(21) strength. He had been selling all of our academic programs
(22) for three years. He had been involved in the Broadcasting
(23) Department, and he and I were colleagues in the Public
(24) Service division. So certainly, one approach was someone
(25) who knew the university backwards and forwards; or the other

Page 86

(1) way was to look for someone who had strengths in the
(2) manufacturing community, for instance. We weren't going to
(3) find someone who knew Vincennes University--well, I did find
(4) someone who knew Vincennes University pretty well backwards
(5) and forwards from the technology standpoint, and I've got
(6) him as my assistant vice president.
(7) Q Is that Ludlow?
(8) A Yes. But he--and also, he knows the state's manufacturing,
(9) but he's been at it for quite some time.
(10) Q With that background; isn't that correct?
(11) A Uh-huh.
(12) Q All right. Then you've known this Ludlow for some time
(13) apparently?
(14) A Uh-huh.
(15) Q Then I don't understand why that position was being thrust
(16) upon Jack Hanes when you had someone else who by your own
(17) testimony right now filled the bill?
(18) A No, John is the Assistant Vice President for Statewide
(19) Business and Industry, and he needs three people. We've
(20) decided that we need three coordinators: one for northern
(21) Indiana, southern Indiana, and central Indiana. And I'm
(22) filling--wanting to fill the southern Indiana position. We
(23) had three positions, and we now have four.
(24) Q Well, you had northern Indiana, which you've had all along;
(25) central Indiana, which you've had all along; and now you're

Page 87

(1) looking to fill the position in southern Indiana?
(2) A That's correct.
(3) Q Okay. And you added a new position, which is the assistant
(4) vice president that assists Jack?
(5) A For Statewide Business and Industry, yes.
(6) Q Right. So you added a new position there, didn't you?
(7) A Uh-huh.
(8) Q Okay. And you talked about that earlier and the $90,000
(9) salary. Who else do you have at Vincennes that knows the
(10) university that also could go out and sell the university in
(11) southern Indiana?
(12) A Well, I guess I don't understand what--I don't know the
(13) purpose of the question. I mean, there are a lot of people
(14) who know Vincennes University.
(15) Q That's right.
(16) A Yeah.
(17) Q And aren't there a lot of those individuals at Vincennes
(18) University who are also familiar with business and industry
(19) in southern Indiana?
(20) A There might be.
(21) Q Did you ask any of those people to take that position?
(22) A Well, we've advertised the position, yes.
(23) Q So you've had other options, isn't that correct? I mean, it
(24) wasn't--
(25) A Since Jack has declined the position, we're looking at other

Page 88

(1) options and other people, yes.
(2) Q Well, that's my point; that he wasn't the only one in the
(3) universe who could have filled that position; isn't that
(4) correct?
(5) A Well, I hope not since he's declined it.
(6) Q And you have other people at the university who have been
(7) there for many years, haven't you?
(8) A There's a lot of people, yes. We have a long, tenured
(9) faculty group here.
(10) MS. LAMBERTI: So my point is simply it wasn't like
(11) this position was going to go unfilled. There are
(12) other qualified people right here at the university by
(13) his own testimony.
(14) MR. WILEY: Since you're addressing the trustees, I
(15) want to make a point, but I'll wait until you're
(16) through questioning.
(17) MS. LAMBERTI: Okay.
(18) Q Now, Jack Hanes asked to return to his teaching position;
(19) isn't that correct?
(20) A He did--well, yes.
(21) Q Okay. Now, we've talked about the money several times here,
(22) and we have just discovered that there's a new position
(23) that's recently been filled at $90,000. We've talked about
(24) the fact that the salary had Jack Hanes went back to
(25) teaching would have been less than if he had accepted this

Page 89

(1) position. And the issue with Jack Hanes was never about
(2) money from his position; isn't that correct?
(3) A I don't understand what you're saying.
(4) Q He never said to you, I don't want this job because it
(5) doesn't pay enough money--
(6) A No.
(7) Q --did he? What he asked you was let me go back to teaching?
(8) A He asked the provost that position.
(9) Q And you're aware of that, aren't you?
(10) A Uh-huh.
(11) Q So my point is if there are other people at the university
(12) who are qualified to do the job, what is the problem with
(13) putting them in this position and letting Jack Hanes go back
(14) to his teaching position which is what he wants and simply
(15) use that person's salary who is currently at VU, use their
(16) salary to pay Jack Hanes' teaching salary and give this new
(17) person the salary that you're offering to Jack Hanes to do
(18) that?
(19) A That's not the way you manage a department.
(20) Q I understand that--
(21) A I have a position that I need to fill. I need to fill it
(22) desperately. We have an individual who has university
(23) tenure. I recognize his value to the university, his
(24) expertise and knowledge about the programs and the
(25) university and what they can do and felt that this was an

Page 90

(1) opportunity, and I agreed with the management team, the
(2) president and the other two vice presidents, that we would
(3) make this position available to Jack and that this would be
(4) an opportunity for him to maintain his role, continue his
(5) role with the university and to help me out and help John
(6) Ludlow out in Business and Industry. He had declined that,
(7) wanted to go back to teaching. As I heard earlier, and as I
(8) understand personnel decisions and budget decisions, there
(9) wasn't a position in broadcasting. I don't know where the
(10) other people might come from. I mean, we have some
(11) university monies allocated to other departments, but they're not sitting
(12) out there not doing nothing right now, and we're just moving
(13) them into a position to do another task. So their job--they
(14) are doing a job, and someone would have to be brought in to
(15) to do that job. So that salary doesn't necessarily move around
(16) to go back and to support extra faculty in the Public
(17) Service division in Broadcasting.
(18) Q Sure. And I think we all understand that salaries, monies,
(19) university monies are allocated to different areas. We
(20) understand that there's a certain amount allocated to the
(21) Broadcasting Department, to the English Department, to the
(22) various departments. They're allocated for that for
(23) salaries. And there are other monies that are allocated for
(24) administration, other monies allocated for other things.
(25) That's what you're referencing, isn't it? I mean, we

Page 91

(1) understand that; that monies are allocated for different--
(2) A There are budgets, yes.
(3) Q Exactly. Nonetheless, right now there's indication from
(4) Provost Dowden that that courses are being covered by
(5) overload in Broadcasting and by adjunct. Well, certainly,
(6) that's also available in other areas where courses are
(7) handled by overload. So my point is if you found someone,
(8) or if you asked someone from another department, maybe
(9) Business since this talks about Coordinator of Business; or
(10) industry, somebody from your Technology or industry.
(11) Whatever it is they're doing now that you're referring to,
(12) could also be covered by overload or adjunct faculty just
(13) the same way that the job that Jack Hanes left three years
(14) ago and was not replaced, those courses are being covered by
(15) overload or adjunct faculty. When it comes down to it, all
(16) the money at Vincennes is in one big pot, isn't it?
(17) A No.
(18) Q You have a pot of money. It's divided into different
(19) categories.
(20) A There's a general fund divided into a lot of different
(21) categories. There are also auxiliaries.
(22) Q And discretionary funds as well; isn't that true, Mr.
(23) Messmer?
(24) A I don't know about that.
(25) Q Who should I ask that to?

Page 92

(1) A CFO.
(2) Q Well, you had discretionary funds, didn't you? You had
(3) funds to change Ludlow from part-time to full-time at
(4) $90,000, didn't you?
(5) A No, we're going to generate those dollars by increased FTE.
(6) I mean, they just didn't come out of the air. We're going
(7) to have to--in Business and Industry we're in a different
(8) situation where we have to generate our income to pay to
(9) cover our expenses, our personnel and so forth.
(10) Q Well, did you tell him you were going to pay him $90,000?
(11) A Uh-huh.
(12) Q Well--
(13) A I did that when I told--when we were discussing that, I
(14) said, figure out for me how we're going to pay you.
(15) Q But you did make a contract with him that you're going to
(16) pay him $90,000, didn't you?
(17) A Uh-huh.
(18) Q I assume you're going to keep your promise to him?
(19) A And I assume--I'm counting on him keeping the promise that
(20) we're going to generate the credit credit hours to do that.
(21) Q But that money is going to come from somewhere, isn't it?
(22) MR. WILEY: What's the length of that contract?
(23) MR. MESSMER: What--
(24) Q If he fails short, if he fails short, are you not going to
(25) pay him his $90,000?

Page 94

(1) had no evidence that he has been stripped of that.
(2) None. And what he wants to do is go back and teach.
(3) There's overload in that department. There are
(4) adjuncts in that department. And there's money here to
(5) pay his salary. And the question is why? Why would
(6) the university want to terminate an individual who by
(7) all of the testimony that has come in, he was an
(8) excellent faculty teaching member, and he did an
(9) excellent job in administration; asked him to come in
(10) and help them out?
(11) MR. WILEY: I have a question on that if I could
(12) address it.
(13) MS. LAMBERTI: It is relevant, sir.
(14) MR. WILEY: Could I ask--
(15) MR. CASE: I've heard a lot of information this morning
(16) to me that is very unrelevant.
(17) MR. WILEY: Well, I hope that you've listened--
(18) MR. CASE: Past proceedings that you have represented
(19) people that's been very unrelevant, also.
(20) MS. LAMBERTI: Well, Mr. Case--
(21) MR. WILEY: The question I had was--
(22) MS. LAMBERTI: Excuse me just a minute.
(23) MR. WILEY: Sure.
(24) MS. LAMBERTI: I think that's an important item to have
(25) on the record here because if you're telling us on the

Page 93

(1) A The university will meet its commitment through July 1.
(2) Q Exactly, exactly. It's going to come from somewhere.
(3) MR. WILEY: Can I ask a follow-up question on that
(4) point? When you contract with him for the next full
(5) year, are you bound to pay him $90,000?
(6) MR. MESSMER: We should once we--you know, when we
(7) issue a contract--
(8) MR. WILEY: But if you do annual contracts, right, and
(9) you contracted with him for this year for $90,000,
(10) presuming he'd be able to bring in these students, when
(11) you go to contract with him for the next year, are you
(12) bound to pay him $90,000 if he hasn't delivered those
(13) students, or could you reduce his salary such to
(14) reflect the fact that he wasn't successful in the work
(15) he committed to do?
(16) MR. MESSMER: We have not discussed those kinds of
(17) arrangements yet.
(18) MR. CASE: I'd like to make a comment here. We're all
(19) here to make this as fair a procedure as possible for
(20) Jack. It seems to me like we're getting way off the
(21) situation--what this meeting is really about.
(22) MS. LAMBERTI: I appreciate your concern, Mr. Case, but
(23) the fact is these questions are relevant. They are
(24) relevant. This man is a tenured faculty person. We've

Page 95

(1) record that you're coming in here predisposed to what
(2) we're doing here this morning--
(3) MR. CASE: I'm telling you I think there's been a lot
(4) of unrelevant information, questions.
(5) MS. LAMBERTI: --then maybe you may want to excuse
(6) yourself, sir.
(7) MR. CASE: No, I'm not doing that, no.
(8) MS. LAMBERTI: All right. Then I hope you will
(9) continue to listen to the testimony because what we're
(10) getting here is the fact that there are new positions
(11) being opened that are being paid big bucks, and there
(12) ought to be enough money to let a man go back to his
(13) teaching position and be paid that salary. That's what
(14) the question is.
(15) MR. WILEY: As a trustee, and let me just say I fully
(16) appreciate Trustee Morrison and Trustee Case's ability
(17) to be a part of this hearing. But as a trustee I'm
(18) painfully aware over the past four years of the
(19) desperate nature of finances for the university and
(20) also unfortunately aware of the demise of the Community
(21) College of Indiana initiative as it was to add to our
(22) student numbers at the university. I guess I'm
(23) wondering is in an area of highest and best use of a
(24) professional staff person and what's going to benefit
(25) the university the most whether having Jack be in this

CROSSROADS COURT REPORTING                    *Depo-Merge*                              Page 25

156

## Page 96

(1) development position where he's trying to recruit FTEs
(2) in the field or whether back in a position in the
(3) Communication Department is the best thing for the
(4) university, and I'd like to actually have that
(5) answered.
(6) MS. LAMBERT: That's fine. Thank you.
(7) MR. MESSMER: Well, from my perspective--and there are
(8) other people here who have perhaps more responsibility
(9) over this, but from my perspective I see Business and
(10) industry and our outreach off-campus areas as
(11) tremendous growth potential. And I view that because
(12) we are taking the education to the people, to their
(13) workplace or to their high school and some other areas
(14) that I have and that we are not influenced by the fact
(15) that to bring--to generate credit hours on this campus
(16) we have to get the students here. And we have to
(17) get--the big group we have to get here are the ones
(18) that are going to live in the residence hall, which
(19) means they got to drive past a lot of other schools to
(20) get to Vincennes University. And in terms of your
(21) question in terms of being in Broadcasting versus
(22) Business and industry, I don't know the broadcasting
(23) industry, but I do know that if we can double our
(24) credit hour production--FTE production in one year by
(25) 300 with a slim staff that by adding another position

## Page 97

(1) we should be able to do that again.
(2) MR. WILEY: That's fine. Thank you.
(3) MS. LAMBERT: Did that answer your question?
(4) MR. WILEY: Uh-huh.
(5) Q You mentioned something right now. You said you need to get
(6) students in residence hall. Where are those students going
(7) to come from? Are those the ones that you're recruiting
(8) here, these FTEs?
(9) A For Business and industry? No. The--and, again, this is my
(10) opinion, but in terms of the survival of Vincennes
(11) University that we've got to be able to draw students--
(12) survival of Vincennes University as we know it now, we've
(13) got to be able to draw students from outside a 50-mile
(14) radius or community. And that means we need them to move
(15) into the residence halls to fill the classrooms so that
(16) there is a need for another--there might be the need for
(17) another faculty in broadcasting or someplace.
(18) Q Okay. Now, those students you're going to bring into the
(19) residence halls, I guess there you're talking about fairly
(20) what we call traditional students?
(21) A Sure.
(22) Q Okay. And some of those also are going to come by way of
(23) this recruitment that you're doing with your coordinator?
(24) A We hope that there's some spinoff that an employee working
(25) in a factory has a child who is getting ready to graduate

## Page 98

(1) from high school. They had a good experience with Vincennes
(2) University education and that they would bring their student
(3) to VU to look at it. And that has happened.
(4) Q Okay. Or maybe somebody who is 20 years old that took a job
(5) out of high school and gets a good taste of Vincennes and
(6) then will come and live in the residence hall and be a
(7) student for a couple of years?
(8) A It's not likely, but that could be possible.
(9) Q Okay. I have some other questions about this document. You
(10) said you prepared the lower half. You've explained the base
(11) salary of $65,000. You've also talked about this benchmark
(12) of the 45 FTEs. Can you explain how that if you have a base
(13) salary of $65,000, how these benchmarks are actually going
(14) to work? Just nuts and bolts how is it going to work to pay
(15) in this case where you offered it to Jack Hanes? You talked
(16) a little bit about how he'd get up to get the additional
(17) $20,000.
(18) A Uh-huh.
(19) Q --if he brings in lots of folk? What happens if the
(20) individual doesn't bring in all those FTEs?
(21) A At the time that the--settlement, we had calculated at
(22) September 15th of 2005, then there would be an adjustment.
(23) Q A downward adjustment, isn't that right?
(24) A A downward adjustment, right.
(25) Q Why isn't that shown on here?

## Page 99

(1) A Because it's part of the description on the next page.
(2) Q Okay. And what could the downward adjustment amount to if
(3) Jack Hanes or whoever takes his position doesn't reach the
(4) number of FTEs?
(5) A It could be downward by that much. That's the dollar--
(6) that's the amounts below there, minus 2,600, 5684. It could
(7) be $19,600.
(8) Q Okay. So instead of a $65,000 salary, the person could
(9) actually be getting about $45,000; isn't that correct?
(10) A If they didn't meet performance goals, yes.
(11) Q Okay. So the base salary is really not a base salary in the
(12) traditional sense of if you have a base salary, common
(13) business understanding is that's what you've got, and then
(14) you may get more on top of that if you perform. But this
(15) isn't a base salary in that sense, is it, Mr. Messmer?
(16) A There are incentives for producing more; that's right.
(17) Q And there are disincentives by way of reduction of that
(18) "base salary" if you don't perform?
(19) A If the goals aren't met, uh-huh.
(20) Q Okay. So it isn't a base salary in the traditional sense;
(21) it's a starting point, but it also can go downward?
(22) A It can go downward.
(23) Q Right. Okay. Before you set this up, what information did
(24) you base this offer on? Did you do a market survey in
(25) southern Indiana?

Page 100

(1) A No, I did it on the fact that we've raised 300 FTE this past
(2) year. We increased our Business and Industry FTE.
(3) Q And what are the dates you're saying you increased it by 300
(4) in the past year? What dates are you talking about?
(5) A Fall.
(6) Q Fall of what?
(7) A The '02-'03 academic year.
(8) Q You brought in 300--
(9) A More FTE.
(10) Q But that wasn't done through the Coordinator of Industry and
(11) Business, was it?
(12) A Sure.
(13) Q Well, who did that?
(14) A John Ludlow and the staff that he has, the northern Indiana
(15) person, the southern--
(16) Q Okay. This fellow that's been working part-time that's now
(17) been put on full-time?
(18) A Uh-huh.
(19) Q Okay. Did you do any other kind of a market survey to find
(20) out what the market is down there for what you're projecting
(21) here?
(22) A No, I mean, we've got contacts, and we've got--we've just
(23) seen that there's a lot of potential.
(24) Q Do you have any documentation on that?
(25) A No.

Page 101

(1) Q Do you have any idea how many potential students there are
(2) in southern Indiana?
(3) A No. I mean, the National Guard wants 2,000 truck
(4) drivers that they want us to work with.
(5) Q Do you have any other--
(6) A That's 20 times 20. That's 40,000 credit hours.
(7) Q Have you done any kind of a survey to give you an idea of
(8) what might be down in southern Indiana?
(9) A No, we've been too busy trying to generate the credit hours
(10) that we've got.
(11) Q The base salary is guaranteed. Is it for one year?
(12) A I thought it was for a year and a half. My thinking was a
(13) year and a half.
(14) Q Where is that?
(15) A It's not on here. We're talking about the bonus schedule
(16) would be effective July 1 of 2005. So we were looking for
(17) the period between November and July 1 of 2005, so it would
(18) have been about 18, 19 months.
(19) Q So was the salary of $65,000, what was that going to cover,
(20) and how long was that going to continue?
(21) A It would be--my understanding, my thinking was it was an
(22) annual basis of $65,000 or 18 months.
(23) Q And then after that?
(24) A Well, it says on the back page we'd re-evaluate.
(25) Q And that's subject to this either going up or also going

Page 102

(1) down?
(2) A Could be, uh-huh.
(3) Q You also wrote another job description a little bit later,
(4) didn't you, a second job description?
(5) A No, John Ludlow did.
(6) Q Okay. I'd just draw your attention to that second job
(7) description at H.
(8) MR. MORRISON: Do what?
(9) MS. LAMBERTI: At H. There's a second job description
(10) at H, which Mr. Measmer is saying Ludlow wrote that.
(11) A Uh-huh.
(12) Q Okay. So that's the one you put out in December 1 of 2003;
(13) that's the second job description that was put out there?
(14) A Uh-huh.
(15) Q Okay.
(16) A When Jack declined the position.
(17) Q All right. I'd like to go back just a little bit just so
(18) that you're aware that there was a second job description
(19) that went out regarding that and note that the requirements
(20) in that were a degree in technology, business--
(21) MR. WILEY: What are you looking at?
(22) MS. LAMBERTI: Exhibit H.
(23) MR. WILEY: I'm sorry.
(24) Q Saying that the successful applicant will have a degree in
(25) technology, business management, or a master's degree in

Page 103

(1) technology, business, or career education; and, again, note
(2) the fact that Mr. Hanes was in broadcasting, not in one of
(3) those areas.
(4) A I'd beg to differ. I think business and career education,
(5) if you look at a number of schools, broadcasting is in
(6) business.
(7) Q Jack Hanes is not in business; isn't that correct?
(8) A The broadcasting program is in the Business and Public
(9) Service division.
(10) Q And he's in broadcasting, not business, isn't that correct?
(11) A He's in broadcasting, yes.
(12) Q Thank you.
(13) MR. WILEY: But that's a division of what?
(14) MR. MESSMER: That's part of the Business and Public
(15) Service division.
(16) Q Now, we've talked a little bit about the kind of students
(17) that you are attempting to recruit. You've talked about the
(18) ones that are going to be out there that are going to take a
(19) course or so. You've talked about the fact that you're also
(20) recruiting traditional students to fill up your residence
(21) halls. Who would be paying for these students that come in
(22) from industry? Somebody out in the manufacturing plant that
(23) wants to learn how to do computer skills, who is going to
(24) pay for his hours?
(25) A Sometimes it's the business. Sometimes it's a grant, a

Page 104

(1) state grant.
(2) Q What kind of a grant?
(3) A The Department of Work Force Development. Incumbent worker
(4) training grants are the big ones that we've been utilizing.
(5) They have GET grants and a lot of different acronyms that
(6) they use. Some companies have their own employee training
(7) programs where employees have a certain dollar amount to
(8) spend on education.
(9) Q Okay. And generally speaking, would these students also be
(10) eligible for Title IV funds?
(11) A Maybe, maybe not. Probably not. They're part-time.
(12) Q Well, Title IV doesn't distinguish between full-time and
(13) part-time students, does it?
(14) A My understanding is that it does.
(15) Q Where did you get that understanding?
(16) A From three years of working with students in the community
(17) college.
(18) Q Well, that's what I'm asking you specifically. Are you
(19) saying that students if they're part-time aren't going to
(20) get any Title IV funds?
(21) A My understanding is that a student has to be full-time to
(22) get financial aid. That's 12 hours a semester.
(23) Q Does this job description that you put forth to Mr. Hance,
(24) does it comply with the requirements of the federal statute,
(25) 20 U.S.C.A. 1094?

Page 105

(1) A I don't know.
(2) Q Does it comply? It's the Higher Education Act. I'm sure
(3) you're familiar with that, aren't you?
(4) A I don't know. The position description I put together met
(5) the requirement--or had John put together, and I reviewed it
(6) met the requirements of our human resources policies.
(7) Q Well, the Act I'm talking about is the Higher Education Act.
(8) I mean, it's what governs Vincennes and every other
(9) university that's in higher education.
(10) A Well, I can't answer that. I assume that it does if it met
(11) our human resources policies.
(12) Q Well, who in human resources would check that out?
(13) A The director.
(14) Q And who is that?
(15) A Gazella Summit.
(16) Q Is Gazella Summit an attorney?
(17) A No.
(18) Q Do you know if Gazella Summit ran this by your university
(19) attorney to see if it complies with the Higher Education
(20) Act?
(21) A I don't know that. I don't know that.
(22) MR. STUCKEY: Ida, I don't want to interrupt, but how
(23) in the world is that relevant to Jack?
(24) MS. LAMBERTI: Because it's very relevant. There's an
(25) act called the Higher Education Act. There are certain

Page 106

(1) qualifications and certain prohibitions under that Act
(2) that regulate exactly this kind of position.
(3) MR. WREY: Is that for an academic or a professional
(4) position?
(5) MS. LAMBERTI: It's for students, that deals with the
(6) students. That's why I'm asking what kind of students
(7) are being recruited here. Who is paying for them?
(8) MR. CASE: And why is that? You didn't answer Brent's
(9) question. How is that relevant to Jack's situation?
(10) MS. LAMBERTI: That's very relevant.
(11) MR. CASE: How?
(12) MS. LAMBERTI: I'll be glad to explain that to you, Mr.
(13) Case. In fact, I have the statute here. I'll be glad
(14) to give you a copy of it. Under the Higher Education
(15) Act, if students are entitled to Title IV funds--and
(16) whether students in the community
(17) are or not. They might be. Might not be. Some might
(18) be. Some might not be. And he said it was reviewed by
(19) Gazella Summit who is not an attorney, so I'm asking
(20) if the university counsel has explored this because
(21) under the Higher Education Act if you have students who
(22) are eligible for Title IV funds, then there are certain
(23) prohibitions that apply as to how those students may be
(24) recruited. And I'm asking have you checked to see that
(25) this type of a position where you're putting the salary

Page 107

(1) dependent on a commission and bonus, whether you've had
(2) that reviewed by counsel to see whether you're in
(3) violation of the Higher Education Act? It's very
(4) relevant unless you want the university to not be in
(5) compliance with the federal statute that governs higher
(6) education. I think that's relevant.
(7) MR. STUCKEY: But, Ida--
(8) MR. CASE: I don't. I'm sorry.
(9) MR. STUCKEY: Just--
(10) MS. LAMBERTI: and so it wouldn't bother you, Mr. Case,
(11) if the university were not in compliance?
(12) MR. STUCKEY: Ida, Ida--
(13) MR. CASE: Move ahead. Move on.
(14) MR. LAMBERTI: That's directed to your counsel.
(15) MR. STUCKEY: Ida, the issue with all due respect is
(16) about Jack, whether he has a tenured teaching
(17) contract--
(18) MS. LAMBERTI: That's right.
(19) MR. STUCKEY: --or a tenured professional staff; if
(20) he's tenured professional staff, whether this job offer
(21) fits within the university tenure. And, I mean,
(22) goodness sakes, you go off on such minutia that it's--I
(23) just don't think it's helpful. And quite frankly, we
(24) want to give Jack due process. We're all here on the
(25) same team and wanting to get to the issues and have

Page 108

(1) full understanding of those.
(2) (OFF THE RECORD WHILE THE COURT REPORTER CHANGED
PAPER)
(3) MR. STUCKEY: And, I mean, from our perspective, Ida.
(4) when you go off on these long tangents, it becomes
(5) weary to where it's hard to keep focused on the real
(6) issues. And I just respectfully ask that you move it
(7) along because I've been a lawyer for a long, long time,
(8) and, you know, things can move much more quickly than
(9) this with all due respect. I don't want to argue with
(10) you about it. I just want to share with you our good
(11) faith desire to move forward to hear what Jack has to
(12) say about his feelings on the thing.
(13) MR. WILEY: We're in the fourth hour with our second
(14) witness, right?
(15) MS. LAMBERTI: That's correct. And, Mr. Stuckey, if
(16) you informed this panel that they were going to be
(17) finished in a few hours, then I believe they were
(18) misinformed. You certainly did not convey to me that
(19) we were limited to two or three hours, nor should a due
(20) process hearing involving a tenured faculty person be
(21) restricted to two or three hours, which really goes to
(22) the heart of this due process hearing. You know, going
(23) through the motions isn't sufficient. There's plenty
(24) of case law out there that shows--I'd like the record
(25) to show that while I'm speaking, Mr. Stuckey is shaking

Page 109

(1) his head in dismay at me. I think you need to know
(2) there's case law out there that says if you're just
(3) going through the motions, it's not a due process
(4) hearing.
(5) MR. STUCKEY: Ida--
(6) MS. LAMBERTI: He's entitled to put on the record what
(7) needs to be on the record. And the reason this is
(8) relevant, those of you on the panel, is that one of the
(9) concerns, and Jack Hanes will testify to this, about
(10) this decision is whether or not this position is in
(11) compliance with the Higher Education Act. And I would
(12) think as their counsel, Mr. Stuckey, with all due
(13) respect, and you as trustees would want to know whether
(14) something you're advertising and showing as a position
(15) you're offering where a recruiter or an enrollment
(16) person going out to seek students of various kinds is
(17) in compliance with the Higher Education Act. If it is,
(18) all you have to do is say we've checked it out, and it
(19) is. But I'm not getting that answer. And Mr. Hanes
(20) will testify that he had concerns about that. My
(21) question is real direct.
(22) Q Mr. Messmer, did you have that--
(23) MR. STUCKEY: Ida, Ida, I'm going to respond.
(24) MS. LAMBERTI: Excuse me, sir. I have an opportunity
(25) to ask my questions.

Page 110

(1) MR. STUCKEY: No, no, no, no, no, no, I'm going to
(2) respond to that because, see--
(3) MS. LAMBERTI: Are you advising him not to answer?
(4) MR. STUCKEY: No. I'm going to say--
(5) Q Well, then answer the question.
(6) MR. STUCKEY: Ida, I'm going to say something to you.
(7) See, you could make that point in ten seconds.
(8) MS. LAMBERTI: I have.
(9) MR. STUCKEY: You could ask of Jack, you could say--
(10) MS. LAMBERTI: I have. I have. I have.
(11) MR. STUCKEY: You made it in 15 minutes.
(12) MS. LAMBERTI: I asked him, and he didn't answer it.
(13) MR. STUCKEY: But every point you take 15 minutes to
(14) make. Jack could have said, hey, I had a concern about
(15) whether this because I know the law; that you can't
(16) induce people. You can't give bonuses for people doing
(17) the recruitment. We all know that.
(18) MS. LAMBERTI: Why don't--
(19) MR. STUCKEY: But we don't think it applies to Title IV
(20) students. But you make it such a maze. Every issue.
(21) Just have Jack say, hey, I had a concern about that.
(22) That's why I thought I maybe didn't want to do the
(23) position.
(24) MS. LAMBERTI: Brent, thank you for telling me how to
(25) handle my case. I really appreciate it.

Page 111

(1) MR. STUCKEY: Well, I'm trying to help you.
(2) Q Now, would you answer the question that I asked you 15
(3) minutes ago, Mr. Messmer? Did you check and see if it's in
(4) compliance with the Higher Education Act? Yes or no?
(5) A No.
(6) MS. LAMBERTI: That time--
(7) A No, that's not standard process here.
(8) MS. LAMBERTI: --it was due to you, for the record.
(9) All he had to do was answer that question 15 minutes
(10) ago.
(11) Q Have you checked since the reauthorization in 2003 regarding
(12) Higher Education Act?
(13) A Not standard process.
(14) Q Have you checked with the new regulations that have come in?
(15) A No.
(16) Q So you don't know one way or another--
(17) A No.
(18) Q --whether it's in compliance or not?
(19) A No.
(20) Q Thank you, Mr. Messmer.
(21) MR. WILEY: Would you expect that your Human Resources
(22) division would know and follow that statute?
(23) MR. MESSMER: Well, I think that certainly there are
(24) other individuals in the university would have that
(25) responsibility besides me.

Page 112

(1) MR. WILEY:  So you wouldn't be the best person to ask
(2) that question to?
(3) MR. WILEY:  No, huh-uh.
(4) Q If Human Resources doesn't know something, how do you ever
(5) find out?  Do you go to university counsel?
(6) A I don't know what their process is, and I'm sure she would
(7) go to her supervisor.
(8) Q Okay.  And who would that be?
(9) A The chief financial officer, Phil Rath.
(10) MS. LAMBERTI:  Thank you for answering my questions.
(11) WITNESS:  Okay.
(12) MR. STUCKEY:  Okay.  Do you have any other questions of
(13) Jim?
(14) (BOARD MEMBERS SHAKE THEIR HEADS NEGATIVELY)
(15) MR. STUCKEY:  That's all of our witnesses, Ida, so you
(16) may call whoever you want to call.
(17) MS. LAMBERTI:  Mr. Dowden and Mr. Measmer are your only
(18) witnesses?
(19) MR. STUCKEY:  Uh-huh.
(20) MS. LAMBERTI:  I believe you indicated in your letter
(21) you were going to be calling interim president.  You're
(22) not going to call him?
(23) MR. STUCKEY:  Huh-uh.  I mean, I don't—
(24) MS. LAMBERTI:  That's fine.
(25) MR. STUCKEY:  —his testimony, I think, would be

Page 113

(1) redundant and just—
(2) MS. LAMBERTI:  That's fine.  All right.  I have just a
(3) few questions for your president.  Maybe in deference
(4) to the fact that he is your president and perhaps wants
(5) to go back to his office—or, Mr. Gregg, are you
(6) planning to stay for all of the hearings anyway?
(7) MR. GREGG:  Can we go off the record?
(8) MS. LAMBERTI:  Certainly.
(9) (OFF THE RECORD & A SHORT BREAK WAS TAKEN)
(10) JOHN R. GREGG,
(11) having been first duly placed under oath, was examined and
(12) testified as follows:
(13) DIRECT EXAMINATION
(14) By Ms. Lamberti:
(15) Q Mr. Gregg, would you just give your full name and your
(16) position here?
(17) A Sure.  My name is John Richard Gregg.  I'm the interim
(18) president of Vincennes University.
(19) Q And when did you become interim president?
(20) A August of this past year, 2003.
(21) Q Okay.  And prior to this, just for the record, what was your
(22) position?  What was your work that you were doing prior?
(23) A I am an attorney.  I was a practicing attorney and a partner
(24) with the law firm of Sommer Barnard Ackerson with offices in
(25) Indianapolis, Washington, D.C., and a one-man office in

Page 114

(1) Vincennes.
(2) Q Okay.  And are you that one-man office in Vincennes?
(3) A You're looking at him.
(4) Q Thank you.  Do you have an undergraduate degree from
(5) Vincennes?
(6) A I have an A.S. degree from Vincennes.
(7) Q Okay.  And then you have a bachelor's degree from where?
(8) A Indiana University at Bloomington.
(9) Q Okay.  And what area is that in?
(10) A Political science and history.  I had a double major.
(11) Q Okay.  And then you have a law degree from Indiana
(12) University?
(13) A At Indianapolis.  And I have another degree if that's
(14) important, but—
(15) Q What is that?
(16) A I have a master's degree in public administration from
(17) Indiana State University that I earned in 1976.  I earned
(18) the law degree in 1984.
(19) Q Okay.  Thank you very much.  Mr. Gregg, do you have
(20) background in higher education?
(21) A My background in higher education is that I've received one,
(22) and I was familiar with the funding of higher education at a
(23) public institution from how they are funded with state
(24) dollars, was familiar with aspects as to how it would
(25) directly be involved with the Indiana General Assembly on

Page 115

(1) behalf of the taxpayers of Indiana.  And I had also taught
(2) as an adjunct at Vincennes University over the years having
(3) taught some business law related courses, history,
(4) government, political science.
(5) Q Okay.  Thank you very much.  Now, in this interim position
(6) you don't have any kind of tenure in this position as
(7) interim president?
(8) A I have a contract.
(9) Q And that's a contract for a year?
(10) A It's a contract where I can give 30-day notice, or they can
(11) give 30-day notice.  It's—I believe it's until they hire a
(12) new president, which was approximately May, June, July.  And
(13) I don't believe it has an ending period.  It may, but I
(14) remember what was discussed and what was in the paper.
(15) Q Okay.  But you don't have tenure in any way?
(16) A Well, no, I mean, I took the job as an interim and took the
(17) job with just—while they're searching for a president.
(18) Q Thank you.  And that search is going on now?
(19) A We've hired a consultant, and the parameters have been set
(20) as we like to see in a president.  The governance groups
(21) have selected their members, and the other members are also
(22) selected now, so that's moving.
(23) Q Okay.  So you do have a search committee at this point, do
(24) you?
(25) A Yes, my understanding.  I'm not part of that process as I'm

**Page 116**

(1) an interim president.
(2) Q But it's your understanding there's a search committee?
(3) A Yes.
(4) Q Okay. Thank you.
(5) MR. WILEY: I'm glad that question was answered.
(6) Q The main question that I would like to ask you is in your
(7) experience, any of your experience, do you have knowledge of
(8) experience with the Higher Education Act?
(9) A I have administrative experience from having served in an
(10) elected capacity. I have not had as I'm thinking any
(11) direct--I've never--no, to my knowledge I do not.
(12) Q Thank you. Are you aware, or do you know whether anyone at
(13) the university has had counsel review to see whether the
(14) university is in compliance with the Higher Education Act in
(15) regard to this faculty description? I have--well, the
(16) university has it identified as Exhibit 5, and I also have
(17) it identified in my records. The--
(18) A I do not know that for a fact. I do know that as you
(19) alluded to that you cannot--I've heard you can't pay through
(20) the admissions, the admissions representatives as you
(21) alluded to Jack. I mean, I'm aware of that, and I'm aware
(22) of some parameters. I know that we--I know we do everything
(23) we can to comply with the law. But as far as specifically
(24) have I asked did this comply with the law, I am of the
(25) opinion that what we advertise tries to comply with the law.

**Page 117**

(1) Q Okay. And you understand that that was my query; I was
(2) asking does it comply with the law?
(3) A Yes.
(4) Q That was my question to Mr. Messmer, and that's my question
(5) to you. Do you know whether or not this job description
(6) complies with the Higher Education Act?
(7) A No, I do not.
(8) Q Okay. Are you familiar with the fact that it was
(9) reauthorized in 2003?
(10) A This position or the Act?
(11) Q The Act.
(12) A No, I am not. No, I was not, am not.
(13) Q Okay. Are you aware of the fact that there were new
(14) regulations that were issued regarding this Act in 2003?
(15) A No, but it wouldn't surprise me, of course, because the law
(16) as we all know changes.
(17) Q Exactly. So you have not had any opportunity to review
(18) those regulations yourself?
(19) A No, I have not.
(20) Q Do you know whether anyone else on behalf of the university
(21) has reviewed those regulations?
(22) A I do not know.
(23) Q Okay. Does it concern you, President Greggg, whether or not
(24) the university is in fact in compliance with this Higher
(25) Education Act?

**Page 118**

(1) A Yes.
(2) Q And, again, this is a question that I'm asking as to whether
(3) the university is in compliance, and your answer is you're
(4) not sure because you haven't pursued that question; is that
(5) correct?
(6) A Yes, that is something I have not done, and it's something I
(7) would not do in the normal course of my responsibilities.
(8) Q Okay. But is there somebody that should be checking that
(9) out?
(10) A Well, yes.
(11) Q And who would that be?
(12) A I would assume it would be our personnel. I wouldn't
(13) assume. I would say it's our personnel, Human Resources
(14) Department.
(15) Q And is that Gazella Summitt?
(16) A That's Ms. Summitt.
(17) Q And to your knowledge do you have any knowledge that she
(18) has
(18) checked that out?
(19) A It's not because Gazella does not report directly to me. I
(20) see her. I speak with her, but normally, not in a--not in
(21) those type of lengthy conversations as to what she's doing
(22) on a daily basis.
(23) Q All right. And I'm assuming then from your answer that you
(24) have not been advised in this regard by your university
(25) counsel?

**Page 119**

(1) A I was advised by counsel in this process, in the overall
(2) process as to tenure, professional staff tenure, faculty
(3) tenure, what the law was in Indiana, our obligations. As
(4) far as was I advised the law about a legal advertisement,
(5) no, but I didn't ask if it complied.
(6) Q Okay. Thank you very much. Excuse me one minute, please.
(7) These are all the questions I have for you. Thank you very
(8) much, Mr. Gregg.
(9) A Thank you.
(10) MR. GREGG: Can I go off the record for a moment and
(11) say something on the way out?
(12) (OFF THE RECORD)
(13) DAN BURGEL,
(14) having been first duly placed under oath, was examined and
(15) testified as follows:
(16) DIRECT EXAMINATION
(17) By Ms. Lambert:
(18) Q Mr. Burgel, for the record, would you state your full name,
(19) please?
(20) A Daniel Len Burgel.
(21) Q And how do you spell your last name?
(22) A B--as in boy--u-r-g-e-l.
(23) Q And how long have you been at Vincennes University?
(24) A This will be my 26th year.
(25) Q So you came in in--

Page 120

(1) A 1978.
(2) Q Okay. And what position did you come in as in 1978?
(3) A I believe it was an instructor. I was a faculty member. I
(4) believe I was an instructor.
(5) Q In what department?
(6) A Law Enforcement.
(7) Q Law Enforcement? And what--is there a separate Department
(8) of Law Enforcement here at the university?
(9) A Yes.
(10) Q Okay. And what division is that in?
(11) A That's in the Business and Public Service.
(12) Q And have you been promoted up through the ranks from
(13) instructor?
(14) A Yes, I went up to full professor, and then I was also a
(15) department chair.
(16) Q When did you become a full professor, if you remember?
(17) A Not right offhand. I assume somewhere around probably 1986
(18) or '88, somewhere in that area, I imagine.
(19) Q '96?
(20) A '86 or '88, somewhere in that area, I think.
(21) Q Okay. Thank you. And you also have faculty tenure in your
(22) academic field?
(23) A Yes, yes.
(24) Q When did you receive tenure, approximately?
(25) A Oh, let's see. Probably '83.

Page 121

(1) Q And did you go through a process in order to receive that
(2) faculty tenure?
(3) A Yes.
(4) Q Okay. You were first evaluated by your peers in your
(5) department?
(6) A Right.
(7) Q And then I went on up through the chain and was ultimately
(8) in fact approved by the board?
(9) A Yes.
(10) Q Okay. Now, in your current position, as I understand it,
(11) you are Dean of the Division of Business and Public Service?
(12) A Yes, yes.
(13) Q And that's not an interim position?
(14) A No, that's full position.
(15) Q A full-time position?
(16) A Full-time position, yes.
(17) Q And in that position of dean, you retain your faculty tenure
(18) position; is that correct?
(19) A Yes.
(20) Q Have you ever been asked to do any work in central
(21) administration?
(22) A When you say central administration, I'm not sure what you
(23) mean there.
(24) Q I mean beyond the division of which you are dean?
(25) A No.

Page 122

(1) Q Are you the immediate supervisor then of the Department of
(2) Broadcasting?
(3) A Yes.
(4) Q In that position as dean of that division and the fact that
(5) you're immediate supervisor, then you're familiar with the
(6) number of faculty--
(7) A Yes.
(8) Q --in the Department of Broadcasting?
(9) A Yes, I am.
(10) Q Okay. If I could just reference you to Exhibit M, and there
(11) should be a book, a black binder of exhibits, I'd ask you to
(12) look at Exhibit M.
(13) A Okay.
(14) Q And if you could just describe for the record what Exhibit M
(15) is from the plaintiff's record?
(16) A This is simply a list of the loads for each faculty member
(17) from fall of 2000 to--through what's estimated for spring of
(18) 2004.
(19) Q Okay. And how many faculty members do we have here
(20) according to this?
(21) A There are seven. Two of those teach half-time, and then
(22) they--the other half of the time they're managers of our
(23) radio and TV stations.
(24) Q Okay. And which two would they be?
(25) A That would be Al Berko and Phil Smith.

Page 123

(1) Q Okay. So those two at the bottom of the list--
(2) A Yes.
(3) Q --are half-time faculty; is that--
(4) A They teach half-time, and then they're managers of the radio
(5) and TV stations.
(6) Q Do they have faculty tenure?
(7) A No.
(8) Q So they're not tenured in any way; is that correct?
(9) A No.
(10) Q So they're at-will employees then since they don't have
(11) tenure?
(12) A I would assume so, yes.
(13) Q And the first five, Hitchcock, Burkes, Young, Young,
(14) and Young, are they tenured?
(15) A Yes.
(16) Q And what is the reference there to staff? What does that
(17) mean?
(18) A That would be the number of hours. For instance, if you
(19) look at the first column--I guess it would be the second
(20) column--the Fall of 2000 loads, that would mean, say, that
(21) there were 16 contact hours that were covered by staff, in
(22) other words, adjunct faculty, people hired to cover those
(23) particular contact hours. They're primarily lab hours.
(24) Q Okay. So when you have a listing here of hours that are
(25) staff hours, they're going to be absorbed in some way by

Page 124

(1) adjunct faculty?
(2) A Right.
(3) Q People that you bring in on a temporary basis?
(4) A Either that, or they could be a--one of our staff that works
(5) in the radio or TV area who might do that as an extra duty,
(6) what they would be paid for.
(7) Q Okay. So it could be adjunct, or it could be--do you
(8) consider--what do you call those people who were, again,
(9) like the radio or TV station?
(10) A Typically, they're either professional or support staff. In
(11) most cases they're professional staff.
(12) Q Okay. So they would absorb those hours?
(13) A Yes.
(14) Q Or you'd go out and get an adjunct person to come in
(15) and teach the hours for you?
(16) A Right.
(17) Q And, of course, none of them have any tenure. They're ones
(18) that you pick up on a semester basis if you need somebody to
(19) cover some hours; is that correct?
(20) A Correct.
(21) Q What is the average teaching load in the Broadcasting?
(22) A For the Broadcasting it's normally 22 contact hours.
(23) Q Okay. Is there a little bit of a range there? Is it
(24) sometimes 20, sometimes 22, maybe even sometimes a little
(25) more than that? Is there kind of a range, or is--

Page 125

(1) A It should average out to 22 contact hours each semester.
(2) Q Has that varied over the past--well, let's go back to 2000
(3) here.
(4) A Okay.
(5) Q Has that varied a little bit from the 22 over those period
(6) of years?
(7) A I'm not sure what you're asking.
(8) Q Well, at some time one semester they might be--a faculty
(9) member might have 24 hours; another semester they might have
(10) 20 hours--
(11) A Sure, yeah--
(12) Q --and sometimes--
(13) A --that does happen on occasion.
(14) Q --and sometimes the--there's going to be a range even as to
(15) those 22 hours. Sometimes it might be 20. Sometimes it
(16) might be 22. Sometimes it might be 21.5?
(17) A I think normally it would be within one--like, 21 to 22.
(18) Q Can you explain the idea of load averaging?
(19) A Load averaging?
(20) Q Right, how the loads--the teaching loads between the fall
(21) semester and the spring semester might balance out?
(22) A I guess if I understand you right, usually, we have more--
(23) more overload in the fall than we do in the spring just
(24) because of the types of courses. We also have more freshmen
(25) in the fall. We lose some during the fall semester. May

Page 126

(1) change majors or drop out of school. So typically, we have
(2) more classes, sections of classes in the fall, and there's
(3) fewer in the spring.
(4) Q Okay. And so with the load averaging, the load that the
(5) faculty person has kind of balances out between what might
(6) be a heavier load typically in the fall and a lighter load
(7) in the spring?
(8) A Yeah.
(9) Q Okay. Now, if we look at the bottom line of this--and I'm
(10) assuming everyone has found what we're referencing here
(11) under M--the bottom line there deals with total overload?
(12) A That would include faculty and staff, the total amount of
(13) overload that would be present during that particular
(14) semester.
(15) Q Okay.
(16) A Using the 22 contact hours for the faculty. Rerko and Smith
(17) both would teach 11 contact hours. How they teach half
(18) their load is--or half their job is teaching the other half
(19) is the managing. So they would teach 11, average 11 contact
(20) hours per semester. The department chair also gets release
(21) time, too. He gets currently 5 contact hours of release
(22) each semester.
(23) Q Who is that department person?
(24) A Now it is Doug Young. He just started the first of January.
(25) It was John Hitchcock.

Page 127

(1) Q Okay. So he gets some release hours because of his duties
(2) as department chair?
(3) A Yes, right, right.
(4) Q Okay. And so looking over here under the fall of 2003 and
(5) the spring of 2004, that's the current academic year that
(6) we're dealing with, right?
(7) A Right.
(8) Q Okay. So with this load averaging, you'd have the 28.2
(9) contact hours in the fall that are being handled as
(10) overload, and in the spring you'd have the 13.1?
(11) A That is--that one is--that 13.1 is still in flux because we
(12) are looking at enrollments yet. There may be--it may be
(13) less than the 13.
(14) Q But this--this was the document that was provided to me as
(15) reflecting?
(16) A Right.
(17) Q So this is your official document; isn't that correct? I
(18) mean, this is an official document from the university;
(19) isn't that correct?
(20) A Well, I don't know if it's an official one. I was asked to
(21) put together some material, and I tried to put it together
(22) the best I can.
(23) Q And this is what you--
(24) A I don't know that it's an official document, but it is a
(25) document that I put together.

**Page 128**

(1) Q But you did prepare this, didn't you?
(2) A Yes.
(3) Q Okay. That's all we needed to know. Thank you. Okay. So
(4) what you'd have here then is the overload is the combination
(5) of what was the overload, the 28.2 in the fall and the
(6) 13.1--
(7) A Yes.
(8) Q --in the spring?
(9) A Yes. And so what do we have there? 41.3--
(10) A Yes.
(11) Q --hours? Okay. So that's--those are the hours that we have
(12) that would balance out to a faculty load for those
(13) semesters; isn't that correct?
(14) A I'm not sure what you're asking me on that. Whether--I
(15) mean, that is all taken care of by either faculty teaching
(16) overload or staff--you know, hiring part-time staff to cover
(17) those particular classes.
(18) Q Right. And that's the 41.3 is the total amount of
(19) overload--
(20) A Right, yes.
(21) Q --that you have to have covered?
(22) A Right.
(23) Q Okay. And you're covering it currently by adjunct faculty?
(24) A That's correct.
(25) Q Or overload to someone?

**Page 129**

(1) A Yes.
(2) Q Or as you said, you'd given some of these hours to someone
(3) who is on the staff of radio and TV?
(4) A Right, right.
(5) Q Okay. Did you advertise a position in Broadcasting this
(6) fall?
(7) A There was an internal position for department chair.
(8) Q Okay. Would you look at the Exhibit N, please?
(9) A Yes.
(10) Q Is that the position that you advertised?
(11) A Yes, it is.
(12) Q Okay. And is this the position that Jack Hanes applied for?
(13) A Yes, it is.
(14) Q Okay. And the next page there is at O. Exhibit O--
(15) A Yes.
(16) Q --is that the letter of application that Mr. Hanes made for
(17) this position that you advertised?
(18) A Yes.
(19) Q Did you offer him the position?
(20) A No, I didn't.
(21) Q Why not?
(22) A Primarily because the position requires a teaching load of
(23) 17 hours, and we did not have a--currently, we do not have a
(24) position in our position control, so there was no position
(25) there. And it went to an internal person--it went to a

**Page 130**

(1) person who was already in the department.
(2) Q So you didn't give him the position?
(3) A No, no, there was no teaching position available, and it
(4) requires teaching 17 contact hours.
(5) Q So 17 contact hours a semester--
(6) A Yes, is what the department--
(7) Q --is what to be asked?
(8) A --showed and taught, yes. And since there was no position
(9) control there, there was no way I could offer that position
(10) to him.
(11) Q There was no position control?
(12) A That's what we call the positions that are available in a
(13) department is called position control. And there was a--we
(14) have seven positions there in our--in our department, the
(15) seven names that you saw on the list. And they're all still
(16) here, so there was no open position. That's why it was
(17) advertised internally.
(18) Q And among those seven positions, I believe that you told us
(19) two of them are half-time positions that are not tenured
(20) positions; isn't that correct?
(21) A That's true. That's true.
(22) Q So you actually have five people?
(23) A We have full-time--five full-time. We have seven positions
(24) there.
(25) Q Right. But you have five full-time tenured positions; isn't

**Page 131**

(1) that correct?
(2) A Yes.
(3) Q And then by your testimony you have two positions there that
(4) are half-time that are not tenured; isn't that correct?
(5) A That's correct.
(6) Q Now, in that Exhibit P you said, unfortunately, we could not
(7) consider you for the position because it would require the
(8) teaching of 17 contact hours, and there's no position
(9) available for teaching. Now, according to this document
(10) that you just showed us that had the hours on it, M, you
(11) actually have an overage of hours; isn't that correct? You
(12) have an overage in the fall semester of 28.2 and an overage
(13) in the spring of 13.1, which is a total of 41.3 overage
(14) hours; isn't that correct?
(15) A That is correct. However, those are all covered by adjunct
(16) part-time faculty. There's no position there.
(17) Q Right, but that's my point. You have the hours to be
(18) taught, right? You have need to get those 41.3 hours
(19) taught?
(20) A That's correct.
(21) Q Right. And they're currently being taught by someone who is
(22) part-time, half-time or adjunct?
(23) A Or full-time.
(24) Q Right. But by your testimony you have two people there that
(25) are half-time, and they're carrying adjunct hours in order

Page 132

(1) to get those hours covered?
(2) A Well, they're not adjunct faculty. They are full-time
(3) faculty. I mean, they are faculty. They have faculty
(4) status, but part of their duties is to manage the stations.
(5) Q Right. Half of their position is as radio and TV, right?
(6) A Right.
(7) Q And in order to get these hours covered, you gave them half-
(8) time positions in order to get these hours covered that need
(9) to be covered; isn't that correct?
(10) A No, I don't believe so. I mean, they were hired there to
(11) teach and also to manage the station.
(12) Q Okay. But their teaching—
(13) A But they're not adjunct faculty.
(14) Q No. Okay. They're—they're people who are with radio and
(15) TV, and you brought them over to also teach a half-time
(16) teaching load. Isn't that what you just said earlier; that
(17) they're half-time faculty? They have a half-time teaching
(18) load?
(19) A Well, they're listed as faculty, but their job is to teach
(20) 50 percent and then manage the radio the other 50 percent.
(21) Q Okay. And those other two that are not tenured; correct?
(22) A Yes.
(23) Q Okay. Then excuse me. The staff—the staff positions,
(24) that's where you use your adjunct faculty? That's where you
(25) brought in adjunct faculty to take care of other hours?

Page 133

(1) A Yes.
(2) Q Okay. Okay. And in regard to the number of hours that you
(3) have that are overage—that's the—under the overload that's
(4) where the 26.2 in the fall and the 13.1 in the spring—those
(5) are the overload hours according to this document that you
(6) put together?
(7) A Yes, yes.
(8) Q Okay. Now, when you answered him and said that you couldn't
(9) consider him because it required teaching 17 contact hours,
(10) you actually have on this overload 41.3 hours?
(11) A But the next sentence says currently there are no open
(12) positions available for teaching.
(13) Q Well, how are you—
(14) A I could not hire him full-time.
(15) Q But you have to get these hours covered in the overload,
(16) don't you?
(17) A That's right, and it's done by adjunct faculty, part-time
(18) faculty.
(19) Q Right. So the point is you're covering them by adjunct
(20) faculty when you have an employee, Jack Hanes, who is asking
(21) to teach them; isn't that correct?
(22) A But there was no position available.
(23) Q Well, you have the hours that have to be taught, and you're
(24) making some kind of a position for some adjunct to come in
(25) and teach them; isn't that correct?

Page 134

(1) A I may have a half a dozen adjuncts to cover that.
(2) Q Right. And they're categorized as adjunct teacher, aren't
(3) they?
(4) A Yes.
(5) Q They're called an adjunct. And you bring them in, and they
(6) are going to cover these 41.3 hours; isn't that right?
(7) A That's correct.
(8) Q That's how you're going to cover them?
(9) A That's correct.
(10) Q And my question is very simple. Do you have an employee, a
(11) former head of the department, someone who received tenure
(12) in their department who is asking for that job? So my
(13) question is very simple. Why did you tell him that he can't
(14) have that job because it requires 17 teaching hours when you
(15) need more than that number of hours covered?
(16) A Because there was no open position. I had no position in
(17) the—in that position control list where I could hire a
(18) full-time person.
(19) Q But you have adjunct positions that are in that?
(20) A That's true.
(21) Q Okay. Did you offer him a position as an adjunct to teach
(22) those?
(23) A No, I didn't because as adjuncts, they're only allowed to
(24) teach a certain number of hours, and that is—that would be
(25) completely—that would be less than the 17 hours.

Page 135

(1) Q Well, why—why would you—we've already established the
(2) number of hours that need to be taught, need to be covered.
(3) You advertised the position; and in fact, you included in
(4) that position that it included teaching hours, didn't you?
(5) A Yes.
(6) Q It says that right on the job description, and you have
(7) someone apply who is fully qualified; why didn't you hire
(8) him?
(9) A Because I didn't have a full-time position. I couldn't hire
(10) him full-time.
(11) MR. STUCKEY: Ida, I think we all understand. You've
(12) made your point, and—
(13) MS. LAMBERTI: No, I don't think you do understand.
(14) MR. STUCKEY: No, we understand that Dan is covering
(15) the classes with adjuncts. He could hire Jack
(16) full-time. It would cost additional money. He doesn't
(17) have the money to do that. And I mean, that point is—
(18) you've made it, and you're going to make that argument
(19) to the trustees. And that's a valid thing that you can
(20) argue to them.
(21) MS. LAMBERTI: Thank you, Mr. Stuckey.
(22) MR. STUCKEY: You're welcome.
(23) MS. LAMBERTI: I appreciate it. I'd like you to take a
(24) look at this document.
(25) MR. CASE: Are we going to get a copy of that, also?

Page 136

(1) MS. LAMBERTI: We'll have him describe what it is; and

(2) if we need, we'll stop and make copies for everyone.

(3) Q I have a question before we actually go to that. Now, when

(4) Mr. Hanes left his teaching job in 2003 in response to the

(5) administrative request to come and help him out, he was not

(6) replaced; isn't that correct?

(7) A That's correct.

(8) Q Okay. Now, will you identify what this document is that

(9) you're looking at?

(10) A This is simply a copy of the position control that I get

(11) each year, and it lists the faculty and what positions are

(12) available.

(13) Q Now, you said it's given to you?

(14) A Yeah, I receive a printout.

(15) Q Okay. Who prepares that? Do you prepare that?

(16) A No, I don't prepare that. It comes from the business

(17) office. I believe it comes out of Phil Rath's office.

(18) Q Okay. So that's the record of what the positions are; is

(19) that correct?

(20) A Yes, yes.

(21) Q Okay. Now, you're correct that we don't have copies. This

(22) is actually a document you gave me at my request, so—

(23) MR. STUCKEY: We can make copies and give it to them

(24) later. That's fine.

(25) Q At the very bottom of the document I believe that it shows

Page 137

(1) the Broadcasting Department, doesn't it?

(2) A Yes.

(3) Q Okay. And perhaps you could describe for the board members

(4) here what does that show at the very bottom of the page?

(5) A It shows the Broadcasting Department, the account number.

(6) It shows the position control number, the job title, who is

(7) in that particular position, whether they're tenured or not,

(8) and whether they're 12-month or not, if it's a 12-month

(9) position or not a 12-month position.

(10) Q Okay. And so that part of the information is very similar

(11) to the document that we just looked at; is that correct?

(12) A Yes.

(13) Q Okay. Now, right above that there's additional information.

(14) Do you see that? And doesn't that state that there is an

(15) unfilled position?

(16) A There is a thing that does say vacant position; however,

(17) there's no money in the account for that.

(18) Q There's a thing called an unfilled position in Broadcasting; isn't that

(19) correct, in your division?

(20) A It's listed here as a vacant position; however, there's no

(21) money in the account.

(22) Q Right. But the position is vacant. It's open; isn't that

(23) correct? I mean, that's what the document says.

(24) A Okay.

(25) MS. LAMBERTI: Okay. Maybe we should take just a

Page 138

(1) moment and make a copy of that right now. Can you

(2) arrange for that? I believe we have a copier right

(3) outside the door here.

(4) MR. STUCKEY: Well, he's described it. We'll make it.

(5) Jim, why don't you take it out, and she can keep asking

(6) questions.

(7) MR. MESSMER: Okay.

(8) MS. LAMBERTI: I'd like these board members to have a

(9) chance to look at that while we're talking about that.

(10) MR. STUCKEY: Dan, I'll go ahead and ask some questions

(11) then.

(12) MR. BURGE: Okay.

(13) MS. LAMBERTI: Oh, I'm not finished.

(14) MR. STUCKEY: No, I know, but if you're going to wait

(15) for a second, I'll go ahead and ask a question so we

(16) can keep it moving along.

(17) MS. LAMBERTI: Actually, I'd like to continue with my

(18) questions—

(19) MR. STUCKEY: Oh, that's fine.

(20) MS. LAMBERTI: —and then I'll turn it over to you, and

(21) we can come back to that document.

(22) MR. STUCKEY: Okay.

(23) Q I'd like to go back to the advertisement that you put out,

(24) back on N, document N. Now, in that—

(25) MR. CASE: What are we looking at?

Page 139

(1) MS. LAMBERTI: N, document N.

(2) Q In that document you describe that you're looking for

(3) someone to fill the position as department chair. On the

(4) next page—

(5) (MR. MESSMER RETURNED TO THE ROOM WITH COPIES OF

(6) THE DOCUMENT)

(7) MS. LAMBERTI: Thank you.

(8) Q On the next page you talk about the fact that this includes

(9) teaching 17 contact hours per semester. You see that on the

(10) next page on N. Now, when—this is what you advertised.

(11) This is what you put out. Now, if this is a position that

(12) you've advertised, then explain to me more fully why when

(13) Mr. Hanes applied for it you said that this teaching

(14) position doesn't exist since you advertised for it? I mean,

(15) it's part of your—it's part of what you put out. It's what

(16) you advertised.

(17) A The teaching of the 17 contact hours is to let the person

(18) know that's what they're expected—that's what they're

(19) teaching; that it's not 22 contact hours.

(20) Q Okay.

(21) Q Why would you tell an applicant then after you've advertised

(22) it, well, we really don't have any teaching hours?

(23) A What I said was we did not have a position available.

(24) Q Then why did you advertise it?

(25) A We were advertising for a department chair, and what that

Page 140
(1) department chair's job includes is teaching 17 contact
(2) hours.
(3) Q So really, what you were advertising was just to those who
(4) were already teaching in the department?
(5) A Yes.
(6) Q So this—
(7) A That's why it was internal.
(8) Q Oh, but it actually had to be someone who was already
(9) teaching a full load then, didn't it?
(10) A Yes.
(11) Q Okay. So it really should have said that it was open to
(12) anyone who is currently teaching in the department who
(13) already has a full-time teaching load? That's what it
(14) should have said?
(15) A Yes.
(16) Q So this advertisement wasn't really accurate at all; is that
(17) what you're saying? Is that your testimony?
(18) A I would stand by the advertisement the way it stands. I
(19) mean, you're trying to put words in my mouth.
(20) Q It's just that it can't be both ways. You advertised for a
(21) position saying that it requires 17 teaching hours. You get
(22) an applicant, and then you say, no, that's not what the job
(23) is. So either the job description is not accurate, or
(24) you've turned down an applicant for a reason that's
(25) different than what you've said in this letter. It can't be

Page 141
(1) both ways. You advertised it this way. You said it
(2) included 17 hours. You get an applicant, and you tell him
(3) even though he's qualified, we don't have a teaching
(4) position for you. So if that's the case, then your
(5) advertisement was incorrect. All I'm asking you is which
(6) way is it? Was the advertisement incorrect? Was it not a
(7) correct advertisement that you advertised, or there's some
(8) other reason why you told the qualified candidate that
(9) applied, I don't have 17 hours for you to teach? Which way
(10) is it?
(11) A When I put this out, it was done internally within the
(12) department. It was an internal position. It says right at
(13) the top, internal search.
(14) Q Yeah, but it doesn't say that it's an internal search for
(15) people who are already teaching a full load. It doesn't say
(16) that at all. It doesn't say it's open only to those that
(17) are currently teaching, and it's open to those that already
(18) have a full-time teaching load. It doesn't say that, does
(19) it?
(20) A No, not in the advertisement it doesn't say that.
(21) Q Thank you. So I guess if it's internal, if somebody that is
(22) over in, oh, radio, they'd be qualified to take this
(23) position as department chair?
(24) A When you say they're in radio, are you talking about a staff
(25) person?

Page 142
(1) Q Well, I'm talking about one of those people that you said
(2) you gave a half-time teaching load to?
(3) A They would have been allowed to. You know, they're faculty.
(4) If they're listed as faculty, they could have.
(5) Q So you'd let an untenured, half-time faculty member apply
(6) for a department chair?
(7) A I don't consider them untenured half-time faculty. I
(8) consider them faculty.
(9) Q Well, they're not tenured, are they? They're not tenured,
(10) are they?
(11) A No, they're not.
(12) Q Okay. And they're teaching—
(13) A But they're still listed as faculty.
(14) Q Right.
(15) A And they're teaching half-time, aren't they?
(16) A As their duties, yes, they teach half-time.
(17) Q Then that's my question. You have someone who is not
(18) tenured and who is only teaching half-time be department
(19) chair, but you turn down a former department chair even
(20) though you have 41.3 overage hours because you don't have
(21) enough hours for him to teach? That's what you're
(22) testifying to, isn't it?
(23) A No, it's not.
(24) Q Well, you turned him down, didn't you?
(25) A I turned him down because we didn't have a current full-time

Page 143
(1) position.
(2) Q And I think we've clarified what you do have, and that's
(3) 41.3 hours of overage?
(4) A I will stipulate, yeah, we have 41 hours of overload.
(5) Q That's correct. Would you take a look at the document
(6) that's passed around—that's been passed around.
(7) MS. LAMBERTI: I'd like to bring this in as a further
(8) exhibit and point out that Mr. Burgei's testimony is
(9) that right above the Broadcast Department and where
(10) it's listed also as Broadcast that there is a vacant
(11) position. We've already had testimony that his
(12) position when he left Broadcasting was never filled.
(13) Q Let me see if I have any other questions for you, Mr.
(14) Burgei. I don't have any more questions at this time.
(15) Board members may ask.
(16) MR. WILEY: And it's relative to this point. That's
(17) why I wanted to raise it. You've got other divisions
(18) that fall under your purview, right?
(19) MR. BURGEI: Other departments?
(20) MR. WILEY: There in Broadcasting?
(21) MR. BURGEI: Yes, yes.
(22) MR. WILEY: In those other departments do you have
(23) positions that are vacant that have been left unfilled
(24) because you don't have money?
(25) MR. BURGEI: Yes, yes, either money, or at a particular

Page 144

(1) time someone left, and there wasn't enough hours to-
(2) for a full-time person. It was left vacant.
(3) MR. WILEY: So the driving decision to hire a position
(4) is based on money, not "vacancies"?
(5) MR. BURGEI: Correct. This vacancy, if you were to
(6) look at the rest of this spreadsheet which lists
(7) salaries--I didn't feel that that was appropriate to
(8) show other people's salaries--there's no money in
(9) there. It's zero.
(10) MR. WILEY: Okay.
(11) MR. MORRISON: What's the number of students in
(12) Broadcasting in the last--
(13) MR. BURGEI: Oh, let's see. For fall of 2003 we had
(14) 134 majors.
(15) MR. MORRISON: What did we have the year before?
(16) MR. BURGEI: The year before, 129. It's run in that
(17) range. Three years ago, 145. So, I mean, it has been
(18) decreasing, you know, four or five students a year for
(19) the last couple of years.
(20) CROSS-EXAMINATION
(21) By Mr. Stuckey:
(22) Q Dan, this Exhibit M, just so that I understand, you're
(23) showing that for this spring--and this is M Ida's--in
(24) Ida's book--that for this spring we have 13.1 hours of
(25) overload, and you said that's an estimate?

Page 145

(1) A That's an estimate, right. It could be as low as the 8.9.
(2) Q Okay. And included in that 13.1 hours of overload, is that
(3) the five hours of release time for your department chair?
(4) A Yeah, that would be part of it because we would have to
(5) cover those five hours.
(6) Q Okay. And those 13.1 hours of overload are being covered
(7) either by paying teachers and overload stipend or by
(8) adjuncts?
(9) A Yes.
(10) Q And you have a sense as to what that costs you, what your
(11) cost is to cover that overload?
(12) A Contact hours, typically it's--you take the number of
(13) contact hours times .67 times 600.
(14) Q So I take 13.1 times .67 times $600?
(15) A Right.
(16) Q That's how you figure it?
(17) A That would be--not only--
(18) Q I understand.
(19) A --for a faculty member; it would be 600 hours times however
(20) many contact hours they have.
(21) Q Okay. But just stay with me on the first thing.
(22) A Okay.
(23) Q You say I take 13.1 times--
(24) A Times .67.
(25) Q Times .67 times--

Page 146

(1) A 600.
(2) Q Okay. What's that number come to?
(3) MR. MORRISON: Looks like $5,266.
(4) Q Does that sound about right to you--
(5) A Yeah, about right.
(6) Q --that that's what your additional cost?
(7) A About right, yeah
(8) Q Now, I--
(9) MS. LAMBERT: I'd like to ask--what's the number
(10) again?
(11) MR. CASE: 5266.
(12) MS. LAMBERT: Thank you.
(13) Q Now, if we had been able to put Jack back in the department
(14) to cover those hours, and I guess the testimony or from
(15) Cross-Examination of Ida was that Jack had said that he
(16) would go in his teacher's salary, which I think was
(17) estimated around $80,000?
(18) A I don't know what his salary is, so I couldn't tell you what
(19) he would be paid.
(20) Q Does that sound right to you that it would be in that range?
(21) A I would assume to be in the $50,000 to $60,000 range.
(22) Q Okay. And then is there a--a fringe that you put on top of
(23) that that you--
(24) A Yes.
(25) Q And do you know what that is from--

Page 147

(1) A I'm trying to remember what that is. I don't remember right
(2) offhand. It seems like it's--
(3) Q Additional 30 percent?
(4) A Yeah.
(5) Q In that range?
(6) A Yeah, in that range, I think, yeah.
(7) Q Okay. So--and I'm just doing the numbers. And, again, you
(8) be fair with the trustees so they get a full picture; but if
(9) that's right, and we'd be paying Jack 60 plus the 30
(10) percent makes it 80?
(11) A So you're talking about $78,000.
(12) Q And so you pay 40 for one semester in which you're going to
(13) pay 8?
(14) A Yeah.
(15) Q Now, is that math, I mean, is that the kind of things that
(16) you think about in program review as to whether--as to
(17) whether you can fill that vacant position?
(18) A Yes.
(19) Q Again, I'm not trying to lead you through this. I'm just
(20) trying to get you to it. And just so the trustees know,
(21) you've got five full-time faculty that are five full-time
(22) tenured faculty?
(23) A Right.
(24) Q And then Al Rerko is half-time and runs the TV station?
(25) A TV station, right.

Page 72

(1) Q Okay. In your view with the trustees—I mean, is this a
(2) professional position?
(3) A Absolutely.
(4) Q Okay. An important position with the university?
(5) A An important professional position. Without a doubt we
(6) have—we were limited by the number of people. We changed
(7) our strategy regarding the Community College Initiative and
(8) decided to fill this position and to move forward. Last
(9) year the limited staff that I have in that area, we were
(10) able to double the number of credit hours that we generated
(11) in Business and Industry over the previous year. And that
(12) number was 300, so, I mean, we were looking at, I thought,
(13) was something very realistic.
(14) MR. STUCKEY: That's all the questions I have of Jim.
(15) Do any of you have questions before Ida?
(16) (BOARD MEMBERS SHAKE THEIR HEADS NEGATIVELY)
(17) CROSS-EXAMINATION
(18) By Ms. Lamberti:
(19) Q Mr. Measmer—
(20) A Yes.
(21) Q —I haven't met you before, so I'm going to be meeting you
(22) for the first time and asking you these questions. First of
(23) all, you said that the salary that you would offer to an
(24) outside person coming in would have been in the $40,000 to
(25) $50,000 range—

Page 73

(1) A That's correct.
(2) Q —is that correct? And the salary that you were proposing
(3) to Jack Hanes would have been $65,000?
(4) A That's correct.
(5) Q So there clearly would be some savings of salary if Mr.
(6) Hanes returned to his teaching position, wouldn't there, in
(7) that position?
(8) A If we had someone else who came in at the originally
(9) prescribed rate, there would have been some savings—
(10) Q Right.
(11) A —to my area.
(12) Q Perhaps $20,000 to $25,000 savings in your area—
(13) A Perhaps.
(14) Q —right?
(15) A Uh-huh.
(16) Q All right. Now, you talked about FTE?
(17) A Yes.
(18) Q And, again, for the record, what exactly is FTE?
(19) A It's full-time equivalent credit hours or—and that's 30
(20) credit hours is one FTE.
(21) Q Okay. So it takes 30 credit hours to equal one FTE?
(22) A Uh-huh.
(23) Q So in order to get 45 FTEs, you'd have to multiply the 45
(24) times the 30—
(25) A Correct.

Page 74

(1) Q —right? And how many—how many hours would that be?
(2) A Something over 1,200. I don't have a calculator with me.
(3) Q Okay. Well, if you multiplied it out, it would be
(4) significantly over 1,200, wouldn't it? Isn't that what
(5) you're talking about here?
(6) A Whatever.
(7) Q In order to—to reach that goal that you're talking about;
(8) isn't that correct?
(9) A Uh-huh.
(10) Q So in other words, to put it in plain English, if they go
(11) out and recruit and get one individual who signs up for a
(12) three-hour class, wants to improve his computer skills, is
(13) taking a three-hour computer class, you have to get ten of
(14) those to make that one FTE—
(15) A That's correct.
(16) Q —isn't that right?
(17) A That's correct.
(18) Q So then in order to get the 45 FTEs, you're talking about
(19) bringing in over 1,200 individuals to sign up for a class;
(20) isn't that correct?
(21) A If each student is taking three credit hours and only three
(22) credit hours, that would be more credit into the 1,200. I
(23) think you'd be looking at 400 students.
(24) Q Well, if you get an enrollee to take a three-hour class, it
(25) will take 10 such enrollees to make one full-time

Page 75

(1) equivalent; isn't that correct?
(2) A Right.
(3) Q So isn't that going to have to be multiplied out in order to
(4) get 45 full-time equivalents?
(5) A Right. Now, so it would be 450 students.
(6) Q All right. Now, you testified that you have already
(7) achieved about half of a certain amount. What amount were
(8) you talking about that you'd already received?
(9) A We had two contracts, two grants. Pardon me. One grant
(10) from—for a client over in Columbus that should generate 70
(11) FTE. And we just signed the final memorandums with the
(12) National Guard that should be able to generate another 70
(13) FTE.
(14) Q All right. Now, who did you send out to do this down in
(15) Columbus?
(16) A The one in Columbus that we had a consultant that was
(17) working with the company, the Department of Work Force
(18) Development and with another consultant we have and came
(19) together and developed curriculum and worked with John
(20) Ludlow in developing the curriculum and things. It was a
(21) collaboration of people. This is a coordinator's position,
(22) and they're going to have to work with Director of Human
(23) Resources. They're going to have to work with the grants
(24) people and the state agencies that we deal with, going to be
(25) working with the faculty here in developing the curriculum,

Page 76

(1) specific courses in curriculum, and we're coming together
(2) for an associate's degree.
(3) Q Who was the individual from Vincennes University that was
(4) involved in this contact at Columbus? Who was that?
(5) A John Ludlow.
(6) Q And who is John Ludlow?
(7) A John Ludlow is the statewide director--well, now he's the
(8) Assistant Vice President for Statewide Business and
(9) Industry.
(10) Q So he's your assistant? I'm sorry.
(11) A Assistant Vice President, yes. He reports to me.
(12) Q Okay. So he's the assistant to you in the statewide
(13) services?
(14) A For Business and Industry. I have a number of areas that I
(15) deal with.
(16) Q Right. But he's the assistant to you for the Business and
(17) Industry portion of it?
(18) A Correct. That's correct.
(19) Q Okay. When did he come in? When was he hired?
(20) A He was part-time beginning in February, I believe it was, of
(21) 2002, and he moved full-time last Thursday, I guess.
(22) Q So you brought in a person who now is full-time as vice
(23) president?
(24) A Correct.
(25) Q How much are you paying him?

Page 77

(1) A I don't know. I don't have that number.
(2) Q Well, you hired him, didn't you?
(3) A I transferred his budget from one to mine. I think it's
(4) over $90,000.
(5) Q Big salary, isn't it?
(6) A Well, when he's generated 600 FTE and doubled the growth,
(7) he's a good man.
(8) Q And what was the increase in the salary from when he was
(9) part-time to when you hired him as full-time $90,000?
(10) A He was full-time university employee. He had
(11) responsibilities for the manufacturing department, and I
(12) carried a percentage of his salary out of Business and
(13) Industry. He did not get a raise when he moved to full-time
(14) Business and Industry.
(15) Q Was he a faculty member before? Is that what you're saying?
(16) A Yes, faculty and department chair in the Technology
(17) division.
(18) Q Okay. And was he tenured in that position?
(19) A I believe that is correct. He's been here a long time.
(20) Q Did you advise him that when he came into this position that
(21) he was waiving all his faculty tenure rights?
(22) A No.
(23) Q Who else have you hired to assist with this program of
(24) coordinating Business and Industry?
(25) A We had a replacement in Indianapolis for the Central Indiana

Page 78

(1) Business and Industry Coordinator.
(2) Q And who was that?
(3) A That's Pat Bell.
(4) Q So is that male or female?
(5) A Female.
(6) Q And she's the replacement?
(7) A Uh-huh.
(8) Q What's her salary?
(9) A Mid $36,000, or $37,000, I believe.
(10) Q Is she full-time?
(11) A Yes.
(12) Q And who else did you hire?
(13) A I don't have anyone else. I mean, there's a position in
(14) northern Indiana. We have a coordinator in northern
(15) Indiana.
(16) Q How much do you pay that person?
(17) A Slightly less than $50,000.
(18) Q And how about the coordinator in central Indiana. Is that
(19) Pat?
(20) A Uh-huh.
(21) Q And you have never filled the position in southern Indiana
(22) prior to very recently; is that correct?
(23) A It's still not filled at all. We still haven't filled it.
(24) Q Okay. And it has never been filled in the past; isn't that
(25) correct?

Page 79

(1) A Not since I've been in this position for two years.
(2) Q Okay. So--and that position still is not filled?
(3) A Correct.
(4) MR. WILEY: Can I ask a question? Does that have
(5) anything to do with Community College of Indiana
(6) initiative?
(7) MR. MESSMER: Yes, it did. It certainly did. We were
(8) limited to three full-time people. And like I said, in
(9) February of 2002 I brought John in part-time to kind of
(10) oversee and coordinate all of the statewide industry
(11) things. And we kept that southern Indiana position
(12) vacant, if you will, because we didn't want to get over
(13) the three people that we had agreed to within the
(14) Community College partnership.
(15) Q And in that partnership what were you saying that you were
(16) limited to three? What exactly do you mean by that?
(17) A Three full-time equivalent staff going out, contacting
(18) businesses, and selling our educational services.
(19) Q And was the reason you were limited to three--was that
(20) supposed to somehow put it on equity with the new developing
(21) community college system? Was that the--
(22) A No, we were never equal with them.
(23) Q Well, you were superior to them, weren't you?
(24) A We would like to think so, but in terms of the resources and
(25) so forth that were put into this, Ivy Tech has 14 regions,

Page 156

(1) Q And it could also be more than that?
(2) A No, it would not be more than that.
(3) Q Oh, how do you know it couldn't possibly be more than that
(4) when you said this is kind of still in--
(5) A Because at that point the sections we have, if we have
(6) additional students come in, we will not be adding sections.
(7) The only thing we'll be doing is reducing sections if
(8) additional new students don't come in or returning students
(9) don't come back. But we have enough openings in the
(10) different sections that we would not add sections.
(11) Q So--
(12) A What I'm saying is that's the maximum. 13.1 contacts is the
(13) maximum that we will have. We've already closed one or two
(14) sections yesterday because of low enrollments in a couple of
(15) classes, so, you know, it's going to be less than the 13.1.
(16) Q Was there any point at which you realized that you had
(17) misadvertised the position?
(18) MR. STUCKEY: Ida, he said he didn't misadvertise it.
(19) MS. LAMBERTI: I'd like him to answer, Brent. That's
(20) the thing about due process.
(21) MR. STUCKEY: Ida, no, it's not. No, it's not.
(22) MS. LAMBERTI: The attorneys don't testify. The
(23) witnesses do.
(24) MR. STUCKEY: Ida, you've asked him ten times claiming
(25) he misadvertised it. Dan said he didn't misadvertise

Page 157

(1) it because it was internal. We understand your point.
(2) And then you ask him a question was there a point in
(3) time when you realized you misadvertised it when he
(4) said all along he hadn't misadvertised it.
(5) MS. LAMBERTI: Well, he never answered the question
(6) that I asked him about the dilemma. He never answered
(7) that question.
(8) MR. STUCKEY: He did. You just did not accept his
(9) answer.
(10) MS. LAMBERTI: No, he didn't answer it. He had a
(11) choice. He had a choice.
(12) MR. STUCKEY: You know what? If you--
(13) MS. LAMBERTI: That's fine, Brent. Have you finished
(14) testifying now during my time? Have you finished
(15) testifying?
(16) MR. WILEY: Is it important that the panel understands
(17) what he testified to, that point, or are you doing it
(18) more for the record?
(19) MS. LAMBERTI: Well, I do want the record to reflect
(20) what went on here today; that's correct.
(21) MR. WILEY: Well, and as a trustee and as a volunteer
(22) who has given a day of my work time to this effort, I
(23) think I understand what he said, and--
(24) MS. LAMBERTI: Well, I appreciate that, and I know
(25) you're all giving up time today. And we also have a

Page 158

(1) man who has given up 22 years of his life for the
(2) University.
(3) MR. WILEY: And I share--
(4) MS. LAMBERTI: I think he's due a day, don't you?
(5) MR. WILEY: Oh, I do.
(6) MS. LAMBERTI: Thank you.
(7) MR. WILEY: And I wouldn't challenge that at all, but--
(8) MS. LAMBERTI: Thank you.
(9) MR. WILEY: But I think I understand what the witness
(10) has said to the effect of the advertisement.
(11) MS. LAMBERTI: And you understand that--
(12) MR. WILEY: It was an internal hire.
(13) MS. LAMBERTI: And that it was not correctly
(14) advertised. You understand that, sir?
(15) MR. WILEY: I understand your confusion as to whether
(16) it was or wasn't, but I think I understand what the
(17) witness has said.
(18) MS. LAMBERTI: Well, you're right. I'm not satisfied
(19) with the answer to that question, and I think the
(20) record will show that he didn't. If you advertise a
(21) position, then you advertise a position. If you want
(22) it to be less than that, you advertise it as less than
(23) that. And I think your testimony shows that that
(24) wasn't done. I don't have any more questions for you.
(25) Thank you for your time.

Page 159

(1) MR. STUCKEY: Thanks, Dan. You can go--
(2) MR. BURGEI: Okay.
(3) MR. STUCKEY: --do your work.
(4) MR. BURGEI: Thank you.
(5) (OFF THE RECORD)
(6) MS. LAMBERTI: Before I call Jack Hanes to testify, I'd
(7) like to give the opportunity for Mr. Wiley to put on
(8) the record the comment he made as we closed just a
(9) little bit earlier before we took our break. Mr.
(10) Wiley, if you'd put that comment on the record, please,
(11) I'd appreciate it.
(12) MR. STUCKEY: And, Curt, I mean, you can, or you
(13) cannot, however you choose.
(14) MR. WILEY: Well, I think I was just referencing the
(15) tedious nature of the process and how it was adversely
(16) effecting me as a public servant.
(17) MS. LAMBERTI: Because you had to give up the time to
(18) sit through the hearing; is that correct?
(19) MR. WILEY: No, I serve pleasurably as a trustee of
(20) Vincennes University, so I give a lot of my time to the
(21) University. No, I think this is in particular
(22) reference to the way that you're conducting the hearing
(23) and the tedious nature upon which you're interrogating
(24) the witnesses.
(25) MS. LAMBERTI: But you understand that that's part of

172

Page 160

(1) due process; that the attorney representing the person
(2) who is being threatened with termination has a duty to
(3) ask the questions in order to have a complete record of
(4) the hearing. And that's why I have that obligation to
(5) do that because it's a due process hearing, which means
(6) we're according him all of the process that he is due.
(7) It cannot be simply going through the motions. It
(8) cannot be a sham. It has to be a full opportunity for
(9) testimony to be given in regard to this termination.
(10) And so while it may feel very tedious to you, that's
(11) the duty that I have because of the rights he has
(12) implicit in his tenure.
(13) MR. WILEY: Oh, I clearly understand that, and I think
(14) 4 hours and 45 minutes into the hearing, we're into our
(15) fourth witness. And I think we're paying—I think
(16) we're abiding by that clearly.
(17) MS. LAMBERTI: Just so you understand the gravity of
(18) the due process hearing when someone's employment is at
(19) stake—
(20) MR. WILEY: Oh, clearly.
(21) MS. LAMBERTI: —and the duty that I have in that
(22) regard.
(23) MR. WILEY: Oh, I understand.
(24) MS. LAMBERTI: Thank you. I'd like to call Jack Hanes
(25) to give his testimony, please.

Page 161

(1) JACK A. HANES,
(2) having been first duly placed under oath, was examined and
(3) testified as follows:
(4) DIRECT EXAMINATION
(5) By Ms. Lamberti:
(6) Q Would you state your full name for the record, please?
(7) A Jack Allen Hanes.
(8) MS. LAMBERTI: At this point it's very clear that it's
(9) not going to work to have the court reporter on the
(10) opposite side of Mr. Hanes when I'm asking the
(11) questions, so maybe if you could just...
(12) (WITNESS MOVES TO THE OTHER SIDE OF THE TABLE)
(13) Q Mr. Hanes, when did you begin at Vincennes University?
(14) A September of 1982.
(15) Q In what position?
(16) A I was hired as an instructor in the Broadcasting Department
(17) and also as manager of the public television station.
(18) Q And during your years at Vincennes University, have you
(19) received various promotions?
(20) A Yes, I was promoted all the way through the ranks to full
(21) professor receiving each promotion on the first application.
(22) Q And when were you named full professor?
(23) A I don't recall the exact date. The contract that was
(24) presented here this morning indicates that it was probably
(25) 1996, but I don't recall that specific date.

Page 162

(1) Q All right. And during the years when you were on the
(2) teaching faculty, were all of your performance evaluations
(3) satisfactory or above?
(4) A Absolutely.
(5) Q And also, during your three years in administration your
(6) evaluations were satisfactory or above?
(7) A Yes.
(8) Q Okay. And are those evaluations shown in the black binder
(9) in which we have our exhibits at A and B?
(10) A I think there are a couple of evaluations there, yes;
(11) obviously, not all of the evaluations that I've been
(12) through. A is the final evaluation as a Broadcasting
(13) Department member before I moved to the Enrollment
(14) Management position, and B is the most recent evaluation
(15) that I received in Enrollment Management.
(16) Q Okay. Did you receive tenure in the Department of
(17) Broadcasting?
(18) A Yes, I did in 1987.
(19) Q All right. And if I could refer you to Exhibit C, please,
(20) for the benefit of all of you, Mr. Hanes.
(21) would you read the first paragraph of that letter dated
(22) April 21st, 1987?
(23) A Sure. "On behalf of Vincennes University and the Board of
(24) Trustees, it's my pleasure to inform you that you've
(25) received tenure. You can be very pleased with the fact that

Page 163

(1) your request and application has been viewed positively.
(2) The recommendation from the Administration and President
(3) were taken to the Board of Trustees at the April 16th
(4) meeting and approved."
(5) Q All right. And when did you—before I go on to that, did
(6) you go through the traditional process of being tenured?
(7) A I went through the process that was in force at the
(8) University at that point in time. As Dale Dowden testified
(9) earlier, the process has been revised since then, but it was
(10) reviewed through multiple chains of command before it got to
(11) the president of the Board of Trustees.
(12) Q And so referencing here your receipt of tenure as a
(13) faculty member in the Department of Broadcasting?
(14) A Yes, ma'am.
(15) Q When did you become department head?
(16) A In 1984, I believe.
(17) Q Okay. And at that time when you became department head,
(18) did
(19) that affect one way or another your teaching load during
(20) A It affected teaching load and compensation. I was given a
(21) release time of contact hours for the work that would be
(22) involved and was also given a small stipend.
(23) Q Okay. And if you'll look at Exhibit D—
(24) MS. LAMBERTI: For your benefit, Exhibit D.
(25) MR. CASE: D.

Page 164
(1) Q --is that what is--what's reflected in document D with the
(2) date July 3rd, 1991, the memorandum to you from Dr. Summers?
(3) A Yes, it is.
(4) Q Thank you. Was there a time when you were asked to take a
(5) position in administration?
(6) A Actually, there were multiple times. On two occasions in
(7) the late 1990s I stepped up at the request of the then Vice
(8) President for Faculty, David Ford, stepped up to serve as
(9) the Interim Dean of the Public Field Division when there
(10) were brief vacancies; and, again, on those two occasions
(11) about three or four months each time serving as the Dean.
(12) Q And you continued to teach during those times? -
(13) A I continued to teach and also continued the chairing of the
(14) Broadcasting Department, yes, ma'am.
(15) Q Was there a time when you were asked to take a position in
(16) central administration?
(17) A Yes, that occurred in the spring of the year 2000. The then
(18) Assistant Vice President for Enrollment Management, which
(19) was the title at that time, had submitted his resignation,
(20) so there was going to be a vacancy. President Summers asked
(21) me if I would accept the responsibilities as the enrollment
(22) management person on an interim basis. He actually asked me
(23) twice. The first time I turned him down. Two weeks later
(24) he called me back in and asked me more forcefully, and at
(25) that point I agreed to undertake those responsibilities.

Page 165
(1) Q When you accepted that--that position as Interim enrollment
(2) management, what exactly did that involve?
(3) A It involved the oversight of the area of enrollment
(4) management which includes multiple areas. There's the
(5) Office of Admissions; at that point a Marketing Department
(6) which had a single person as the Director of Marketing; an
(7) Office of Retention Management; and an Office of Parent
(8) Services. In addition to directly supervising those areas,
(9) it was also an administrative position that interacted with
(10) virtually every area on campus from a standpoint of
(11) coordinating activities and improvement of the enrollment
(12) management concepts here at the university.
(13) Q Okay. Were you in fact recruited to take that position in
(14) administration?
(15) A Yes, I believe I was. Again, the fact that Dr. Summers
(16) called me in twice and the second time really, you know,
(17) worked hard at convincing me that the University would need me
(18) in that position. I must confess that after a brief period
(19) of time thinking about it during that two-week period I did
(20) come to the realization that it probably was a way for me to
(21) serve the University. Ultimately, I felt that coming from
(22) the ranks of faculty and moving into the enrollment
(23) management area could benefit the University in that at that
(24) point in time--the board would probably remember--there was
(25) a significant rift between what would be considered the

Page 166
(1) administration and the faculty; and coming from the faculty
(2) ranks, being a well-respected member, thought maybe I could
(3) bring some buy-in, kind of help heal some of those wounds
(4) and maybe get everybody pushing in the same direction in the
(5) area of enrollment management. I thought that it was
(6) something I could offer the University and something that I
(7) could offer at a very critical time in the University's
(8) history as was testified to this morning. There had been
(9) nine years of enrollment decline and thought that I could
(10) assist in helping that.
(11) Q And the testimony earlier showed then that in that period
(12) from 2000 when you accepted the position for the next
(13) several years that you were in fact able to get the
(14) enrollment turned around; is that correct?
(15) A Coming into the position in April of the year 2000, that
(16) recruiting cycle was pretty well completed. In the fall of
(17) 2000 there was still a slippage or a decline in enrollment;
(18) but, again, the cycle was pretty well completed by April.
(19) In the first two full recruiting cycles after I assumed the
(20) position, yes, we did indeed show an increase in enrollment.
(21) Q Okay. Did you believe that you had been able to help heal
(22) the rift between faculty and administration?
(23) A I certainly tried my hardest, and I do feel that I was
(24) respected in the position by the vast majority of the
(25) faculty members on this campus; that they felt we could all

Page 167
(1) move forward together. And I think we worked in a very
(2) collegial manner.
(3) Q Okay. I'd like to refer you to Exhibit E. Exhibit E in the
(4) black binder. And Exhibit E is a letter to Mr. Hanes dated
(5) November 25th, 2003 signed by Phillip Summers who was
(6) president of the University. Would you please refer to that
(7) letter; and, Jack, if you would, if you would read that
(8) letter into the record, please?
(9) A The entire letter?
(10) Q At least the first two photographs.
(11) A Okay. "It was with tremendous surprise and regret when I
(12) learned of the 'change in administrative personnel.' Of all
(13) people at VU, you are one of the most dedicated. You gave
(14) untold hours to your responsibility plus have been a loyal
(15) alumnus of your alma mater. You helped VU in many ways.
(16) Not only were you a successful chair of the Broadcasting
(17) Technology program, but you became the Enrollment
Management
(18) Administrator after we 'begged' you to do that. You
(19) organized Admissions and Marketing in a positive way and
(20) turned around a difficult situation."
(21) Q Thank you. Did you sign a contract at the time agreeing to
(22) serve the administration in that position as Assistant
(23) Provost in charge of Enrollment Management?
(24) A In the month of April of the year 2000 I assumed the
(25) responsibilities on an interim basis. Subsequently, I

Page 168

(1) assumed the position on a full-time basis in August of the
(2) year 2000, and at that point I signed a contract.
(3) Q All right. And I'd like to refer you to Exhibit F. We're
(4) at Exhibit F. Is this the contract that you signed in
(5) August of 2000?
(6) A Yes, it is.
(7) Q Okay. When you signed that contract, which has been
(8) referred to earlier, that describes your duties in the first
(9) part of it there as Assistant Provost of Enrollment
(10) Management, were you told when you signed that contract that
(11) you were waiving your faculty tenure in your academic
(12) department?
(13) A No, I was not.
(14) Q Were you ever advised when you signed this contract that you
(15) were losing your rights as a tenured faculty member when you
(16) signed that contract?
(17) A No, I was not.
(18) Q When you signed this contract, did you intend to return to
(19) teaching?
(20) A This was really a personal question that I've never really
(21) shared with people. My planning for my own professional
(22) future was that I would probably do this job for five or six
(23) years, hopefully would be successful. The University would
(24) be on track in the area of enrollments and then would move
(25) back to my first and absolute love, and that's teaching

Page 169

(1) students in the Broadcasting Department.
(2) Q Thank you. During that time when you were working for the
(3) administration, did you involved in any activities
(4) that kept you in touch with your academic area?
(5) A Yes, I was, and I also requested to be and unfortunately
(6) wasn't allowed. When I assumed the position, I did request
(7) being able to teach one three-credit hour course per
(8) semester so that I could stay more involved; was told that
(9) that would not be possible. The demands of the enrollment
(10) management position would require 100 percent of my time, so
(11) I was not allowed to teach; although, I requested. But
(12) certainly, in those three years' time I've kept current in
(13) the industry by reading, you know, trade journals,
(14) periodicals. Last year I attended the National Conference
(15) of the Broadcasters Association at my own expense and using
(16) my own vacation time, again, in order to maintain currency
(17) within the broadcasting area.
(18) Q Okay. And that conference that you went to, that's one that
(19) a—a faculty person such as you were in broadcasting, that
(20) would be the type of conference that you would go in in
(21) order to maintain your currency in your field?
(22) A Yes, when I was teaching in the broadcasting industry, I
(23) tried to go at least every two years because of the
(24) tremendous change that occurs within that industry.
(25) Q Okay. Did you attend that conference with any of your

Page 170

(1) colleagues from the Broadcasting Department?
(2) A Yes, Professor Al Rerko.
(3) Q And, again, were there any other reasons, or is there any
(4) other discussion that you can provide as to your motivation
(5) for going to that conference at your own expense?
(6) A Again, it was in order to maintain current knowledge of the
(7) broadcasting area.
(8) Q Why was it at that time and, again, in fact, at this time
(9) that you want to go back to your teaching position?
(10) A Because in all of my 50 years of life, I've never done
(11) anything more satisfying than teaching students and seeing
(12) young people become successful. I was reminded last night
(13) by my wife of some of those anecdotes of the students who
(14) come in on the first day of class with blue, spiked hair,
(15) and five years later I watched them perform on television on
(16) a commercial television station as a well-respected
(17) broadcast journalist. That's just the most satisfying thing
(18) in the world.
(19) Q During your years of teaching were there any activities that
(20) you as a faculty member were involved in to try and promote
(21) what it is someone can do in a teaching position in regard
(22) to the students, in relationship with the students?
(23) A I'm not exactly sure I understand the question.
(24) Q I'll clarify. Did you have during your years of teaching
(25) any contact with the students, or did you foster any contact

Page 171

(1) with the students outside of your teaching—
(2) A Oh, certainly.
(3) Q —or was outside when they were in the class with you and
(4) had to be there?
(5) A Well, certainly. The Broadcasting Department is a very
(6) intensive program. Students spend a lot of hours with the
(7) faculty members there. So in addition to classrooms and
(8) laboratory settings we spend countless hours working with
(9) students in the field on location shoots, setting up and
(10) tearing down equipment. So I spent many, many hours on the
(11) road with students going to South Knox High School to
(12) interview the basketball coach, etc. We also—my wife and I
(13) had a study session each semester for final exams at my home
(14) where we entertained the students and had a study session,
(15) so, yes, I was very involved.
(16) Q How long did you serve in that position as a faculty member
(17) in Broadcasting?
(18) A Well, from 1982 to the year 2000, so 18 years.
(19) Q Now, in the new position that you were asked to take by
(20) President Summers' letter that the administration begged you
(21) to take according to his letter, that new position of
(22) vice-Assistant Provost in charge of Enrollment Management,
(23) how long were you in that position?
(24) A A little over three years, from April of 2000 to November
(25) 13th of 2003.

**Page 172**

(1) Q And when were you notified that this new position as
(2) Assistant Provost of Enrollment Management, when were you
(3) notified that that position was being eliminated?
(4) A The morning of November 13th.
(5) Q And would you describe how the elimination of your position
(6) was explained to you?
(7) A I was called to Dale Dowden's office. When I reported
(8) there, Dale and Jim Messmer were in the room. I sat down.
(9) Dale explained that after review, they were going to be
(10) moving enrollment management into a new direction and that
(11) that move did not include me. But out of respect for my
(12) tenure with the university, they were going to offer me a
(13) position in Business and Industry and that Jim Messmer would
(14) be able to explain more about that position to me. It was
(15) really a rather brief meeting. I do believe we talked for a
(16) little bit about the Business and Industry position there,
(17) but subsequently, I walked across campus with Jim Messmer to
(18) meet in his office to get more information about that
(19) position.
(20) Q And was the—out of respect for your tenure, was that tenure
(21) your faculty tenure in your academic department?
(22) A That would be my assumption.
(23) Q Yes. Was that—you've described earlier the process that
(24) you went through when tenure was conferred on you. Have you
(25) gone through any other process by which professional staff

**Page 173**

(1) tenure was conferred on you?
(2) A No, and I wouldn't see how that would be possible since it
(3) ceased in 1990.
(4) Q When you had this discussion, were you provided with a job
(5) description at that time?
(6) A Yes, I was.
(7) Q And what was that?
(8) A It's one of the exhibits.
(9) Q Okay. I'd refer you to G.
(10) A Yes, that's it.
(11) Q Okay. Would you describe that and what that was and what
(12) you assumed that required?
(13) A The job position description that was handed me, of course,
(14) it delineates the title of the position, goes through
(15) several bulleted items regarding job description, which I
(16) understood to be working on generating FTE enrollments for
(17) Business and Industry in the southern third of Indiana. I
(18) saw that as primarily a sales and development type position;
(19) and to be honest, something that the University was sorely
(20) in need of, being fully aware of the enrollment situation
(21) and the need to develop FTE through Business and Industry.
(22) The bottom portion of the page outlines salary information.
(23) They explained to me that I would begin at a base salary of
(24) $65,000 and then over an 18-month period or at the
(25) conclusion of an 18-month period would then have bonus or, I

**Page 174**

(1) guess, negative bonus adjustments made based upon the
(2) generation of FTE as outlined in the little horizontal chart
(3) at the bottom of the page.
(4) Q Okay. Did you accept this position that was offered to you?
(5) A I reviewed this for a 24-hour period. The following morning
(6) I—at about 8:30 I went to Dale Dowden's office; and as he
(7) stated, and I concur, respectfully declined the position and
(8) followed that with the statement that what I would really
(9) like to do is what I thought I always did best to serve the
(10) University, and that was teach.
(11) Q Okay. Do you know whether there was a later job description
(12) job?
(13) A Subsequently, I saw a job description posted on the
(14) University's electronic communication system of an internal
(15) posting, and I believe it was on either December 1st or
(16) December 2nd.
(17) Q Okay. I refer you to Exhibit H. Is this the subsequent
(18) job?
(19) A Yes, it is.
(20) Q Okay. So this was actually the second job description—
(21) A Yes.
(22) Q —that was put forth?
(23) A Yes, yes.
(24) Q Okay. Now, according to the requirements of the successful
(25) applicant, this position calls for someone in business and

**Page 175**

(1) technology. Do you have experience in business?
(2) A No.
(3) Q Do you have experience in technology?
(4) A No.
(5) Q As well, in reviewing this and in hearing what was described
(6) earlier by the several university witnesses, this job seems
(7) to be looking for someone who sells. Do you have experience
(8) in sales?
(9) A No, I do not.
(10) Q Do you have a network of contacts in business or in
(11) technology in southern Indiana?
(12) A No.
(13) Q So that's not been your experience over the past—
(14) A No.
(15) Q —your adult life?
(16) A No.
(17) Q Again, when you discovered that your position as Assistant
(18) Provost of Enrollment Management was being eliminated, what
(19) did you request of Mr. Dowden or Mr. Messmer?
(20) A I requested that they reconsider and allow me to teach in
(21) Broadcasting.
(22) Q And was that conversation, again, on November 14th when you
(23) went back to decline the position?
(24) A The conversation on November 14th was with Dale Dowden
(25) personally. Jim Messmer was not there. At that point Dale

176

Page 176
(1) indicated that he could not give me an answer to that
(2) request, but would look into it and that I should check back
(3) with him the first of the week.
(4) Q  Okay.  Did Provost Dowden look into it?
(5) A  Yes, the following Thursday morning, November 20th, he
(6) called me at home and asked if I could attend a meeting in
(7) his office at 11:00 that day.  At that meeting Dale Dowden
(8) was there, also Jim Messmer.  Dale indicated that he had
(9) looked into the opportunity of teaching in Broadcasting and
(10) that although there was overload within the department,
(11) there was no full-time position available.  Therefore, they
(12) would really like me to reconsider accepting the Business
(13) and industry position.  At that point I'd reminded them that
(14) a week earlier I'd declined the position and that I had not
(15) changed my mind.  Still did not want to accept that
(16) position.  At that point Dale handed me a prepared letter
(17) which basically said they understand this is a difficult
(18) decision for me to make; that they were willing to give me
(19) some time to make that decision, but they were directing me
(20) to assume the position in Business and Industry.  And if I
(21) chose not to follow that direction, then I must submit my
(22) resignation to Human Resources by December 1st.
(23) Q  Okay.
(24) A  At that point I explained to Dale and Jim that I was not
(25) interested in doing either of those requests.

Page 177
(1) Q  I'd refer you to Exhibit I.  Exhibit I is a letter to Mr.
(2) Hanes dated November 20th, 2003 signed by Provost Dowden
(3) and Mr. Messmer.  Is that the letter that you're referring to?
(4) A  Yes, it is.
(5) Q  How did you respond to this ultimatum that they gave you?
(6) A  Well, again, as I read the letter in Dale's office, after I
(7) completed reading the letter, I shared with them that I was
(8) not going to accept the position and that I was not going to
(9) resign.  At that point Dale told me that, well, someone
(10) would be in touch with me, and the meeting ended.  I at that
(11) point did contact a local attorney to ask him to--between
(12) that time and the December 1st deadline that I was given, I
(13) asked him to write a letter to the University explaining
(14) that my goal was to teach within the Broadcasting
(15) Department.  That attorney was Paul Ledford.  He did write
(16) such a letter for me.
(17) Q  Okay.  And referring you to Exhibit J is a letter on Paul
(18) Ledford's letterhead.  It's dated November 25th, 2003.  Is
(19) that the letter that you're referencing?
(20) A  Yes, it is.
(21) Q  After this letter was written by Mr. Ledford to Mr. Dowden,
(22) then what happened?
(23) A  Well, the December 1st deadline came and passed, and a few
(24) days later I received a letter from President Gregg which
(25) was dated December 5th.  I actually received it a couple

Page 178
(1) days later.  The letter from President Gregg indicated that
(2) because I had failed to accept that position that they were
(3) going to recommend that I be terminated for insubordination
(4) and begin that process, and then he outlined what my due
(5) process opportunities were in that case.
(6) Q  At some point after you received this letter from President
(7) Gregg, did you also receive then a letter informing you of
(8) your right to a due process hearing for tenured employees?
(9) A  Yes, I received a letter from University's counsel, Brent
(10) Stuckey, actually through--well, one through Paul Ledford
(11) and then another which came directly to my home.
(12) Q  Okay.  I'd refer you to Exhibit L, a letter to Mr. Ledford
(13) who is the local attorney.  It's dated December 5th, 2003.
(14) Exhibit L, directed to Paul from Mr. Stuckey.  And I'd draw
(15) your attention to the last paragraph on the first page of
(16) that letter.  In this letter Mr. Stuckey is alerting Mr.
(17) Ledford to the fact that the University will go forward with
(18) termination proceedings pursuant to the University manual
(19) for tenured employees.  Again, the only tenure that you have
(20) received at the University is as a faculty member in the
(21) Department at Broadcasting; isn't that correct?
(22) A  That's right.
(23) Q  Mr. Hanes, is it still your preference at this point to
(24) return to your teaching position?
(25) A  Yes, it is.

Page 179
(1) Q  You spoke briefly about why you declined the new position of
(2) Coordinator Southern Indiana Business and Industry.  You've
(3) referenced that briefly.  Is there any further reason why
(4) you do not want to take that position?
(5) A  Well, again, I understood the importance of that position in
(6) light of the University's need to generate enrollments in
(7) business and industry.  I also feel I have an understanding
(8) of the qualifications and type of person needed for that
(9) position; felt like in acting in the best interest of the
(10) University I should not accept the position because I don't
(11) meet the qualifications.  I really don't have the
(12) background, skills or attributes to be successful in
(13) traveling to businesses and industries and trying to sell
(14) course work to those people.  Again, I have no contacts in
(15) business and industry.  I don't have a background in
(16) business and industry.  And I am not a salesperson.  I do
(17) not have the attributes to be a salesperson.
(18) Q  Is it your belief that there are other employees at the
(19) University, perhaps even including tenured faculty members,
(20) who would be qualified to be at least invited to apply for
(21) this position?
(22) A  Yes, and I'm sure that among the employees at the University
(23) there are people who would have a much greater opportunity
(24) to be successful in that position than I.
(25) Q  Were there any other reasons why you declined this position?

Page 180

(1) A Well, over the past several years in enrollment management
(2) on numerous occasions I heard discussions about the concept
(3) of providing incentive pay for recruitment, at that point
(4) specifically targeted to admissions staff to which the
(5) Director of Admissions and I had attempted to fend off
(6) because of our concern for violation of the Higher Education
(7) Act. When I was presented with this job description and saw
(8) that it contained what I would consider a commission or
(9) incentive pay plan, once again, a red flag went up. As a
(10) matter of fact, at that point I went home and did some web
(11) searching to try to find specific information that would
(12) pertain to this particular area. And I certainly was very
(13) cautious, if not skeptical about whether or not that pay
(14) structure was in violation or incongruence with the Higher
(15) Education Act.
(16) Q As far as you know, did anyone at the University during the
(17) time you were in enrollment management, did anyone have that
(18) reviewed to see whether the University was in compliance
(19) with the Higher Education Act as far as you know?
(20) A Not that I'm aware of.
(21) Q Okay. In regard to this new position, which makes it clear
(22) that the remuneration for it will be based on bonus
(23) commission contingent on securing enrollments, as far as you
(24) know, has anyone reviewed that to see if it's in compliance
(25) with the Higher Education Act?

Page 181

(1) A Not to my knowledge.
(2) MR. WILEY: Can I ask a question relative to that?
(3) MS. LAMBERTI: Certainly, or if you'd like, you can
(4) wait until I'm finished. I only have one more
(5) question, and then you might like to ask him several
(6) questions.
(7) MR. WILEY: Oh, no, I just have one.
(8) MS. LAMBERTI: Okay. If I could just finish my last
(9) question, and then. .
(10) Q Has anyone explained to you, or do you have any
(11) understanding about why the basis for the claim that VU is
(12) bringing here and recommending your termination is based on
(13) insubordination? Has anyone specifically explained that to
(14) you?
(15) A No.
(16) MS. LAMBERTI: I don't believe I have any more
(17) questions at this point, so, Mr. Wiley, I think you
(18) wanted to ask a question.
(19) MR. WILEY: Just one question. I share Dale's support
(20) for your activities around the--but here's the question
(21) I have. In your role as enrollment manager, when you
(22) deemed that you thought you might be asked to do
(23) something that you thought was illegal by statute, did
(24) you raise that with your superiors or--
(25) MR. HANES: Yes. Yes, I had.

Page 182

(1) MR. WILEY: With your counsel?
(2) MR. HANES: Not with counsel. With my superiors. I--
(3) if there's anything that goes to the point of my
(4) conferring with counsel about situations and issues, I
(5) can tell you--and Brent can verify--that over the three
(6) years that I've been in the position, there have been a
(7) number of times I have conferred with counsel about
(8) issues that we were concerned that would be, you know,
(9) potential legal problems for the University in the
(10) realm of Admissions and Enrollment Management.
(11) MR. WILEY: And why didn't you on that either?
(12) MR. HANES: Well, at that point in time nothing had
(13) occurred that represented a threat to that. As I said,
(14) within the enrollment management area, simple
(15) discussions were brought up on a few occasions about
(16) compensating admissions counselors. And at that point
(17) Anne Skuce, Director of Admissions, and myself
(18) responded, that's against the Higher Education Act.
(19) And then the issue dropped. Our hand was never forced
(20) to try to do that.
(21) MS. LAMBERTI: Okay.
(22) MR. CASE: Jack, you said that you became the interim
(23) enrollment manager director in April of 2000?
(24) MR. HANES: Yes.
(25) MR. CASE: Okay. And then you became the permanent

Page 183

(1) position in August?
(2) MR. HANES: Yes.
(3) MR. CASE: Was there an interview process, or how did
(4) that--
(5) MR. HANES: Yes, there was a formal application
(6) process.
(7) MR. CASE: Okay.
(8) MR. HANES: In the spring of the year 2000 when Dr.
(9) Summers recruited me to the interim position, he
(10) indicated that I could take the responsibilities on on
(11) an interim basis. If I found the job challenging and
(12) something that I enjoyed and thought that I wanted to
(13) pursue, then he would welcome my application when the
(14) position was opened in a formal process.
(15) MR. CASE: Okay.
(16) MR. HANES: And that's what happened then late in the
(17) summer of 2000.
(18) MR. CASE: Okay.
(19) MR. MORRISON: Nothing for Jack.
(20) CROSS-EXAMINATION
(21) By Mr. Stuckey:
(22) Q Jack, I just want to ask you a few questions about when
(23) you--when you took the position and your conversation with
(24) Dr. Summers. Did you have any discussions with Dr. Summers
(25) one way or the other about returning to the classroom?

178

Page 164

(1) A No.
(2) Q Okay.
(3) A The only discussion that I recall was that, again, I would
(4) like to continue to teach a course. That's the only
(5) discussion I recall.
(6) Q Which was denied?
(7) A Yes.
(8) Q Okay. And I take it you didn't have any discussions with
(9) him about tenure?
(10) A No.
(11) Q And about having a right if this job didn't work out to
(12) return to the classroom?
(13) A No.
(14) Q So he didn't make any affirmative assurances to you, Jack,
(15) if this doesn't work, we'll get you back in Broadcasting?
(16) A I don't recall that.
(17) Q Okay. You heard Dale's testimony, and a really nice thing
(18) about this hearing editorially is I think everybody's
(19) testimony has been consistent, and, you know, there's no
(20) issues about any of that. But you heard his testimony this
(21) morning about the different tenure contracts, the one that
(22) says teaching contract and the one that does not?
(23) A Uh-huh.
(24) Q Okay. Were you aware of that?
(25) A No, I was not. I was not.

Page 185

(1) Q When--you're aware of it now?
(2) A I was made aware of it when I saw copies of the contracts
(3) this morning.
(4) Q And so your--and you know the contract you had signed
(5) earlier when you became a full professor, it actually says
(6) teaching contract on it; you saw that this morning?
(7) A Yes, I saw that this morning. I don't recall in 1996 having
(8) read it in that much detail. In fact, I think I testified
(9) this morning that that was an additional word added to that
(10) contract sometime maybe in that time period. I had copies
(11) of some previous contracts at home and had referred to
(12) those. And, of course, those did not use the word teaching;
(13) although, I guess they were teaching contracts. They just
(14) didn't use the word. But at some point that word was added.
(15) I guess my concern is having signed a contract in the year
(16) 2000 that didn't use the word that I might be hard pressed
(17) looking at a contract to try to decipher what word was
(18) missing from a contract as opposed to what word was added
(19) because that's what happened in 2000. A word was missing
(20) that I wasn't aware of.
(21) Q No, and I just want to understand what your--your
(22) representation to the trustees is that you did not
(23) understand there was any significance in your signing the
(24) new contract in 2000 that did not say teaching contract?
(25) A No, my assumption of a contract is that it helps, you know,

Page 186

(1) provide a description of the job and duties required.
(2) Certainly, the contract I signed talked about, you know,
(3) working, you know, in professional staff areas. Did not
(4) refer to teaching things. Well, that's because the job I
(5) was about to undertake wasn't teaching. A teaching contract
(6) should refer to teaching things.
(7) Q And your representation to us is that you did not have any
(8) understanding that signing what--what we now all understand
(9) is the professional staff tenure contract changed in any
(10) manner your tenure from faculty to professional staff?
(11) A Correct.
(12) Q And you had no conversation with Dr. Summers about it one
(13) way or the other?
(14) A No.
(15) Q Jack, it--are you aware of anybody else at the university
(16) who has moved into a position like yours? Ida talked about
(17) central administration, and we'll use--we can use that term;
(18) that has moved into central administration--they're not part
(19) of any department--any division or department--you know, in
(20) the academic side that has moved there in a full-time
(21) position and then has made a claim that they continue to
(22) have tenure in their academic department?
(23) A No.
(24) Q Okay. Do--and you heard me ask Dale questions about our new
(25) tenure policy now provides that in each academic department,

Page 187

(1) when you have somebody going through the tenure process,
(2) they look at how many tenured faculty there are; again, with
(3) the idea of enrollment management, we don't want to have too
(4) many tenured, so if enrollment goes down, we cannot renew
(5) some untenured contracts?
(6) A Right.
(7) Q I mean, do you think that Dan Burgel or people in the
(8) Broadcasting Department as they've managed that department
(9) have had in their mind that you're still a tenured faculty
(10) person with a right to return to that department?
(11) A I don't think I can testify for what's in somebody else's
(12) mind. I think what I can say is that when I moved to
(13) enrollment management in the year 2000, no position was
(14) replaced within Broadcasting, so in effect, they went a man
(15) down. And I can testify that the enrollments have remained
(16) relatively constant within the department as have the loads.
(17) Q Do you--I mean, is it your position that you had the right
(18) at any time during your employment as enrollment management
(19) to say, I want to go back to the classroom and that they
(20) would then need to put you back in that Broadcasting
(21) Department?
(22) A I guess from a standpoint of a strict interpretation of
(23) tenure as a property right, yes. Did I have any
(24) expectations or thought of doing that, no, because I
(25) expected to be successful and for the University to continue

Page 188

(1) to want me to be in that position. Again, as I said, I
(2) really had in a long-range planning mode considered that
(3) after a few years of making that request to move back, yes,
(4) have thought--maybe I'm asking the question again. And I
(5) Q And I know we're ending our time, but, I mean, would you
(6) don't want to do that. I'm trying to ask it a little
(7) differently. But five or six years down the road, you said
(8) that was your expectation that you wanted to return to the
(9) classroom. Would you have thought you could have returned
(10) to the Broadcasting Department upon your request no matter
(11) what the student, you know, FTE was, no matter what the
(12) tenured status of faculty there at that time was?
(13) A Yes.
(14) MR. STUCKEY: Okay. Other questions from the trustees?
(15) Thank you, Jack.
(16) MS. LAMBERTI: I'd like to go back to a couple of
(17) exhibits, please.
(18) MR. CASE: I'm going to have to excuse myself right
(19) away. I apologize for that, but I'm in a situation I
(20) need to be in a meeting that's been planned for about
(21) two months.
(22) MS. LAMBERTI: Well, I regret that no one informed you
(23) that this might take a good part of the day.
(24) MR. WILEY: Six hours.
(25) MS. LAMBERTI: A good part of the day. We can agree to

Page 189

(1) continue this at a later date, or then I think we need
(2) to have a record of the fact that you are not here for
(3) the balance of the hearing and for the closing
(4) statements and that that be--
(5) MR. STUCKEY: And, ida, I don't think we'll have
(6) closing statements. I think we'll allow you to send
(7) something to the trustees in writing if you'd like to
(8) do that.
(9) MS. LAMBERTI: I will do that, but I will have some
(10) closing statements.
(11) MR. WILEY: We'll be able to review the court record,
(12) right?
(13) MS. LAMBERTI: I will have a closing statement, and I
(14) certainly will put that in writing and forward that to
(15) you so that you can review it along with the record.
(16) MR. CASE: That will be fine.
(17) MS. LAMBERTI: All right. Thank you.
(18) MR. STUCKEY: And the record can reflect that Brad Case
(19) is leaving the hearing.
(20) MR. CASE: Thank you.
(21) MS. LAMBERTI: Thank you, Mr. Case.
(22) MR. CASE: Uh-huh. Thank you. We'll see you.
(23) MS. LAMBERTI: I'd like to just have you go back and
(24) look again at Exhibit D.
(25) MR. MORRISON: Exhibit what?

Page 190

(1) MS. LAMBERTI: D.
(2) MR. MORRISON: D as in dog?
(3) MS. LAMBERTI: D as in dog and Exhibit F.
(4) Q Mr. Hanes, as to Exhibit D, the--which is a reflection of
(5) the contract that you signed in 1991--
(6) A Yes.
(7) Q --at the top the first paragraph there where it talks about
(8) your employment as an associate professor of Broadcasting,
(9) again, to clarify and to point to the document that supports
(10) his earlier testimony, was it your assumption that what you
(11) were looking at there was simply a description of the duties
(12) you'd be doing at that time?
(13) A Yes.
(14) MS. LAMBERTI: Then I'd like you to refer to document F
(15) which is the document Mr. Hanes signed in August of
(16) 2000, and I'd like to point again to the first
(17) paragraph of that contract where it states that he will
(18) be Assistant Provost for Enrollment Management.
(19) Q Jack, in support of the testimony you gave earlier, is this
(20) the paragraph you relied on that was simply describing what
(21) your duties were?
(22) A Yes.
(23) Q Mr. Stuckey has asked you several questions about whether in
(24) your conversation with President Summers he told you that
(25) your employment as a faculty member in your academic department

Page 191

(1) would be affected by going into administration, and you
(2) said, no, that he hadn't. And I'd like to ask the reverse
(3) of that question. At any time during those conversations
(4) and negotiations with President Summers, did he tell you,
(5) Jack, when you sign this contract, you are waiving your
(6) rights as a tenured faculty member?
(7) A Absolutely not.
(8) Q Did anyone so advise you when you signed this contract?
(9) A No.
(10) Q And has anyone ever provided you with any document of any
(11) kind whereby you waived your rights as a faculty member?
(12) A No.
(13) Q Would you explain to the remaining board members here, if
(14) you would, what the tradition is of tenure for a faculty
(15) member in an academic department, what tenure means and
(16) what
(17) by tradition and by policy and by practice that means? I
(18) don't believe either of these gentlemen are in the field of
(19) education. Would you explain that briefly?
(20) A Well, I'll do my best. I may miss some points. But as I
(21) understand the concept of tenure, it's a property right
(22) that's awarded to a faculty member in education based upon a
(23) record of outstanding academic performance and scholarship
(24) and that it's a protection of one's employment and one's
(25) position within a specific area. The primary rationale, I
(26) believe, for that existing is to assure that the faculty

Page 192

(1) member is able to exercise freedoms without fear of
(2) retribution, and that's my best understanding of tenure.
(3)   Q   Okay.
(4)   A   That's a pretty simplistic version.
(5)   Q   But that answers the question. Thank you. Mr. Stuckey also
(6) asked you a question about whether or not you were aware of
(7) anyone who had been a faculty member and then went into
(8) administration. He asked you a question in that regard.
(9) Are you aware of anyone who was a tenured faculty member who
(10) served briefly in the administration and then was
(11) terminated?
(12)   A   I don't recall any.
(13)   MS. LAMBERT:  To complete the record, I'd like to
(14) provide copies to you. You can enter it in your
(15) booklet as Exhibit S which is a copy of the statute
(16) that we are referring to here, the Higher Education
(17) statute. I have copies for each of you to put in your
(18) binder.
(19)   MR. WILEY:  And why was it you didn't provide this
(20) earlier when you were talking about it?
(21)   MS. LAMBERT:  Why didn't I provide it earlier? Well,
(22) I'm providing it to you now and—
(23)   MR. WILEY:  But you've been talking about it all day.
(24)   MS. LAMBERT:  No, we've been talking about it since we
(25) had Jack on the stand, and I'm now providing it to you.

Page 193

(1) And actually, to respond to your question, Mr. Wiley,
(2) any time a public statute or law is being referred to,
(3) it doesn't actually have to be included in exhibits.
(4) It's understood that everyone is aware of it, so that's
(5) why I didn't include it with the other exhibits. But
(6) as a courtesy, I'm providing it to you now.
(7)   MR. WILEY:  Thank you very much for your explanation.
(8)   (EXHIBITS S & T INTRODUCED)
(9)   MS. LAMBERT:  You're welcome. And so I'd like to make
(10) sure that the record includes Exhibit S which has
(11) been added to our book of exhibits. If you'll give me
(12) just a moment before I finish with Mr. Hanes, please.
(13)   Q   Mr. Hanes, you answered Mr. Wiley's question earlier, and
(14) you said that during the time that you served as Assistant
(15) Provost in charge of Enrollment Management, if you had a
(16) question regarding compliance with any laws during your time
(17) when you were in that position, you did raise the question
(18) and resolve it?
(19)   A   Yes.
(20)   Q   Do you recall that testimony?
(21)   A   Yes.
(22)   Q   Okay. In regard to this new position, the one that you all
(23) have, the position description for in which the remuneration
(24) applies on bonus and commission, to your knowledge did

Page 194

(1) anyone resolve that issue as far as you know?
(2)   A   As far as I know, no.
(3)   MS. LAMBERT:  All right. I don't have any more
(4) questions for Mr. Hanes, so I would like to—I don't
(5) know what your intention is, Brent, but I would like to
(6) make a very brief closing comment, and then I'll follow
(7) up with that with a written record.
(8)   MR. STUCKEY:  I would advise the trustees that it's not
(9) part of due process to have an oral closing. We've
(10) given Jack a good hearing, and I appreciate, you know,
(11) all the information that's been brought forth. And
(12) it's really up to you if you want Ida to make an oral
(13) closing, or you'd just have her do it in writing, and
(14) Brad get a copy of it.
(15)   MS. LAMBERT:  Along that same line—
(16)   MR. STUCKEY:  It's really your call.
(17)   MS. LAMBERT:  —I'm entitled to inform you that in a
(18) due process hearing that it is implicit in a due
(19) process hearing that the testimony that's available is
(20) to be provided, and any information that bears on your
(21) decision is to be presented. I have a very brief
(22) closing statement that I would like to make. One of
(23) the indications of a fair and adequate due process
(24) hearing is to be allowed both the—
(25)   MR. WILEY:  Let me interrupt you. I don't care if you

Page 195

(1) give a closing statement, and I'm sure Jimmie will be
(2) happy to listen to your closing statement. We've
(3) listened to your line of questioning all day long, so
(4) please proceed.
(5)   MS. LAMBERT:  Thank you.
(6)   MR. MORRISON:  I have one question. On this document
(7) you just gave us—
(8)   MS. LAMBERT:  Sure.
(9)   MR. MORRISON:  —have you researched where Business and
(10) Industry with the Work Force Development and some of
(11) those are federal programs; the funding does not come
(12) through the state money or something? It's grants or
(13) something that we've received? Does it coincide with
(14) this, or is it completely different?
(15)   MS. LAMBERT:  What I'm asking about here today is
(16) whether the University is in fact in compliance with it
(17) and with the new regulations. It's not my
(18) responsibility at this hearing to explain to the
(19) University whether you are or not. I'm not the
(20) University's attorney, and I'm not telling you what the
(21) law is in this regard. I'm not telling you whether
(22) you're in compliance or not. It's my job—
(23)   MR. MORRISON:  You're just raising the question?
(24)   MS. LAMBERT:  Whether you are in compliance, that's
(25) for your University people to investigate and

Page 196

(1) determine.
(2) CLOSING STATEMENT
(3) By Ms. Lamberti:
(4)  I would just like to point out to you—and this will
(5) be a very brief closing statement—that we have had no
(6) testimony that Jack Hanes waived his tenure rights as a
(7) faculty member. We've had no documents that show that
(8) Jack Hanes waived his tenure rights as a faculty member.
(9) There has been no testimony that he was advised that he
(10) was waiving his tenure rights and no documents that show
(11) he was advised that he was waiving his tenure rights.
(12) What the administration appears to be hanging their case
(13) on is the difference in the opening paragraph for the job
(14) duties that are described. We would expect a teaching
(15) contract to indicate that there will be teaching duties.
(16) And we would expect a contract regarding an Assistant
(17) Provost for Enrollment Management to be expected to do
(18) all of the professional duties connected with that.
(19) There is nothing, nothing in the contract by which he
(20) waives his rights, just as no one advised him that he was
(21) waiving his rights.
(22) He does have faculty tenure. It's a time-honored
(23) tradition. It's the practice. It's the policy in higher
(24) education. If you were to refer this question to the
(25) AAUP, the Association of the University Professors, you

Page 198

(1) believe that their tenure counts for very much?
(2) You've had a rocky road over the past few years.
(3) And you have tried diligently, all of you, to preserve
(4) what you have here at Vincennes, to promote Vincennes, to
(5) make it a good university with a good reputation
(6) throughout the state. What will you have? What will you
(7) have here if you deny this man his position because you
(8) say he doesn't have tenure as a faculty member? You will
(9) set Vincennes back lots of years. You've worked very
(10) hard over the past few years to try and put VU on equity
(11) with the other state institutions. That's been an uphill
(12) battle for a lot of you to get them the same as the other
(13) state institution got. You spent a lot of time trying to
(14) get appropriations to make it fair with the other state
(15) universities. What will you have if you have an
(16) institution where you've set a precedent that you can
(17) terminate someone who went through the process and
(18) received tenure in a faculty position? What will you
(19) have here?
(20)  I propose that you certainly will not have an
(21) institution of higher education where there is a time-
(22) honored tradition of tenure and that it will, it will
(23) have a negative effect on how Vincennes University is
(24) perceived.
(25)  Why would anyone seek a position at this university

Page 197

(1) would be advised that someone who goes through the
(2) process and is given tenure maintains that tenure. As
(3) well, there may be, there may be a time frame involved.
(4) It's usually a much longer time than Jack Hanes'
(5) departure for three years. There are several cases that
(6) support this—several supreme court cases that support
(7) this. Harry versus Cinderman, the Board of Regents
(8) versus Roth, and I will include them in my statement to
(9) you when I give you a written explanation.
(10)  I would also ask you why it is, why the University
(11) would want to terminate a loyal employee like Jack Hanes?
(12) Why would you want to do that? Why would you want to set
(13) this precedent?
(14)  I think the question you really need to pursue is
(15) this. You have other faculty members that are
(16) illustrious, productive, energetic faculty members just
(17) like Jack Hanes was. Which of them do you think is ever
(18) going to step forward and respond to an administrative
(19) request to help them out for a couple of years after
(20) they've seen the way Jack Hanes was treated? President
(21) Summers' own letter shows that he was begged to take the
(22) position. And he responded. He served you well. Who
(23) will ever at Vincennes do that again when they see how
(24) Jack Hanes is being treated? In fact, who at Vincennes
(25) University among your teaching faculty is going to

Page 199

(1) if someone who had tenure is going to be terminated on
(2) the basis of insubordination? That's the long question
(3) here. This isn't just Jack Hanes. It's the precedent
(4) you're setting. And I ask you, please, put your
(5) presentations, your thoughts that you had before you came
(6) in here and any other pre-notions that you may have. Put
(7) those aside and look at the testimony you've heard today.
(8) Look at the documents you're relying on, and look back
(9) how you want this precedent to affect Vincennes
(10) University in the years to come. Thank you.
(11) MR. MORRISON: Do you have anything, Mr. Brent?
(12) MR. STUCKEY: I don't think it would be appropriate. I
(13) appreciate—
(14) MR. HANES: Brent, may I ask what the procedural steps
(15) are from here and when I can expect to hear a response?
(16) MR. STUCKEY: Uh-huh. They will meet with the board in
(17) executive session at Indianapolis. I'm sure the board
(18) will make a decision at that time.
(19) MR. HANES: Okay.
(20) MR. MORRISON: Will we have Ida's stuff—
(21) MS. LAMBERTI: My understanding—
(22) MR. MORRISON: —before our board meeting?
(23) MS. LAMBERTI: Certainly. You've informed me that the
(24) board meeting is the 26th of January. I've got that
(25) written down here in my notes.

182

Page 200

(1) MR. STUCKEY: I was thinking the 28th.
(2) MS. LAMBERTI: It is the 28th; that you'll be meeting
(3) on the 28th in Indianapolis. And, yes, you may be
(4) assured that I will have a written document in your
(5) hand before that--in fact, well before that so you'll
(6) have time to consider it. Thank you for raising that.
(7) MR. HANES: Brent, the decision will be made in
(8) executive session. Will an announcement of the
(9) decision be made as part of the public session?
(10) MR. STUCKEY: I would--I mean, I'd just tell you, I
(11) would respect your wishes on that, and my sense would
(12) that it not be either way. But it--
(13) MR. MORRISON: We normally do not--we can't make a
(14) decision in executive session. About personnel
(15) matters, we usually don't--
(16) MS. LAMBERTI: That's confidential.
(17) MR. MORRISON: Confidential.
(18) MS. LAMBERTI: Absolutely.
(19) MR. WILEY: If the decision is not made on January 28th
(20) at executive session, it will probably be brought up
(21) again in the February meeting, right? There's nothing
(22) that says the board has to decide on January 28th.
(23) MR. STUCKEY: No, there isn't.
(24) MR. WILEY: We'd like it.
(25) MR. STUCKEY: But I don't think there's going to be new

Page 201

(1) information, and I think in fairness to Jack and--Jack
(2) is being paid now. He's in limbo.
(3) MR. HANES: I'd certainly like to move on with my life.
(4) MR. STUCKEY: And so I don't think--
(5) MR. WILEY: Well--
(6) MR. STUCKEY: I think you would agree there's no reason
(7) for it not to be done.
(8) MR. WILEY: Okay.
(9) MR. HANES: So then I will get a written notification
(10) of that decision then within a couple of days after
(11) that?
(12) (BOARD MEMBERS NOD THEIR HEADS AFFIRMATIVELY)
(13) MS. LAMBERTI: Yes, for the record. They're nodding
(14) yes.
(15) MR. STUCKEY: You can do that, Jack, or certainly one
(16) of us can call Ida or you to let you know.
(17) MS. LAMBERTI: Mr. Stuckey, as soon as that decision is
(18) made, I'd like a call from you.
(19) MR. STUCKEY: Okay.
(20) MS. LAMBERTI: And then I'd like verification by way of
(21) letter.
(22) MR. STUCKEY: Okay.
(23) (EXHIBITS 1-10 INTRODUCED)
(24)  *   *   *   *   *   *
(25) HEARING CONCLUDED

Page 202

(1) STATE OF INDIANA   )
                       ) SS:
(2) COUNTY OF VIGO     )
(4) I, Renee R. Dobson, a Notary Public in and for said
(5) county and state, do hereby certify that the foregoing hearing
(6) was taken down in Stenograph notes and afterwards reduced to
(7) typewriting under my direction; and that the typewritten
(8) transcript is a true and accurate record of the hearing given by
(9) said speakers;
(10) IN WITNESS WHEREOF, I have hereunto set my hand and
(11) affixed my notarial seal this   10th   day of April
(12) , 2004.
(17) Renee R. Dobson, Notary Public,
Residing in Vigo County, Indiana
(19) My Commission Expires:
September 1, 2007

**Historical and Statutory Notes**

Formerly:

Acts 1965, c. 108, s. 3.

**Library References**

Colleges and Universities ⟨⟩11.
Westlaw Topic No. 81
C.J.S. Colleges and Universities § 10.

## Chapter 18

## Vincennes University

Section
23–13–18–1      Incorporation, powers and duties.
23–13–18–2      Sale and lease of land for support of university.
23–13–18–3      Acquisition of land for campus; eminent domain.
23–13–18–4      Board of trustees; membership; meetings; quorum; salary and expenses.
23–13–18–5      Powers and duties.
23–13–18–6      President of trustees; president pro tempore.
23–13–18–7      President and faculty of university; power; term.
23–13–18–8      General duties of trustees.
23–13–18–9      Establishment of library.
23–13–18–10     Election and appointment of professor of divinity, of law, and of physic.
23–13–18–11     Encouragement of aborigines.
23–13–18–12     Exemption of professor and students from militia.
23–13–18–13     Establishment of grammar school.
23–13–18–14     Construction of buildings, equipment operation, and control of proper-
                ties; lease or purchase of property.
23–13–18–15     Issuance and sale of revenue bonds, purposes, security.
23–13–18–16     Repealed.
23–13–18–17     Amount of revenue bonds, form; terms; resolution; sale.
23–13–18–18     Execution of bonds.
23–13–18–19     Bonds as eligible investments.
23–13–18–20     Bond defined.
23–13–18–21     Lease or sale of property not required for educational purposes.
23–13–18–22     Obligations not to become lien or charge against university except as
                provided in chapters.
23–13–18–23     Furnishing of heat, light and power.
23–13–18–24     Authority to accept gifts, bequests and devises.
23–13–18–25     Terms and conditions of receipt and acceptance of gifts, bequests and
                devises.
23–13–18–26     Use or disposal of property received from gift, bequest or devise.
23–13–18–27     Exemption of bonds from taxation.

### 23–13–18–1   Incorporation; powers and duties

Sec. 1. (a) There is instituted and incorporated Vincennes University.

(b) There is created a body corporate and politic, by the name of "the board of trustees for the Vincennes University" that is ordained, constituted and declared to be forever a body politic and corporate, in fact and in name, and by that name, the trustees and their successors shall have continual succession and shall be persons in law capable of:

286

(1) suing and being sued;

(2) pleading and being impleaded;

(3) answering and being answered unto; and

(4) defending and being defended, in all courts and places whatsoever, in all manner of actions, suits, complaints, matters and causes whatsoever.

(c) The board of trustees may:

(1) have a common seal, and make and alter the same at their pleasure, and

(2) by the same name and style, be in law capable of purchasing, holding, leasing and conveying any estate, real or personal, for the use of the university.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

Acts 1982, P.L. 146, Sec.2, emerg. eff. Feb 25, 1982, added this chapter.

**Formerly:**
Acts 1807, c. 67, s. 1.

### Library References

Colleges and Universities ⬤–3
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 5 to 6

## 23–13–18–2   Sale and lease of land for support of university

Sec. 2   Congress has appropriated a township of land, of twenty-three thousand and forty acres (23,040), for the use and support of the university. The trustees are authorized to sell, transfer, convey, and dispose of any quantity, not exceeding four thousand (4,000) acres of the land, for the purpose of putting into immediate operation, the university and to lease or rent the remaining part of the land, to the best advantage, for the use of the university.
*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1807, c. 67, s. 2.

### Library References

Colleges and Universities ⬤–6(2).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 10 to 11.

## 23–13–18–3   Acquisition of land for campus; eminent domain

Sec. 3   The acquisition of so much land as may from time to time be needed as a campus by the Vincennes University is declared to be for public use and title thereto may be taken under the power of eminent domain.
*As added by Acts 1982, P.L.146, SEC.2.*

## Historical and Statutory Notes

Formerly:

Acts 1807, c. 67, s. 3.
Acts 1927, c. 101, s. 1.
Acts 1921, c. 196, s. 1

Acts 1959, c. 364, s. 1.
Acts 1963, c. 160, s. 1.
Acts 1975, P.L.346, SEC.1.
Acts 1976, P.L.150, SEC.1.
Acts 1981, P.L.325, SEC.1.

## Library References

Colleges and Universities ⚖6(3).
Eminent Domain ⚖40.
Westlaw Topic Nos. 148, 81.

C.J.S. Colleges and Universities §§ 10 to 11
C.J.S. Eminent Domain § 51.

## 23–13–18–4  Board of trustees; membership; meetings; quorum; salary and expenses

Sec. 4. (a) The board of trustees of Vincennes University shall consist of ten (10) trustees. Nine (9) shall be appointed by the governor, one (1) of whom must be a resident of Knox County and one (1) must be an alumnus of Vincennes. In addition, the governor shall appoint one (1) trustee who is a full-time student of the university during his term.

(b) To aid the governor in the selection of the student member, a search and screen committee is created consisting of one (1) representative of the governor and at least four (4) students chosen by the elected student government representatives of the student body. The committee shall establish the mode and criteria to be used in the selection of student nominees to serve on the board of trustees. The committee shall submit a list of at least five (5) names to the governor for his consideration. The governor shall select one (1) of these names for appointment as a trustee of the university in accordance with the provisions of this chapter.

(c) There shall be four (4) ex officio members of the board: the president of the university, the superintendent of the Vincennes Community School Corporation, the superintendent of the South Knox School Corporation, and the superintendent of the North Knox School Corporation.

(d) The term of each appointed trustee shall be for three (3) years, except that of the student appointee, who shall serve a one (1) year term. When a vacancy occurs in the membership of the board of trustees, such vacancy shall be filled by the board for the unexpired term. The appropriate number of appointive trustees shall be appointed prior to the first Monday of October of each year, and that first Monday shall be the first day of their terms.

(e) The annual meeting of the board shall be held on the first Monday of October of each year. Special meetings may be called by the president of the board or by any four (4) trustees.

(f) Six (6) trustees shall constitute a quorum at any regular or special meeting of the board.

(g) The trustees shall serve without compensation, except that each member is entitled to the salary per diem as provided by IC 4-10-11-2.1 and to reimbursement for travel, lodging, meals, and other expenses as provided in the

288

VINCENNES UNIVERSITY

23–13–18–5

state travel policies and procedures established by the department of adminisnation and approved by the state budget agency.
*As added by Acts 1982, P.L.146, SEC.2.*

*Legislative evaluation and oversight of agencies and agency programs,
see section 2–5–21–1 et seq.*

## Historical and Statutory Notes

**Formerly:**

Acts 1807, c. 67, s. 3.
Acts 1927, c. 101, s. 1.
Acts 1931, c. 196, s. 1.

Acts 1959, c. 364, s. 1.
Acts 1963, c. 180, s. 1.
Acts 1975, P.L.146, SEC.1
Acts 1976, P.L. 150, SEC.1.
Acts 1981, P.L.325, SEC.1

## Library References

Colleges and Universities ⊙⊅4, 7.
Westlaw Topic No. 81.

C.J.S. Colleges and Universities §§ 5 to 6, 13
to 18.

## Notes of Decisions

**Voting    1**

**1. Voting**

Ex officio members of the Board of Trustees
of Vincennes University should be considered

voting members of Board until General Assembly declares in express terms that they are non
voting members of Board. 1991 Op.Atty.Gen.
No. 91–19.

## 23–13–18–5   Powers and duties

Sec. 5. The trustees, or a majority of them, shall have full power, from time
to time, to:

(1) make such bylaws and regulations in writing, not inconsistent with this
chapter, with the laws of Indiana, or of the United States, as to them shall
appear necessary for the good government of the said university, and the
students thereof, and the same to be put in execution, revoke, alter and
make anew as to them shall appear necessary; and

(2) appoint such subordinate officers, as they may think convenient for the
police of said university, and for carrying this chapter into effect, and by
ordinance to require such sureties from the several officers and to annex
such fees to the several officers of the corporation, and to impose such
fines for a neglect of duty or misconduct in office as to them shall appear
proper.

*As added by Acts 1982, P.L.146, SEC.2.*

## Historical and Statutory Notes

**Formerly:**
Acts 1807, c. 67, s. 4.

## Library References

Colleges and Universities ⊙⊅5, 7.
Westlaw Topic No. 81.

289

**187**

**23-13-18-5**                                                      EDUCATIONAL INSTITUTIONS

C.J.S. Colleges and Universities §§ 8, 12-30,
  18, 41

### Notes of Decisions

Voting    1

1.  Voting
  Ex officio members of the Board of Trustees
of Vincennes University should be considered

voting members of Board until General Assem-
bly declares in express terms that they are not
voting members of Board.   1991 Op.Att'y.Gen.
No. 91-19

## 23-13-18-6   President of trustees; president pro tempore

Sec. 6. The trustees at their first stated meeting shall elect a president out of their own body, and in case of his absence at any future stated or extraordinary meeting, the said trustees shall elect a president pro tempore.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
  Acts 1807 c. 67, § 5.

### Library References

Colleges and Universities ⊕8(2).                    C.J.S. Civil Rights §§ 122, 140.
West's Key Topic No. 81.                             C.J.S. Colleges and Universities §§ 19 to 20.

## 23-13-18-7   President and faculty of university; power; term

Sec. 7. (a) The trustees shall appoint to preside over and govern the said university a president.

(b) The president and professors shall instruct and give lectures to the students of the said university, according to such plan of education as the said trustees may approve and direct.

(c) The president and professors, or a majority of them, shall be styled and called the "faculty of the university". The faculty shall have the power:

(1) of enforcing the rules and regulations adopted by the said trustees for the government and discipline of the said university;

(2) for granting and confirming by, and with the consent of the trustees, such degrees in the liberal arts and sciences to such students of the said university, who by their proficiency in learning the said professors shall think entitled to them, as are usually granted and conferred in other universities in the United States; and

(3) to grant to such graduates diplomas, under the common seal of the said university, to authenticate, and perpetuate the memory of such graduations.

(d) The said president and professors shall hold their offices during the pleasure of the trustees, and the president of the university, ex officio for the time being, shall be considered as one (1) of the trustees of said university.

*As added by Acts 1982, P.L.146, SEC.2.*

790

VINCENNES UNIVERSITY                                                      23–13–18–9

### Historical and Statutory Notes

**Formerly:**
Acts 1807, c. 67, s. 6.

### Library References

Colleges and Universities ⚖8(2)
Westlaw Topic No. 81.

C.J.S Civil Rights §§ 122, 140.
C.J.S. Colleges and Universities §§ 19 to 20.

## 23–13–18–8   General duties of trustees

Sec. 8. It shall be the duty of the said trustees, and they are hereby authorized and required as soon as may be, to:

(1) erect, purchase or hire, as they may deem most expedient, for carrying the said university into effect, suitable buildings for the said university;

(2) make ordinances for the government and discipline thereof;

(3) establish plans of education, which plans shall embrace each and every of the languages, sciences and branches of learning directed to be taught in the said university;

(4) regulate the admission of students and pupils into the same;

(5) elect and appoint persons of suitable learning and talents to be president and professors of the said university and agree with them for their salaries and emoluments.

(6) visit and inspect the said university;

(7) examine into the state of education and discipline therein;

(8) make a yearly report thereof to the legislature; and

(9) generally to do all lawful matters and things whatsoever, necessary for the maintaining and supporting the institution and for the more extensive communication of useful knowledge.

*As added by Acts 1982, P.L.146, SEC.2.   Amended by P.L.2–1995, SEC.88.*

### Historical and Statutory Notes

**1995 Legislation**
P.L.2–1995, Sec.88, emerg. eff. May 5, 1995, which was part of the correction bill, made nonsubstantive changes.

**Formerly:**
Acts 1807, c. 67, s. 7

### Library References

Colleges and Universities ⚖5, 7.
Westlaw Topic No. 81.

C.J.S. Colleges and Universities §§ 8, 15 to 18, 41.

## 23–13–18–9   Establishment of library

Sec. 9. The trustees shall:

(1) establish a library, in and for the use of the students, professors and other members of the said university, to consist of such books and experi-

291

mental apparatus as they may deem proper for the said university and to provided in such manner and by such ways and means as they on majority of them shall by ordinance direct, and

(2) regulate the terms upon which books and apparatus may be taken of the said library and returned to the same.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1807, c. 67, s. 8.

### Library References

Colleges and Universities ⊕=5, 6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 8, 10, 41

## 23–13–18–10   Election and appointment of professor of divinity, of law and of physic

Sec. 10. (a) The said trustees shall from time to time:

(1) elect and appoint a professor of divinity, of law and of physic, whenever they may deem it necessary for the good of the university, or when the progressed state of education in the said university may require it,

(2) agree with them for their salaries, and

(3) point out the duties of said professors.

(b) The said professors shall be considered as members of the faculty of said university and hold their appointments during the pleasure of the board of trustees.

(c) No particular tenets of religion shall be taught in said university, by its president or by the professors mentioned in this section.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1807, c. 67, s. 9, 10

### Library References

Colleges and Universities ⊕=8(2)
Westlaw Topic No. 81

C.J.S. Civil Rights §§ 122, 140
C.J.S. Colleges and Universities §§ 19 to 20.

## 23–13–18–11   Encouragement of aborigines

Sec. 11. (a) The said trustees shall use their utmost endeavors to induce the said aborigines to send their children to the said university, for education, who when sent, shall be maintained, clothed, and educated, at the expense of the said university.

293

VINCENNES UNIVERSITY                                    23–13–18–13

(b) The students, whenever the funds of the university shall, in the opinion of the trustees permit it, be educated gratis at the said university, in all or any of the branches of education which they may require.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

Formerly:
Acts 1807, c. 67, s. 11.

### Library References

Colleges and Universities ⊜9.13, 9.25(1).
Westlaw Topic No. 81.
C J S Civil Rights §§ 122, 140.

C.J.S Colleges and Universities §§ 29 to 30, 33.

## 23–13–18–12  Exemption of professor and students from militia

Sec. 12. The professors during their professorship, and the students, while at the university, shall be exempt from militia duty.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

Formerly:
Acts 1807, c. 67, s. 12.

### Library References

Militia ⊜6.
Westlaw Topic No. 259.

## 23–13–18–13  Establishment of grammar school

Sec. 13. The said trustees shall have the power to establish a grammar school, connected with, and dependent upon the said university, for the purpose of teaching the rudiments of the languages. The trustees may employ a master and ushers specially for this purpose, or employ the professor of languages to superintend the same, as the one (1) or the other may be found most convenient and economical.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

Formerly:
Acts 1807, c. 67, s. 14.

### Library References

Colleges and Universities ⊜5, 6(1).
Westlaw Topic No. 81.
C.J.S Colleges and Universities §§ 8, 10, 41.

293

Case 2:04-cv-00140-RLY-WGH   Document 59   Filed 06/16/05   Page 44 of 52   PageID #: 521

### 23–13–18–14   Construction of buildings; equipment operation, and cont- of properties; lease or purchase of property

Sec. 14. (a) The trustees of Vincennes University are hereby authorized and empowered, from time to time, and as such trustees shall find a necess therefor exists, to:

(1) erect, construct, and complete buildings, structures and otherwise improve property owned by the university;

(2) equip, furnish, operate, control and manage said properties for the purposes of the or for the benefit of the university; and

(3) acquire by purchase, lease, gift or otherwise, such property both real personal as in the judgment of said trustees shall be necessary for su purposes. The said trustees are further authorized and empowered to us any real or personal property heretofore acquired by said trustees for su purposes.

(b) Title to all property so acquired including the improvements thereon sh be taken and held by and in the name of said trustees in their corpora capacities for the purposes of this chapter.

*As added by Acts 1982, P.L.146, SEC.2.*

#### Historical and Statutory Notes

**Formerly:**
Acts 1953, c. 22, s. 1.

#### Library References

Colleges and Universities ⚖6.
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 10 to 14

### 23–13–18–15   Issuance and sale of revenue bonds; purposes; security

Sec. 15. (a) For the purpose of:

(1) raising funds for improving property as provided in section 14 of thi chapter;

(2) acquiring property as provided in section 14 of this chapter;

(3) the interim financing of the cost of any such improvement or acquisi tion;

(4) the reimbursing of the trustees of Vincennes University for funds expended or advanced for interim financing of the cost of any such improvement or acquisition, or, subject to existing covenants and agree ments with the holders of outstanding bonds, for funding or refunding bonds issued pursuant to this section; or

(5) for any one (1) or more of the foregoing;

the trustees of Vincennes University are authorized and empowered to issue and sell revenue bonds of the university.

294

**VINCENNES UNIVERSITY**

**23–13–18–15**

(b) The bonds and the interest thereon may be secured in any one (1) or more of the following ways as the trustees may determine.

(1) By pledge or mortgage of any property, real or personal, used or acquired or to be acquired and used for such purposes, and the improvements made or to be made thereon.

(2) By pledge or mortgage of the net income from said property.

(3) By the pledge or mortgage of the unobligated net revenues of any one (1) or more other properties of the trustees of Vincennes University.

(4) In the case of bonds issued under this section, for interim financing of any property, by pledge of the funds derived from the sale of the bonds issued and sold under this section for the permanent financing thereof.

(c) The lien of said pledge or mortgage, to the extent thereof, as determined and provided by the trustees, and as authorized by this section, shall be a first and primary lien for the payment of said bonds and the interest thereon. In authorizing the issuance of such bonds for any particular property or properties, the trustees of Vincennes University may limit the amount of bonds that may be issued as a first lien and charge against such property or properties and the net income therefrom, or may authorize the issuance from time to time thereafter of additional obligations secured by the same lien to provide funds for the completion of the property or properties on account of which the original bonds were issued, or for any other purpose authorized by this chapter, or both. Such additional bonds shall be issued on such terms and conditions as the trustees of Vincennes University may determine, and may be secured equally and ratably, without preference, priority or distinction, with the original issue of bonds or may be made junior thereto.

(d) If the trustees of Vincennes University determine that it would be advantageous to the corporation to exchange funding or refunding bonds for the bonds being refunded, such exchange may be made, provided the actual interest cost is not increased.

*As added by Acts 1982, P.L.146, SEC.2. Amended by P.L.2, 1995, SEC.89.*

## Historical and Statutory Notes

**1995 Legislation**

P.L.2, 1995, Sec.89, emerg. eff. May 5, 1995, which was part of the correction bill, made nonsubstantive changes.

**2002 Legislation**

P.L.173, 2002, Sec.4, eff. March 28, 2002, provides:

"The board of trustees of Vincennes University may issue and sell bonds under IC 20-12-6, subject to the approvals required by IC 20-12-5.5 and IC 23-13-18, for a Technology Building, a Performing Arts Center, and a Recreation

Building, so long as the sum of principal costs of any bonds authorized by this act for those projects, excluding amounts necessary to provide money for debt service reserves, credit enhancement, or other costs incidental to the issuance of the bonds, does not exceed twenty-five million dollars ($25,000,000). The projects are eligible for fee replacement."

**Formerly–**

Acts 1953, c. 22, s. 2

Acts 1955, c. 310, s. 1

Acts 1967, c. 341, s. 1

295

**23–13–18–15**                                        EDUCATIONAL INSTITUTIO

### Library References

Colleges and Universities ⊂═6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 16.

## 23–13–18–16   Repealed

*(Repealed by P.L.18–1983, SEC.14.)*

### Historical and Statutory Notes

P.L.18–1983 provided in Section 15, contain-
ing emergency clause, that the act takes effect
upon passage April 22, 1983.

The repealed section authorized the issuance
and sale of general obligation bonds.

Formerly:
Acts 1953, c. 22, s. 2A.
Acts 1965, c. 370, s. 2.
Acts 1967, c. 341, s. 2.
Acts 1952, P.L.146, SEC.2.

## 23–13–18–17   Amount of revenue bonds; form; terms; resolution; sale

Sec. 17. (a) Bonds authorized by section 15 of this chapter may be issued
an amount or amounts as the trustees of Vincennes University determin
However, the bonds authorized may not exceed:

(1) the total estimated cost of any proposed building, facility, work, act,
undertaking authorized, including interest during construction, inciden:
expenses, debt service reserves, and financing costs; or

(2) the amount required to effect any proposed funding or refund
operation.

(b) The bonds may be issued in the form, upon the terms and conditions
the rates of interest, and in the denominations (which may be made converti
into different denominations) as may be determined by the adoption of
resolution or approval of a form of trust indenture between the university an
designated corporate trustee, or both.

(c) The resolution or the indenture may include:

(1) provisions for protecting and enforcing the rights and remedies of
holders of the bonds being issued;

(2) covenants setting forth the duties of the corporation and its officers
relation to the acquisition, construction, operation, maintenance, u-
abandonment, insurance to be carried on its property, and the maint-
nance of fees and charges to be collected on account of its proper:

(3) provisions for the custody, safeguarding, application of all money, an
the rights and remedies of the trustee and the holders of the bonds bein
issued,

(4) provisions for the issuance of additional bonds as provided in th
resolution or indenture; and

(5) other terms, conditions, limitations, and covenants as the truste-
consider proper.

296

, (d) The bonds shall be sold at public sale or negotiated sale to the highest bidder as provided by IC 4-1-5. All bonds and the interest coupons appertaining to the bonds issued under this chapter are negotiable instruments within the meaning and for all purposes under the laws of this state, subject only to the provisions of the bonds for registration as to principal, or as to principal and interest. Any bonds registered as to principal and interest may be made convertible to bearer bonds with coupons.

(e) No action to contest the validity of any bonds issued under this chapter shall be brought after the fifteenth day following:

(1) the first publication of notice of the sale or intent to sell the bonds under IC 4-1-5, if the bonds are sold at public sale; or

(2) the publication one (1) time in newspapers described in IC 4-1-5-1 of notice of execution and delivery of the contract of sale for the bonds, if the bonds are sold at negotiated sale.

(f) The university shall publish notice under subsection (e)(2) if it sells bonds at negotiated sale no later than thirty (30) days after the execution of the contract of sale for the bonds.

(g) The rate or rates of interest of the bonds may be fixed or variable. Variable rates shall be determined under the procedures set forth in the resolution or indenture authorizing the issuance of the bonds. Bonds bearing a variable rate of interest may be converted to bonds bearing a fixed rate or rates of interest as set forth in the resolution or indenture. The interest may be payable semiannually, annually, or at other intervals as may be provided in the resolution or indenture, or the interest may be compounded and paid at maturity or at any other time as specified in the resolution or indenture. *As added by Acts 1982, P.L.146, SEC.2. Amended by P.L.18 1983, SEC.12; P.L.17 1987, SEC.21.*

### Historical and Statutory Notes

P.L. 18-1983, Sec.12, emerg. eff. April 22, 1983, substituted, in Subsec. (e), the reference to section "15" for section "16".

P.L.17-1987, Sec.21, emerg. eff. April 24, 1987, inserted the subdivision designations in Subsec. (a), included "debt service reserves" in the total estimated cost; in Subsec. (d), deleted "other than refunding bonds being exchanged as provided in section 15 of this chapter, and bonds maturing less than two (2) years for the date thereof)" and inserted "or negotiated sale"

in the first sentence; in Subsec. (e), deleted "the date fixed for the receipt of bids for such bonds" at the end of the introductory clause and added Subds. (1) and (2); added Subsecs. (f) and (g); and made other nonsubstantive changes.

**Formerly:**

Acts 1953, c. 22, s. 2B.
Acts 1967, c. 341, s. 3.

### Library References

Colleges and Universities ⊜6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 10.

## 23-13-18-18   Execution of bonds

Sec. 18. The bonds and coupons appertaining thereto shall be executed in the corporate name by the manual or facsimile signatures of such officer or officers

297

**23-13-18-18**

EDUCATIONAL INSTITU

of the university as the trustees shall designate. The signature of at ...
(1) such officer on each such bond shall be a manual signature. The s...
facsimile thereof of the university shall be affixed, imprinted, engra...
otherwise reproduced on each bond. In case any officer whose man...
facsimile signature appears on any bond or coupon shall cease to b...
officer before the delivery of such bonds, such signature shall neverthe...
valid and sufficient for all purposes as if he had remained in office un...
delivery. The resolution or trust agreement pursuant to which such bo...
issued may provide for the authentication of the bonds by the trustee des...
therein.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1953, c. 22, s. 2C.
Acts 1967 c. 341, s. 4.

### Library References

Colleges and Universities &=6(1)
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 10.

## 23-13-18-19  Bonds as eligible investments

Sec. 19  Any bonds issued pursuant to the provisions of this chapter sl...
eligible investments for the funds of any kind or character of every fin...
institution, insurance company, or private trust, and such bonds sh...
eligible for deposit by any financial institution, insurance company, or ...
under any law of this state providing for the deposit of securities or ...

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1953, c. 22, s. 2D.
Acts 1967, c. 341, s. 5.

### Library References

Colleges and Universities &=6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 10

## 23-13-18-20  Bond defined

Sec. 20. The term "bond" or "bonds" as used in this chapter shall mean ...
bonds (including refunding bonds), notes, temporary, interim or perma...
certificates of indebtedness, debentures, or other obligations evidencing inde...
edness for borrowed money.

*As added by Acts 1982, P.L.146, SEC.2.*

298

**Historical and Statutory Notes**

Formerly:
Acts 1953, c. 22, s. 2E.
Acts 1967, c. 341, s. 6.

**Library References**

Colleges and Universities ⟨6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 10.

## 23–13–18–21   Lease or sale of property not required for educational purposes

Sec. 21  The trustees of Vincennes University are authorized and empowered to lease or sell property of the university which, in the judgment of the trustees, is not required for educational purposes, together with any improvements constructed thereon or to be constructed thereon.  Such lease or sale shall be made upon such terms and conditions as said trustees deem proper.

As added by Acts 1982, P.L.146, SEC.2.

**Historical and Statutory Notes**

Formerly:
Acts 1953, c. 22, s. 4.
Acts 1967, c. 341, s. 7.

**Library References**

Colleges and Universities ⟨6(3)
Westlaw Topic No. 81
C.J.S. Colleges and Universities §§ 10 to 11.

## 23–13–18–22   Obligations not to become lien or charge against university except as provided in chapters

Sec. 22  No indebtedness, bond or obligation incurred or created under the authority of this chapter shall be or become a lien, charge or liability against the university nor against the property or funds of the university except to the extent authorized by this chapter.

As added by Acts 1982, P.L.146, SEC.2.

**Historical and Statutory Notes**

Formerly:
Acts 1953, c. 22, s. 4.
Acts 1965, c. 370, s. 3.

**Library References**

Colleges and Universities ⟨5.
Westlaw Topic No. 81
C.J.S. Colleges and Universities §§ 4, 41

299

**23–13–18–23**                                         EDUCATIONAL INSTITUTION

## 23–13–18–23   Furnishing of heat, light and power

Sec. 23. Said trustees may in their discretion furnish heat, light, power ..
other like facilities or service to any or all structures to be constructed und:
the provisions of this chapter from the plant or facilities of the university, w..
or without charge therefor.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1955, c. 22, s. 5.

### Library References

Colleges and Universities ⚖6(1).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities § 10

## 23–13–18–24   Authority to accept gifts, bequests and devises

Sec. 24. Express power and authority is hereby given to the trustees ..
Vincennes University to accept gifts, bequests, and devises of personal and rea
property for the maintenance, use in benefit of such university, or to b
administered for other public charitable purposes, for the benefit or use :
students of the university.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1955, c. 22, s. 6.

### Library References

Colleges and Universities ⚖6(2), 6(3).
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 10 to 12.

## 23–13–18–25   Terms and conditions of receipt and acceptance of gifts
                bequests and devises

Sec. 25. (a) The trustees of Vincennes University are hereby granted the
authority to receive, accept, hold, administer and use any property transferred
to them by gift, bequest or devise, with such terms and conditions, and with
such obligations, liabilities and burdens as are imposed thereon, when, in the
judgment of the trustees, it is for the best interest of the university.

(b) When any gift, devise or bequest is made for the purpose of providing an
annuity, the same may be accepted by the trustees of the university on
condition that the university pay to:

(1) the donor, for the life of the donor, or for a term of years not beyond
the lifetime of the donor, as may be agreed;

300

(2) any person or persons named by the donor or testator, in being at the time of the making of said gift, devise or bequest, for the life or lives of such named person or persons, as may be agreed upon; or

(3) the donor and/or to any person or persons named by the donor or testator, in being at the time of such gift, devise or bequest, for the life of the donor and the life or lives of such named person or persons, either in succession in a designated order of survivorship or in shares, concurrently, as may be agreed upon;

an annuity on the value of the property at the time the gift, devise or bequest is made, but such annuity shall in no case exceed the actual income of the property donated, devised or bequeathed, unless a written agreement to pay a greater sum than such annuity is executed by the trustees of such university.

(c) For the purpose of securing the payment of annuities, granted under this section, the property comprised in the gift, devise or bequest may be pledged by way of mortgage or otherwise to the annuitant or annuitants for the full period of the life of the annuity or annuities but the property pledged shall be the sole guaranty, and the donee shall not be obligated in any other manner unless by written agreement of the donee.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

Formerly:
Acts 1953, c. 22, s. 7.

### Library References

Colleges and Universities ⚖ 6(2), 6(5)
Westlaw Topic No. 81.
C.J.S. Colleges and Universities §§ 10 to 12

## 23–13–18–26   Use or disposal of property received from gift, bequest or devise

Sec. 26. The trustees of Vincennes University, may, if not inconsistent with the terms and conditions of such gift, bequest or devise, sell, convey or otherwise dispose of such real property and invest or reinvest or use the proceeds derived from such sale, conveyance or disposition as in the judgment of the trustees will be of greatest benefit to the university. All money or other proceeds derived from the sale, conveyance or other disposition of any such real property shall be kept in a separate and distinct fund, and shall be devoted exclusively to the uses which shall have been designated and prescribed in the gift, bequest or devise under the terms of which such property was originally received and acquired. If the uses to which such property is to be devoted shall not have been specifically designated or prescribed in such gift, bequest or devise, then and in that event, the trustees of the university shall have the authority to prescribe the uses to which the proceeds derived from the sale, conveyance or other disposition of any such real property shall be devoted. The purchaser of any real property so sold, or to whom any such real property

301

**23-13-18-26**

EDUCATIONAL INSTITUTIO·

is to be conveyed or otherwise disposed of shall pay the purchase mo-
therefor, as the same shall have been agreed upon, to the treasurer of
university and shall take the receipt of said treasurer therefor. Upon presen
tion of the receipt of the treasurer to the trustees of the university such truste
shall cause to be executed a deed of conveyance to such purchases, which d
shall be signed by the trustees.

*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1953, c. 22, s. 6.

### Library References

Colleges and Universities ⬡=o15.
Westlaw Topic No. 81
C.J.S. Colleges and Universities §§ 10, 14

## 23-13-18-27   Exemption of bonds from taxation

Sec. 27. All bonds issued under the authority of this chapter together wit
the interest thereon, shall be exempt from taxation as provided by IC 6-8-5
*As added by Acts 1982, P.L.146, SEC.2.*

### Historical and Statutory Notes

**Formerly:**
Acts 1953, c. 22, s. 5.

### Library References

Taxation ⬡=242.80.
Westlaw Topic No. 371
C.J.S. Taxation §§ 339 to 340

## Chapter 19

## Wabash College

**Section**
23-13-19-1   Body corporate and politic; appointment of faculty; power and duties
23-13-19-2   Board of trustees; members; elections; alumni trustees
23-13-19-3   Selection of alumni trustees

## 23-13-19-1   Body corporate and politic; appointment of faculty; power and duties

Sec. 1. (a) Wabash College is a body corporate and politic that has perpetual
succession.

(b) The board of trustees of Wabash College shall have power to appoint a
faculty in said college consisting of a president, professors, and tutors, as the

302

200